Corrie Yackulic, WSBA No. 16063
**Corrie Yackulic Law**
110 Prefontaine Place South, Suite 304
Seattle, WA 98104
corrie@cjylaw.com

Rachel B. Abrams
Samira J. Bokaie
William H. Cross
**Levin Simes Abrams LLP**
1700 Montgomery Street, Suite 250,
San Francisco, CA 94111
P: (415) 426-3000 | F: (415)-426-3001
rabrams@levinsimes.com
wcross@levinsimes.com

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| JEFFREY HUNTINGTON,<br><br>Plaintiff,<br><br>vs.<br><br>SMOKE CITY FOR LESS LLC d/b/a SMOKE CITY FOR LESS; LG CHEM LTD.; AND DOES 1-50<br><br>Defendants. | **Case No.: 4:22-cv-05014**<br><br>**DECLARATION OF SAMIRA BOKAIE IN SUPPORT OF PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT LG CHEM, LTD.'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION** |

I, Samira Bokaie, declare and state as follows:

1. I am an attorney at law duly licensed to practice law in all courts of the State of California and admitted *pro hac vice* in this case. I am an attorney at Levin Simes Abrams LLP and counsel for Plaintiff Jeffery Huntington. I have

personal knowledge of the facts stated herein, and if called as a witness, I could and would competently testify thereto under oath.

2. Attached hereto as **Exhibit 1** is a true and correct copy of LG Chem, Ltd.'s webpage, available at https://www.lgchem.com/company/company-information/about.hed.
3. Attached hereto as **Exhibit 2** is a true and correct copy of *Celgard LLC v. LG Chem, Ltd.*, No. 3:14-cv-00043, Docket No. 128, Order (W.D.N.C. July 18, 2014).
4. Attached hereto as **Exhibit 3** is a true and correct copy of Celgard LLC v. LG *Chem, Ltd.*, No. 3:14-cv-00043, 2015 WL 2412467 (W.D.N.C. May 21, 2015).
5. Attached hereto as **Exhibit 4** is a true and correct copy of an article from the Seattle Bike Blog confirmed Bird and Lime are permitted by Seattle to operate there.
6. Attached hereto as **Exhibit 5** is a true and correct copy of an article from Bird's blog indicating it has been allowed to operate in Seattle.
7. Attached hereto as **Exhibit 6** is a true and correct copy of Lime's Locations webpage.
8. Attached hereto as **Exhibit 7** is a true and correct copy of an article in Quartz, indicating Bird purchases its Scooter from Xiaomi.

9. Attached hereto as **Exhibit 8** is a true and correct copy of a Xiaomi's Mi's product specifications, indicating it contains LG Chem 18650 lithium ion batteries.

10. Attached hereto as **Exhibit 9** is a true and correct copy of a Proterra press release announcing co-development of a battery cell optimized for use in Proterra's electric buses.

11. Attached hereto as **Exhibit 10** is a true and correct copy of a Proterra press release announcing its sale of two of its buses to King County Metro.

12. Attached hereto as **Exhibit 11** is a true and correct copy of a Kitsap Transit Press Release indicating Kitsap Transit purchased its first Proterra bus in 2017.

13. Attached hereto as **Exhibit 12** is a true and correct copy of a Pierce County Transit Authority informational website indicating its fleet contains three Proterra buses.

14. Attached hereto as **Exhibit 13** is a true and correct copy of a Proterra press release indicating it was selected by the Washington State Department of Enterprise Services as a vendor to supply Proterra buses and charging infrastructure to the state.

15. Attached hereto as **Exhibit 14** is a true and correct copy of a map from Chevrolet's website indicating where Chevrolets, including the Chevy Volt, may be purchased in and around Spokane, Washington.

16. Attached hereto as **Exhibit 15** is a true and correct copy of an inventory list from Chevrolet's dealer website for AutoNation Chevrolet, Spokane Valley in Spokane Valley, Washington indicating it has Chevy Volts available for sale.

17. Attached hereto as **Exhibit 16** is a true and correct copy of an inventory list from Chevrolet's dealer website for Chuck Olson Chevrolet in Shoreline, Washington indicating it has Chevy Volts available for sale.

18. Attached hereto as **Exhibit 17** is a true and correct copy of an inventory list from Chevrolet's dealer website for Burien Chevrolet in Burien, Washington, indicating it has Chevy Volts available for sale.

19. Attached hereto as **Exhibit 18** is a true and correct copy of a CNBC article covering the recall of 140,000 electric vehicles due to the risk of the batteries "spontaneously catching fire."

20. Attached hereto as **Exhibit 19** is a true and correct copy of a product overview from Gelish's website indicating it nail-drying system operates using LG Chem lithium batteries.

21. Attached hereto as **Exhibit 20** is a true and correct copy of a map from Gelish's website indicating spas that use the Gelish system in the greater Seattle area.

22. Attached hereto as **Exhibit 21** is a true and correct copy of a Pulse article documenting LG Electronics Inc.'s release of the CordZero vacuum and indicating it runs on LG Chem lithium ion batteries.

23. Attached hereto as **Exhibit 22** is a true and correct copy of a map from LG's own website showing where in Spokane, Washington its CordZero cordless vacuum may be purchased.

24. Attached hereto as **Exhibit 23** is a true and correct copy of the Deposition of Joon Young Shin in the matter Flores v. LG Chem, Ltd. et al., Case No. 16-cv-297 (November 29, 2017), Southern District of Texas (hereinafter "Shin Dep.") at p. 28:20-21.

25. Attached hereto as **Exhibit 24** is a Declaration of Nickie Bonenfant of ImportGenius. Due to clerical oversight, we discovered late today that we do not have a signed copy of Ms. Bonenfant's Declaration and have been unable to reach her. Ms. Bonenfant has previously affirmed the statements in her Declaration, and Plaintiff will file a signed version of her Declaration shortly after the filing of Plaintiff's Response in Opposition.

///

///

///

///

///

///

///

Executed on January 18, 2022, at San Francisco, California.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 18th day of January, 2023.

Respectfully submitted,

LEVIN SIMES ABRAMS, LLP

Samira Bokaie
*Admitted Pro Hac Vice*
Rachel B. Abrams
*To Be Admitted Pro Hac Vice*
**Levin Simes Abrams, LLP**
1700 Montgomery Street
Suite 250
San Francisco, CA 94111
Telephone: (415) 426-3000
Facsimile: (415) 426-3001
sbokaie@levinsimes.com

Corrie Yackulic, WSBA No. 16063
**Corrie Yackulic Law**
110 Prefontaine Place South, Suite 304
Seattle, WA 98104
corrie@cjylaw.com

*Attorneys for Plaintiff*

# EXHIBIT 1

LG Chem
(/)

ENG

# About Us



Company Profile
(/upload/file/introduce/Introducing_LG_Chem_ENG

Electronically Filed 10/09/2019 14:23 / BRIEF / CV 19 917268 / Confirmation Nbr. 1838344 / BATCH

## Having continued to grow over 7 decades since founded in 1947, LG Chem is literally the company leading the chemical industry in Korea.

The company has built the global network for production, sales and R&D not only in Korea btn also in main bases across the world and has provided globally competitive products including ABS, polarizers and EV battery cells, raising its global position as a material supplier.

The company has strengthened market dominance starting from the Petrochemicals business to Energy Solution, Advanced Materials and has expanded its business into Life Science area, building a future-oriented business portfolio. In the long term, the company will build the foundation for sustainable growth by selecting and concentrating on the 'energy', 'water' and 'bio' businesses as the new growth engines.

LG Chem is committed to becoming a global company that realizes the vision of "growing with customers by providing innovative materials and solutions" and provides new values to customers.

## LG Chem, Ltd.

| | | |
|---|---|---|
| Foundation | **January 1947** | Milestone (/company/company-information/company-history) |
| CEO | **Shin Hak Cheol** | |
| Employees (As of December 2018) | **33,694** | |
| Headquarters | **LG Twin Towers,128, Yeoui-daero, Yeongdeungpo-gu, Seoul, South Korea** | |

Financial Snapshot (As of December 2018)

| | |
|---|---|
| **Sales** | **KRW 28.2 trillion** |
| **Operating Income** | **KRW 2.25 trillion** |

Electronically Filed 10/09/2019 14:23 / BRIEF / CV 19 917268 / Confirmation Nbr. 1838344 / BATCH

# Global Network

Business Areas

**Petrochemicals, Energy Solutions, Advanced Matrerials, Life Sciences**

**5**

**Europe**

(/company/company-information/global-network/overseas-corporation/europe)

**7**

**America**

(/company/company-information/global-network/overseas-corporation/america)

**19**

**Korea(HQ)**

(/company/company-information/global-network/domestic-corporation)

**30**

**Asia**

(/company/company-information/global-network/overseas-corporation/asia)

**1**

**Oceania**

(/company/company-information/global-network/overseas-corporation/oceania)

**Related Sites**

History Highlights

Privacy Policy (/privacy/privacy_v7) Rejection of unauthorized e-mail collection

Ethics Hotline (http://ethics.lg.co.kr/realName/insertDetailForm.do)

©LG Chem. All Rights Reserved.

This site uses cookies. By continuing to browse the site, you agree to the use of cookies.

Electronically Filed: 09/20/2019 1:28 / BRIEF / CV19-917263 / Confirmation Nbr. 1838344 / BATCH

Electronically Filed 10/09/2019 14:23 / BRIEF / CV 19 917268 / Confirmation Nbr. 1838344 / BATCH

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**3:14-cv-43**

| | | |
|---|---|---|
| **CELGARD, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **ORDER** |
| **Vs.** | ) | |
| | ) | |
| **LG CHEM, LTD. and** | ) | |
| **LG CHEM AMERICA, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**THIS MATTER** is before the Court on LG Chem, Ltd. ("LG Chem") and LG Chem America, Inc.'s ("LGCAI") (together, "Defendants") Motion to Dismiss for Lack of Personal Jurisdiction (#30); Defendants' Motion to Transfer Venue (#71); and Celgard, LLC's ("Celgard" or "Plaintiff") Motion for Preliminary Injunction (#15) and Motion for Jurisdictional Discovery (#58). The Court heard oral arguments on these motions on May 14, 2014.

Having considered the motion and reviewed the pleadings, the Court enters the following Findings, Conclusion, and Order granting Plaintiff's Motion for Jurisdictional Discovery and Motion for Preliminary Injunction to be reviewed after 60 days.

**FINDINGS AND CONCLUSIONS**

## I. Background

### A. The '586 Patent

Plaintiff brought this action for patent infringement, alleging that defendant is infringing upon its interest in United States Patent No. 6,432,586 (the "'586 patent"). The patent relates to "separators" used in the construction of high energy rechargeable lithium-ion batteries. Compl. ¶ 7, ECF No. 1; '586 Patent Abstract 1, ECF No. 1-A. These separators are designed to address



Electronically Filed 10/09/2019 14:23 / BRIEF / CV 19 917268 / Confirmation Nbr. 1838344 / BATCH

"dendrite growth" in lithium batteries, a common problem associated with the high energy anodes used in such high energy batteries. Abstract 1:20-22. Dendrite growth penetrates the separator, creating direct contact between the anode and cathode within each cell of the battery, thereby causing "electronic" shorting of the battery. Abstract 1:22-31. A minimal amount of shorting may only reduce the efficiency of the battery; however, electronic shorting can also cause a phenomenon known as "thermal runaway" of the battery, a serious safety problem for rechargeable lithium batteries. Id. at 1:33-35. According to the Patent Abstract, the dendrite growth limits the commercial application of lithium-ion batteries. Id. at 1:36-39.

The instant invention contemplates a separator designed to address these problems. Id. at 1:45-51. A ceramic composite layer is designed to block dendrite growth and prevent direct contact between the anode and cathode, and a polymeric micro-porous layer is designed to address "thermal runaway" in the event of contact between the anode and cathode. Id. at 2:52-60. A battery with such a separator is less likely to fail, catch fire, or experience a short, and is more likely to last longer. Pl. Mem. in Supp. Prel. Inj. 4, ECF No. 16. Celgard filed a patent application for the invention on April 10, 2000, and the Patent Office issued the patent on April 13, 2002.

**B. Alleged Infringement**

Plaintiff brings two claims against Defendants: direct and induced infringement of the '586 Patent in violation of 35 U.S.C. § 271(a)-(b). The Complaint generally alleges that Defendants obtains, either from a third-party manufacturer or through its own production, "uncoated polymeric base films" to which it applies a ceramic coating layer to create battery separators that fall within the scope of the '586 Patent. Compl. ¶ 10-12. The separators are then either sold to third parties or are used in Defendants' own production of lithium-ion batteries, all

allegedly in violation of the '586 Patent. Id. at 13. According to the Complaint, batteries containing the infringing separator—whether manufactured by Defendants or a third-party—are used in various consumer electronic devices such as laptops and tablets, and are also used in electric vehicles. Id. at ¶ 19.

### C. Factual Setting of this Dispute

In contrast to the typical patent litigation in which the parties produce the same or similar product, compete for the same customers, and have little or no prior relationship with the opposition, the parties in this case have been involved with each other in the production of lithium ion batteries since 2005. According to the Complaint and accompanying affidavits, beginning in 2005 and continuing through 2008, Celgard supplied LGC, on an as-needed purchase order basis, with uncoated base films to be used in the production of lithium-ion batteries for consumer-electronic products. In 2008, at LGC's request, the relationship significantly expanded as the parties entered into discussions regarding the prospect of Celgard becoming LGC's exclusive supplier of base film for lithium-ion batteries to be used in electric vehicles ("EVs").

As the parties began negotiating the terms of a Long Term Supply Agreement ("LTA") that would solidify their new relationship, LGC notified Celgard that it would need to increase its production capacity to satisfy LGC's supply demands. Pulwer Decl. ¶ 8, ECF No. 18. Negotating the terms of the LTA for Celgard was its Vice President and General Manager Mitch Pulwer. Id. at ¶ 1. During these negotiations, Jai Ham, a Vice President of LGC, explained to Pulwer that if Celgard "demonstrated its commitment" to LGC and their new relationship by expanding its production capacity, LGC would enter into the LTA, with Celgard becoming the exclusive supplier of base film in its EV program. Id. at ¶ 9. In reliance on this representation

and in order to meet LGC's supply demands, Celgard began a five-phase expansion project including an expansion to its Charlotte, North Carolina, facility and the construction of a new facility in Concord, North Carolina, costing in excess of $300,000,000. Id. at ¶ 9.

Despite Celgard's expansion, the parties were unable to reach an agreement on the LTA. According to Celgard, LGC continuously rejected terms to which the parties had previously agreed, made counterproposals that included only minor changes, and requested changes that included terms that it had rejected during previous rounds of negotiations. Id. at ¶ 11. The parties were able to agree to a Memorandum of Understanding ("MOU") as a precursor to an LTA. MOU 1, ECF No. 18-1 ("MOU . . . is made in anticipation of the parties entering into a long-term supply agreement").

Under the MOU the parties agreed to "work together in a collaborative effort" during the Collaborative Period which ran from March 11, 2011, to December 31, 2015. Id. However, the agreement was non-binding and stated that neither party was bound to enter into a subsequent supply agreement. Id. Generally speaking, the MOU includes the following principal terms: (1) that LGC will purchase separator "primarily" from Celgard as long as Celgard is able to supply separator to LGC meeting certain qualifications and "overall program objectives which includes price competitiveness, in the quantity needed"; (2) that "LGC intends to purchase the majority of separator required for each application in which Celgard is qualified as long as the Celgard separator" meets the above conditions; and (3) that LGC will give "priority" to Celgard separator in any new application for the electric drive vehicle ("EDV") and energy storage system ("ESS") markets. Id.

Following the execution of the MOU in 2011, the parties' relationship began to sour over price and quantity disputes. According to Celgard, between 2009 and July 2013, LGC purchased

all its base film requirements for the EV industry from Celgard. In November of 2012, LGC demanded that Celgard significantly reduce its prices and threatened to use other base film suppliers should Celgard refuse. Pulwer Decl. ¶ 19. Believing the LGC's price demands were contrary to past negotiations and course of dealings, Celgard refused to lower its prices. After that, the parties' relationship spiraled downward. In June 2013, LGC gave notice that Celgard was being phased out of the EV program beginning in September 2013, with Celgard being completely out by April 2014. Id. at ¶ 25. Celgard filled all outstanding orders but stopped taking additional purchase orders. Its final shipment of base film material to LG Chem was in July 2013. Celgard filed this suit in January 2014.

## II. Personal Jurisdiction and Venue

Defendants move to dismiss the Complaint for lack of personal jurisdiction, contending that they lack the minimum contacts necessary to establish personal jurisdiction in the state of North Carolina. LGC is a Korean Company with no offices or personnel in the United States. It contends that it does not manufacture the allegedly infringing batteries within the United States. Instead, the batteries are manufactured in Asia and then sold to customers outside of the State of North Carolina. LGCAI is a Delaware company with headquarters in New Jersey. It contends that it has little involvement in the production of the lithium ion batteries. It further contends that while it is registered to do business in the State of North Carolina, it has no offices or personnel in the state, and "simply does not sell the accused products or conduct the accused business" in the State of North Carolina. Def.'s Mem. 1.

Federal Circuit case law applies in determining whether this Court has personal jurisdiction over an out-of-state accused infringer. Beverly Hills Fan Co. v. Royal Sovereign Corp., 21 F.3d 1558, 1564-65 (Fed. Cir. 1994). Federal courts apply the relevant state statute

when determining whether a federal court, sitting in a particular case, has personal jurisdiction over a defendant, even when the cause of action is purely federal. Id. at 1569. Because North Carolina's long-arm statute is co-extensive with federal due process requirements, the jurisdictional inquiry collapses into a single determination of whether this Court's exercise of jurisdiction over Defendants comports with due process. Dillon v. Numismatic Funding Corp., 291 N.C. 674, 676 (1977). "The constitutional touchstone for determining whether an exercise of personal jurisdiction comports with due process 'remains whether the defendant purposefully established minimum contacts in the forum State.'" Nuance Commc'ns, Inc. v. Abbyy Software House, 626 F.3d 1222, 1230-31 (Fed. Cir. 2010) (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474, (1985) (internal quotation marks omitted)).

Having considered such threshold motions, the Court will allow Celgard's Motion for Jurisdictional Discovery (#58) into whether LGC and LGCAI have established minimum contacts in North Carolina such that the maintenance of a suit in this forum would not "offend traditional notions of fair play and substantial justice." Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414, 104 S. Ct. 1868, 1872, 80 L. Ed. 2d 404 (1984). The Court does not agree with Defendants assertion that by filing this motion Plaintiff has "essentially concede[d]" that it has failed to establish a prima facie case of personal jurisdiction over Defendants. Def.'s Resp., ECF No. 75 at 1. The Court will refer this matter, as well as the Motion to Change Venue, back to the Magistrate Judge for limited discovery and disposition of those motions.

**III. Preliminary Injunction**

A preliminary injunction is an extraordinary remedy, the primary function of which is to protect the status quo and to prevent irreparable harm during the pendency of a lawsuit. In re



Electronically Filed 10/09/2019 14:23 / BRIEF / CV 19 917268 / Confirmation Nbr. 1838344 / BATCH

Microsoft Corp. Antitrust Litigation, 333 F.3d 517, 525 (4th Cir.2003). A plaintiff seeking a preliminary injunction must give notice to the opposing party under Federal Rule of Civil Procedure 65 and, at the hearing, must establish the following: (1) plaintiff is likely to succeed on the merits; (2) plaintiff is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of the equities tips in plaintiff's favor; and (4) an injunction is in the public interest. Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 129 S.Ct. 365, 374 (2008); Moore v. Kempthorne, 465 F.Supp.2d 519, 525 (E.D.Va.2006) ("[t]he standard for granting either a TRO or a preliminary injunction is the same").

The most recent test was adopted by the Court of Appeals for the Fourth Circuit in The Real Truth About Obama, Inc. v. Fed. Election Comm'n, 575 F.3d 342, 346–47 (4th Cir.2009), *vacated on other grounds*, 130 S.Ct. 2371, 176 L.Ed.2d 764 (2010)(memorandum opinion), *reissued in pertinent part*, 607 F.3d 355 (4th Cir.2010), *overruling* Blackwelder Furniture Co. v. Selig Mfg. Co., 550 F.2d 189 (4th Cir.1977) (providing a four-pronged balance of the hardships test). The Winter Court emphasized that a plaintiff must demonstrate more than just a "possibility" of irreparable harm and a strong showing of likelihood of success on the merits. Winter, 129 S.Ct. at 375.

**A. Likelihood of Success on the Merits**

The court finds that plaintiff is likely to prevail on the merits of its claim. To establish likelihood of success on the merits, plaintiff must show that (1) it will likely prove infringement of one or more claims of the patent and (2) if validity is challenged, that the infringed claims are likely valid. Sanofi-Synthelabo v. Apotex, Inc., 470 F.3d 1368, 1374 (Fed. Cir. 2006). Whether plaintiff has made an adequate showing is viewed by considering "presumptions and burdens that will inhere at trial on the merits." Id. If the court ultimately finds that defendants likely

infringe on any claim of the patent, this factor must be weighed in favor of plaintiff. Having reviewed description of the claims detailed the claim charts, it appears likely that the SRS sold, offered for sale, used, and imported into this country by defendants infringes at least claim 1 of the '586 patent.

Thus, the court finds this factor weighs in favor of preliminary injunctive relief.

**B. Irreparable Harm**

While it is clear that plaintiff has already suffered harm, the court has concluded that if the alleged infringing activity were allowed to continue, it is very likely that plaintiff will suffer irreparable harm in the absence of preliminary relief. This harm includes plaintiff losing goodwill, laying off employees, and loss of market share to at least some competitors who appear to be engaged in infringing activity. The court finds that this factor weighs heavily in favor of preliminary injunctive relief.

**C. Balance of the Equities**

Defendants' right to source materials from whatever vendor it is confident in and can receive the lowest price is a cornerstone of the free market carries with it substantial weight. On the other hand, the property interest plaintiff has in its patented technology, and protecting that intellectual property from misappropriation, also carries with it substantial weight. Such equitable consideration is further informed by the impact this court's action on the motion will have on either party's ability to compete: without the injunction, plaintiff is likely to be shut out of automotive marketplace; with the injunction, defendants will have to pay slightly more for supplies from plaintiff. The former harm appears to be irreparable, while the latter harm is compensable in that defendants can be reimbursed if plaintiff fails to prevail in this action. The court finds this factor weighs in favor of preliminary injunctive relief.

### D. Public Interest

Finally, the court has considered the public interest. While the public is certainly interested in being able to buy end products at the lowest possible price through a free and robust market, a public market place that contains goods sourced or produced in a manner that trammels on the very intellectual property that has allowed the product to come to market, while perhaps enjoying lower prices in the short term, is harmed in the long run as such activity discourages investment research and development. Here, plaintiff holds a patent for a very important technological development that ultimately benefits consumers by allowing for the delivery of *safe* electric power to mobile devices by reducing the risk of fire posed by dendrite growth. The court need not look far past the headlines in recent years to understand how important such development is in preventing fire.

The imposition such proposed injunction will place on defendants is minimal in protecting the public interest which is not only in low-priced goods, but in protecting the property interests of those who apply resources to solving not only technological problems, but problems that could have great impact on public safety. Put another way, an injunction which ultimately prevents an upstream misappropriator from profiting from its alleged theft of protected technology by limiting the downstream user is not a hardship because it "simply prevents [the misappropriator] from doing that which the law already prohibits." Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc., No. 1:04CV977, 2007 WL 4262725, at *3 (M.D.N.C. Nov. 30, 2007); Prudential Ins. Co. v. Inlay, 728 F.Supp.2d 1022, 1032 (N.D.Iowa 2010) (noting that balance of harms favors plaintiff where an injunction restricts the defendant's ability "from using information that it appears he should not be able to use at all for the [applicable] period."). The court has no reason to believe that defendants ability to produce

# EXHIBIT 3

# Celgard, LLC v. LG Chem, Ltd.

United States District Court, W.D. North Carolina, Charlotte Division. | May 21, 2015 | Not Reported in F.Supp.3d | 2015 WL 2412467

**Outline**
Attorneys and Law Firms
ORDER
All Citations

## Document Details

KeyCite: **KeyCite Yellow Flag - Negative Treatment**
Distinguished by Rosinbaum v. Flowers Foods, Inc., W.D.N.C., June 8, 2016
**KeyCite Overruling Risk - Negative Treatment**
Overruling Risk TC Heartland LLC v. Kraft Foods Group Brands LLC, U.S., May 22, 2017

standard Citation: Celgard, LLC v. LG Chem, Ltd., No. 3:14-CV-00043-MOC-DC, 2015 WL 2412467 (W.D.N.C. May 21, 2015)

All Citations: Not Reported in F.Supp.3d, 2015 WL 2412467

## Search Details

Jurisdiction: North Carolina

## Delivery Details

Date: September 30, 2019 at 3:02 PM

Delivered By: Taylor Lacy

Client ID: 662417000-WTL

Status Icons:

Inline KeyCite: Inline KeyCite completed successfully.

KeyCite Yellow Flag - Negative Treatment
Distinguished by Rosinbaum v. Flowers Foods, Inc., W.D.N.C., June 8, 2016

KeyCite Overruling Risk - Negative Treatment
Overruling Risk TC Heartland LLC v. Kraft Foods Group Brands LLC, U.S., May 22, 2017

2015 WL 2412467
Only the Westlaw citation is currently available.
United States District Court, W.D. North Carolina,
Charlotte Division.

CELGARD, LLC, Plaintiff,
v.
LG CHEM, LTD., and LG Chem America, Inc., Defendants.

No. 3:14–cv–00043–MOC–DCK.
|
Signed May 21, 2015.

**Attorneys and Law Firms**

Charles Bailey King, Jr., Fred M. Wood, Jr., Smith Moore Leatherwood LLP, Charlotte, NC, Richard A. Coughlin, Smith Moore LLP, Greensboro, NC, Andrew Douglas Hedden, Robins Kaplan LLP, Minneapolis, MN, Bryan J. Vogel, Robins Kaplan LLP, New York, NY, Jamie R. Kurtz, Martin R. Lueck, Robins, Kaplan, Miller & Ciresi, L.L.P., Minneapolis, MN, for Plaintiff.

David Matthew Wilkerson, Larry Stephen McDevitt, Van Winkle Buck Wall Starnes & Davis PA, Asheville, NC, Kevin C. Wheeler, Leah A. Edelman, Michael J. McKeon, Fish & Richardson P.C., Washington, DC, F. Lane Williamson, Tin Fulton Walker & Owen, Charlotte, NC, for Defendant.

ORDER

MAX O. COGBURN, JR., District Judge.

***1 THIS MATTER** is before the court on Plaintiff's "Objections to Magistrate Judge's Order Granting Defendants' Alternative Motion to Transfer Venue" (Document No. 266), the associated response (Document No. 269), and the supplemental briefs allowed by the court (Document Nos. 275–1; 278). The court heard oral argument on the objections on April 8, 2015. Also before the court are Defendants' "Motion To Dismiss Counts III, IV, V, VI of Celgard's First Amended Complaint ..." (Document No. 222), Defendants' "Motion To Dismiss Plaintiff's First Amended Complaint For Lack Of Personal Jurisdiction" (Document No. 226), and the associated briefs. Having considered the briefs, the oral arguments of counsel as to the objections, the Magistrate Judge's Order, and the record in this matter, the court enters the following Order.

## I. INTRODUCTION

Celgard, LLC ("Plaintiff" or "Celgard") initiated this patent infringement action on January 30, 2014, asserting claims against LG Chem, Ltd. ("LGC") and LG Chem America, Inc. ("LGCAI") (together "LG Chem" or "Defendants") for: (1) direct infringement of U.S. Patent No. 6,432,586; and (2) induced infringement of U.S. Patent No. 6,432,586. (Document No. 1, pp. 10–12). The underlying patent, U.S. Patent No. 6,432,586 (the " '586 patent"), is titled "Separator for a High Energy Rechargeable Lithium Battery," and relates to "separators" used in the construction of high energy rechargeable lithium-ion batteries. *See* (Document No. 1, ¶ 7); (Document No. 1–A, p. 1). Put simply, this technology reduces the likelihood that a battery will fail, catch fire, or experience a short. *See* (Document Nos. 16, p. 4; 1–A, p. 1).

Plaintiff's Amended Complaint generally alleges that LG Chem obtains uncoated polymeric base films from third parties, to which it applies a ceramic coating layer to create battery separators that fall within the scope of the '586 Patent. (Document No. 217, ¶ 51). The separators are then sold by LGC and/or LGCAI to third parties, or used in Defendants' own production of lithium-ion batteries, all allegedly in violation of the '586

Patent. *Id.* at ¶¶ 106–09. Plaintiff alleges that batteries containing infringing separators manufactured by Defendants are used in various consumer electronic devices and electric vehicles that are sold throughout the United States, including North Carolina. *Id.* at ¶¶ 16, 52–53, 106.

### A. Factual Background and Relationship Of The Parties

As previously discussed by this court, *see* (Document No. 128), the factual setting of this patent dispute is somewhat unique and, as it relates to the contested issue of personal jurisdiction, bears repeating here. In contrast to the typical patent litigation in which the parties produce the same or similar product, compete for the same customers, and have little or no prior relationship with the opposition, the parties in this case have been involved with each other in the production of lithium ion batteries since 2005. Beginning in 2006 and continuing through 2008, Celgard supplied LGC, on an as-needed purchase order basis, with uncoated base films to be used in the production of lithium-ion batteries for consumer-electronic ("CE") products. (Document No. 18, Declaration of Mitchell Pulwer ("Pulwer Decl."), ¶¶ 4–5; Document No. 217, ¶ 67). In 2008, at LGC's request, the relationship significantly expanded as the parties entered into discussions regarding the prospect of Celgard becoming LGC's exclusive supplier of base film for lithium-ion batteries to be used in electric vehicles ("EVs"). (Pulwer Decl., ¶ 6; Document No. 217, ¶ 17).

***2** As the parties began negotiating the terms of a Long Term Supply Agreement ("LTA") that would solidify their new relationship, LGC notified Celgard that it would need to increase its production capacity to satisfy LGC's supply demands. (Pulwer Decl. ¶ 8). Negotiating the terms of the LTA for Celgard was its Vice President and General Manager Mitch Pulwer. *Id.* at ¶ 1. During these negotiations, Jai Ham, a Vice President of LGC, explained to Pulwer that if Celgard "demonstrated its commitment" to LGC and their new relationship by expanding its production capacity, LGC would enter into the LTA, with Celgard becoming the exclusive supplier of base film for LGC's EV program. *Id.* at ¶ 8. Plaintiff states that in reliance on this representation and in order to meet LGC's supply demands, Celgard began a five-phase expansion project including an expansion to its Charlotte, North Carolina facility and the construction of a new facility in Concord, North Carolina, costing in excess of $300,000,000. *Id.* at ¶ 9; (Document No. 217, ¶ 68–70). LGC stopped purchasing base film for use in CE devices in 2008 in order for Plaintiff to be able to focus exclusively on producing base film for EVs. (Pulwer Decl. ¶ 6).

Despite Celgard's expansion, the parties were unable to reach an agreement on the LTA. According to Celgard, LGC continuously rejected terms to which the parties had previously agreed, made counterproposals that included only minor changes, and requested changes that included terms that it had rejected during previous rounds of negotiations. *Id.* at ¶ 11. The parties were able to agree to a Memorandum of Understanding ("MOU") as a precursor to an LTA. *Id.* at ¶ 13; MOU (Document No. 18–1), p. 2 ("LGC and Celgard understand that this is a non-binding MOU and is made in anticipation of the parties entering into a long-term supply agreement").

Under the MOU, the parties agreed to "work together in a collaborative effort" during the "Collaboration Period," which ran from March 11, 2011, to December 31, 2015. *Id.* at p. 2–3. However, the agreement was non-binding and stated that neither party was bound to enter into a subsequent supply agreement. *Id.* Generally speaking, the MOU includes the following principal terms: (1) that LGC will purchase separators[1] "primarily" from Celgard as long as Celgard is able to supply separators to LGC meeting certain qualifications and "overall program objectives which includes price competitiveness, in the quantity needed"; (2) that "LGC intends to purchase the majority of separator required for each application in which Celgard is qualified as long as the Celgard separator" meets the above conditions; and (3) that LGC will give "priority" to Celgard separators in any new application for the electric drive vehicle ("EDV") and energy storage system ("ESS") markets. *Id.*

Following the execution of the MOU in 2011, the parties' relationship began to sour over price and quantity disputes. According to Celgard, between 2009 and July 2013, LGC purchased substantially all of its base film requirements for the EV industry from Celgard. (Pulwer Decl., ¶ 19). In November of 2012, LGC demanded that Celgard significantly

reduce its prices and threatened to use other base film suppliers should Celgard refuse. *Id.* at ¶ 21. Believing that LGC's price demands were contrary to past negotiations and course of dealings, Celgard refused to lower its prices. *Id.* at ¶ 23. After that, the parties' relationship spiraled downward. In June 2013, LGC gave notice that Celgard was being phased out of the EV program beginning in September 2013, with Celgard being completely out by April 2014. *Id.* at ¶ 25. Celgard filled all outstanding orders but stopped taking additional purchase orders from LGC. *Id.* at ¶ 26. Its final shipment of base film material to LGC was in July 2013. (Document No. 80 ("Paulus Decl."), ¶ 7). Celgard filed this suit in January 2014, bringing the above-mentioned claims for patent infringement.

**B. Procedural History**

***3** Approximately one month after filing the original complaint in this matter, on March 5, 2014, Plaintiff filed a "Motion For Preliminary Injunction." (Document No. 15). On March 19, 2014, Defendants filed a "Motion To Dismiss Plaintiff's Complaint For Lack Of Personal Jurisdiction" (Document No. 30). On April 7, 2014, Plaintiff filed an "Alternative Motion For Jurisdictional Discovery." (Document No. 58). On April 23, 2014, Defendants filed an "Alternative Motion To Transfer Venue To The Eastern District Of Michigan." (Document No. 71). On May 14, 2014, the undersigned held a hearing on the aforementioned motions, during which the court primarily considered arguments on the issues of personal jurisdiction and a preliminary injunction.

The undersigned issued an "Order" (Document No. 128) on July 18, 2014, granting Plaintiff's "Motion For Preliminary Injunction" (Document No. 15) and Plaintiff's "Alternative Motion For Jurisdictional Discovery" (Document No. 58), and directing that "The LG Chem Defendants' Motion To Dismiss Plaintiff's Complaint For Lack Of Personal Jurisdiction" (Document No. 30) and "The LG Chem Defendants' Alternative Motion To Transfer Venue To The Eastern District Of Michigan" (Document No. 71) be referred to Magistrate Judge Keesler for consideration after jurisdictional discovery. The Order also discussed the factual setting, the history of the parties' business transactions, the relationship of the parties to North Carolina, and the appropriateness of jurisdictional discovery. (Document No. 128, at p. 2–6). Judge Keesler issued an "Order" (Document No. 139) on July 21, 2014, setting limits and deadlines for jurisdictional discovery. Also on July 21, 2014, Defendants filed a "Notice of Appeal" as to the Order granting the Preliminary Injunction. (Document No. 150). On July 22, 2014, the undersigned issued an Order, (Document No. 160), granting Defendants' "Motion to Stay Preliminary Injunction Pending Appeal." On August 13, 2014, the undersigned entered an Order, (Document No. 188), denying Plaintiff's Motion for Reconsideration of the Order Granting LG Chem's Motion to Stay. (Document No. 165). On August 15, 2014, Plaintiff filed a "Notice of Appeal" (Document No. 191) as to the Order granting Defendants' Motion to Stay, and from the Order denying Plaintiff's Motion for Reconsideration. Both appeals are currently before the Court of Appeals for the Federal Circuit. *See Celgard, LLC v. LG Chem, Ltd .,* No. 14–01675, (Fed.Cir.2014).

On August 26, 2014, Judge Keesler issued an "Order And Memorandum And Recommendation" (Document No. 204) allowing Plaintiff to file an Amended Complaint incorporating the results of jurisdictional discovery, and recommending that the pending motions to dismiss and transfer (Document Nos. 30 and 71) be denied as moot.

Plaintiff filed its "First Amended Complaint" (Document No. 217) on September 5, 2014. The Amended Complaint re-asserts claims for direct infringement and induced infringement of the '586 Patent by both Defendants. Plaintiff alleges that after the parties' business relationship went sour, "Defendants walked away from their prior commitments and chose to purchase, coat and sell infringing ceramic coated separator with base film from other suppliers, despite their knowledge that these actions infringed on Celgard's exclusive patent rights." (Document No. 217, ¶ 1). The Amended Complaint also adds claims against LGC (only) for: unfair and deceptive trade practices; breach of contract; breach of the implied covenant of good faith and fair dealing; and, in the alternative, unjust enrichment. *Id.* at ¶¶ 115–143. The new claims against LGC relate to Plaintiff's role as a supplier of separator base film for lithium-ion batteries manufactured by LGC for EVs. *Id.* at ¶ 1. Plaintiff's additional counts contend that LGC is liable for its "repeated false promises to use Celgard as its exclusive and/or primary long-term supplier of base film for the

electric vehicle industry.” *Id.* ¶ 116.

***4** On September 29, 2014, Defendants filed: (1) “Motion To Dismiss Counts III, IV, V, VI, Celgard’s First Amended Complaint ...” (Document No. 222); (2) “Motion To Dismiss Plaintiff’s First Amended Complaint For Lack Of Personal Jurisdiction” (Document No. 226); and (3) “Alternative Motion To Transfer Venue To The Eastern District Of Michigan In Whole Or In Part.” (Document No. 230). On February 18, 2015, Judge Keesler issued an Order (Document No. 262) granting Defendants’ “Alternative Motion to Transfer.” In this Order, Judge Keesler declined to address the merits of, or make any recommendations regarding, the two Motions to Dismiss. In doing so, Judge Keesler cited, among other authority, *BSN Medical, Inc. v. American Medical Products,* LLC, 3:11cv092–GCM–DSC, 2012 WL 171269, at *2 (W.D.N.C. Jan.20, 2012), wherein another magistrate judge in this district granted an alternative motion to transfer without reaching the merits of the motion to dismiss. Plaintiff has timely objected to Judge Keesler’s Order pursuant to 28 U.S.C. § 636(b) and Fed.R.Civ.P. 72(a). Defendants have responded to such objections and the matter is now ripe for review.

## II. ALTERNATIVE MOTION TO TRANSFER

### A. Standard of Review

When a magistrate judge issues an order on a non-dispositive matter, “[t]he district judge in the case must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law.” Fed.R.Civ.P. 72(a). *See also* 28 U.S.C. § 636(B)(1)(A) (“A judge of the court may reconsider any pretrial matter under this subparagraph (A) where it has been shown that the magistrate judge’s order is clearly erroneous or contrary to law.”). In engaging in such review, a finding is “ ‘clearly erroneous’ when, although there is evidence to support it, the reviewing court ... is left with the definite and firm conviction that a mistake has been committed.” *High Voltage Beverages, L.L.C. v. Coca–Cola Co.,* No. 3:08–CV–367, 2010 WL 2342458, at *1 (W.D.N.C. June 8, 2010) (citing *Walton v. Johnson,* 440 F.3d 160, 173–74 (4th Cir.2006)). A magistrate judge’s order is “contrary to law” where he “failed to apply or misapplied statutes, case law, or procedural rules.” *Id.* (citing *Miceli v. KBRG of Statesville, L.L.C.,* No. 5:05–CV–265–V, 2008 WL 2945451, at *1 (W.D.N.C. July 24, 2008)).

### B. Discussion of Plaintiff’s Objections

#### *1. Standing Order Regarding Magistrate Judge Referrals*

This court’s “Standing Order” regarding referrals to Magistrate Judges in this District, No. 3:11–mc–25–MOC (W.D.N.C., Mar. 16, 2011) provides, in relevant part:

> pursuant to 28, United States Code, Section 636(b) and Local Civil Rule 72.1, in civil and miscellaneous cases, magistrate judges shall be specifically referred the following duties:
>
> ...
>
> to dispose of non-dispositive civil motions, including but not limited to motions for ... transfer to another division or district ... Where a non-dispositive motion is pled in the alternative to a dispositive motion, a Memorandum and Recommendation will be entered as to both motions.

***5** *Id.* Plaintiff’s first objection centers on the argument that because Judge Keesler issued an order on a non-dispositive motion (to transfer) without addressing the merits of the two dispositive motions (to dismiss) through a Memorandum and Recommendation, Judge Keesler violated this Court’s Standing Order and thus is contrary to law. Plaintiff argues that the proper remedy for this error is to require Judge Keesler to issue a Memorandum and Recommendation for each of the dispositive motions, as well as the non-dispositive alternative motion.

As discussed at the hearing, the undersigned regards the Standing Order as an in-house policy for chambers to follow in an attempt to efficiently

resolve the merits of motions and move the docket along. While the court always finds it helpful to have recommendations on legal issues from the magistrate judges of this district, a magistrate judge's failure to comply with the procedures of the Standing Order does not constitute grounds for overturning his decision. The court will therefore overrule Plaintiff's objection as to Judge Keesler's non-compliance with the Standing Order.

The court finds in this situation, however, that the merits of the dispositive motions have a significant bearing on the resolution of the alternative motion to transfer. In light of the fact that the uncertainty of the jurisdictional issue was a significant reason for Judge Keesler's Order transferring venue, *see* (Document No. 262, pp. 7–9), the court finds that the proper course of action here would have been to address the issue of personal jurisdiction (raised in the dispositive Motion to Dismiss for Lack of Jurisdiction) simultaneously with the issue of transfer. The court will therefore address both of the dispositive motions along with the objections to the Order transferring venue.

***2. Transfer of Venue***

i. *Legal Standards*

28 U.S.C. § 1404(a) provides: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." *Id.* 28 U.S.C. § 1400(b), which specifically governs venue in patent actions, provides, "[a]ny civil action for patent infringement may be brought in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business." *Id.* A motion to transfer pursuant to § 1404(a) in a patent case requires application of the law of the regional circuit. *In re Link_A_Media Devices Corp.,* 662 F.3d 1221, 1222–23 (Fed.Cir.2011).

Upon a motion to transfer, the moving party carries a heavy burden. *Duke Energy Florida, Inc. v. Westinghouse Elec. Co.,* No. 3:14–CV–00141–MOC, 2014 WL 2572960, at *5 (W.D.N.C. June 9, 2014) (citing *Datasouth Computer Corp. v. Three Dimensional Technologies, Inc.,* 719 F.Supp. 446, 451 (W.D.N.C.1989)). A court's decision to grant a motion to transfer venue under 28 U.S.C. § 1404(a) is largely discretionary. *3A Composites USA, Inc. v. United Indus., Inc.,* No. 5:13CV83–RLV, 2014 WL 1471075, at *1 (W.D.N.C. Apr.15, 2014) (citing *Landers v. Dawson Const. Plant Ltd.,* 201 F.3d 436, 1999 WL 991419, *2 (4th Cir.1999)). In exercising such discretion, the court applies a balancing test and considers various factors in deciding whether transfer is appropriate. *Jim Crockett Promotions, Inc. v. Action Media Grp., Inc.,* 751 F.Supp. 93 (W.D.N.C.1990). The factors to be considered include:

***6** 1. The plaintiff's initial choice of forum;

2. The residence of the parties;

3. The relative ease of access of proof;

4. The availability of compulsory process for attendance of witnesses and the costs of obtaining attendance of willing witnesses;

5. The possibility of a view by the jury;

6. The enforceability of a judgment, if obtained;

7. The relative advantages and obstacles to a fair trial;

8. Other practical problems that make a trial easy, expeditious, and inexpensive;

9. The administrative difficulties of court congestion;

10. The interest in having localized controversies settled at home and the appropriateness in having the trial of a diversity case in a forum that is at home with state law that must govern the action; and

11. The avoidance of unnecessary problems with conflict of laws.

*Id.* "The above factors fall into three categories: (1) factors that favor neither party, (2) factors that favor Defendant, and (3) factors that favor Plaintiff." *Cohen v. ZL Technologies, Inc.,* No. 3:14–CV–00377–FDW, 2015 WL 93732, at *2 (W.D.N.C. Jan.7, 2015) (citing Crockett, 751

F.Supp. at 98). The court must analyze the eleven factors based on quality, not just quantity. *Id* . (citing Crockett, 751 F.Supp. at 96). In most cases, the plaintiff's choice of forum should be given significant weight, and should not be disturbed unless the balance is strongly in favor of transfer. *Collins v. Straight, Inc.,* 748 F.2d 916, 921 (4th Cir .1984) (citing *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508, 67 S.Ct. 839, 91 L.Ed. 1055 (1947)). A motion should not be granted if transfer "would merely shift the inconvenience from the defendant to the plaintiff, or if the equities lean but slightly in favor of the movant after all factors are considered." *Jim Crockett Promotions, Inc. v. Action Media Grp., Inc.,* 751 F.Supp. 93, 95 (W.D.N.C.1990).

On a motion to transfer, the facts as alleged in the complaint are accepted as true and all reasonable inferences are drawn in the plaintiff's favor. *Century Furniture, LLC v. C & C Imps., Inc.,* No. 1:07cv179, 2007 WL 2712955, at *2 (W.D.N.C. Sept.14, 2007).

As noted by Judge Keesler, "While a court typically decides the question of personal jurisdiction over a defendant before considering venue, the Supreme Court has held that 'when there is a sound prudential justification for doing so, ... a court may reverse the normal order of considering personal jurisdiction and venue.' " *BSN Medical, Inc. v. American Medical Products, LLC,* 3:11cv092–GCM–DSC, 2012 WL 171269, at *2 (W.D.N.C. Jan.20, 2012) (citing *Leroy v. Great W. United Corp.,* 443 U.S. 173, 180, 99 S.Ct. 2710, 61 L.Ed.2d 464 (1979)). "A court need not have personal jurisdiction over a defendant to transfer a case pursuant to 28 U.S.C. §§ 1404(a) or 1406(a)." *Id.*

ii. *The Magistrate Judge's Order*

Judge Keesler found good cause to allow Defendants' motion to transfer to the Eastern District of Michigan and, citing *BSN Medical,* declined to make any recommendation as to the pending dispositive motions, including the motion pertaining to personal jurisdiction. Judge Keesler found that the question of personal jurisdiction over Defendants in North Carolina presented a "close call upon which reasonable minds could differ," and that the issue remained uncertain even after a round of briefing, oral arguments, and a jurisdictional discovery period prior to the filing of an Amended Complaint and renewed motions. (Document No. 262, p. 7). Judge Keesler also noted that this court recently rejected many of the same jurisdictional arguments that Plaintiff made in this case in a different patent infringement lawsuit filed by Plaintiff against a different defendant. *See* (Document No. 262, p. 7) (citing *Celgard, LLC v. SK Innovation, Co., Ltd.,* 3:13cv254–MOC–DSC, 2014 WL 5430993 (W.D.N.C. Aug.29, 2014)). He noted that he found it doubtful that this court has personal jurisdiction over both Defendants with regard to all the claims asserted against them, but that Defendants admit to jurisdiction in Michigan.[2] *Id.*

*7 In making the decision to grant transfer in light of what he found to be "doubtful" jurisdiction over both Defendants in North Carolina and Defendants' concessions that they are subject to jurisdiction in Michigan, Judge Keesler cited several decisions from district courts in this circuit doing the same. *See* (Document No. 262, pp. 8–9 (citing *La Casa Real Estate & Inv., LLC v. KB Home of S.C., Inc.,* No. 1:09CV895, 2010 WL 2649867, at *2 (M.D.N.C. June 30, 2010) ("in the interests of convenience, fairness and judicial economy, the Court elects to consider Defendant's Motion to Transfer pursuant to 28 U.S.C. § 1404(a) before reaching any issues related to the Court's jurisdiction."); *Nacco Materials Handling Grp., Inc. v. Lilly Co.,* 2011 WL 2119097, at *4 (E.D.N.C. May 25, 2011) (granting motion to transfer when personal jurisdiction over defendant remained "in serious doubt"); *Waldron v. Atradius Collections, Inc.,* 2010 WL 2367392, at *3 (D.Md. June 9, 2010) ("[T]he constitutional question of personal jurisdiction is a close one upon which reasonable minds could differ. There is no reason to inject such a question into the case unnecessarily."); *Jenkins v. Albuquerque Lonestar Freightliner, LLC,* 464 F.Supp.2d 491, 494 (E.D.N.C.2006) (granting motion to transfer in part because "the absence of personal jurisdiction over the defendant" in the original forum but not the transferee forum is an "impediment to a decision on the merits"); *Tyler v. Gaines Motor Lines, Inc.,* 245 F.Supp.2d 730, 734 (D.Md.2003) (transferring case in interest of justice because the question of personal jurisdiction was a "close one" and "would inject into the case an unnecessary legal issue that would render the entire litigation null and void, if,

on appeal, jurisdiction were found to be lacking")). While the court agrees that the issue of personal jurisdiction presents a "close call" in this case, it also believes that the parties deserve a thorough analysis of the dispositive question of personal jurisdiction before this matter is transferred to another district.

iii. *Review of Crockett Analysis*

Plaintiff argues that Judge Keesler's Order should be set aside as clearly erroneous and contrary to law based on his analysis of the *Crockett* factors. Judge Keesler found that five factors—residence of the parties, access to proof, attendance of witnesses, fair trial, and practical problems affecting trial expediency and efficiency—weighed in favor of transfer, while the remaining factors were neutral. (Document No. 262, pp. 9–14). Plaintiff argues that each of these factors, as well as its choice of forum and local resolution factors, weigh against transfer or, at a minimum, are neutral, and that none of the *Crockett* factors weigh in favor of transfer. Judge Keesler found the following factors to be neutral: the possibility of a view by the jury; the enforceability of a judgment; the relative court congestion between the districts; and the avoidance of conflict of laws. Plaintiff does not challenge the venue order based on these factors and the court will therefore not disturb Judge Keesler's determinations on those factors.

***8** The court is mindful of the discretion to the magistrate judge in analyzing a motion to transfer, *3A Composites USA, Inc. v. United Indus., Inc.,* No. 5:13CV83–RLV, 2014 WL 1471075, at *1 (W.D.N.C. Apr.15, 2014), and will only disturb his decision where clearly erroneous or contrary to law. Fed.R.Civ.P. 72(a); 28 U.S.C. § 636(B)(1)(A). The court will address the objections in turn.

a. *Plaintiff's choice of forum*

Judge Keesler found this factor to be neutral; Plaintiff objects to such a finding, arguing that its choice of forum should have weighed more strongly in its favor. Judge Keesler properly noted that although the choice of forum by the Plaintiff is ordinarily given considerable weight, "that weight is diminished when the conduct giving rise to the complaint did not occur in the forum." *See* (Document No. 262, p. 9); *Hames v. Morton Salt, Inc.,* 3:11cv570–MOC–DSC, 2012 WL 1247201, at *2 (W.D.N.C. Apr.13, 2012) (citing *Parham v. Weave Corp.,* 323 F.Supp.2d 670, 674 (M.D.N.C.2004); *Telepharmacy Solutions, Inc. v. Pickpoint Corp.,* 238 F.Supp.2d 741, 743 (E.D.Va.2003); *Lynch v. Vanderhoef Builders,* 237 F.Supp.2d 615, 617 (D.Md.2002)). Plaintiff argues that the "diminished weight" rule only applies where none or essentially none of the conduct giving rise to the action occurred in the plaintiff's chosen forum. *See Parham,* 323 F.Supp.2d at 674 ("While the plaintiff's choice of forum is accorded substantial weight, the deference given to the plaintiff's choice is proportionate to the relation between the forum and the cause of action." (citations and internal quotations omitted)); *Speed Trac Technologies, Inc. v. Estes Express Lines, Inc.,* 567 F.Supp.2d 799, 803 (M.D.N.C.2008) (noting that choice of forum "receives less weight ... when (1) the plaintiff chooses a foreign forum, or (2) the cause of action bears little or no relation to the chosen forum.").

Judge Keesler found that while Plaintiff had noted some contacts with North Carolina by Defendant LGC, most of the conduct giving rise to the crux of the amended complaint (the patent infringement claims) as to both Defendants occurred in Korea or Michigan. (Document No. 262, p. 10). Judge Keesler thus applied the "diminished weight" rule upon finding that most of the conduct giving rise to the complaint did not occur in North Carolina. However, as explained above, Plaintiff has alleged, and this court can reasonably infer, that much of the conduct giving rise to Defendants' claims *did* occur in North Carolina. Plaintiff's Amended Complaint alleges that at least some conduct giving rise to the alleged patent infringement occurred in North Carolina, (Document No. 217, ¶ ¶ 10–17), and that all of the conduct forming the basis of its state law claims occurred in North Carolina. *See, e.g. id.* at ¶ ¶ 17–32, 80–82, 101. As alleged in the Amended Complaint, Plaintiff argues that the alleged infringement in this case occurred as a result of the longstanding business relationship of the parties concerning sales of Celgard base film and the ultimate breakdown of such relationship. *See* (Document No. 217, ¶ ¶ 18; 26–28; 49–51). The crux of Plaintiff's argument is that it provided base film to LGC specifically for its use and that

when the business relationship went sour, LGC sourced base film from third parties but continued to use Celgard's patented technology without Celgard's permission, which constitutes infringement of the '586 patent. *Id. See also* Pl. Opp. Mot. Transfer (Document No. 243, p. 7) ("Celgard provided LG Chem separator material that Celgard permitted to be ceramic coated pursuant to the patent-in-suit, and the breakdown of this relationship—caused by LG Chem's misconduct—led LG Chem to manufacture and distribute products containing unauthorized separator material, thereby infringing the patent-in-suit.").

***9** Here, while not *all* of the conduct giving rise to the claims asserted against Defendants occurred in North Carolina, much of it did. *See* Section IV, C. Accordingly, the court finds that it was error for the magistrate judge to apply the "diminished weight" rule and that the general rule that the plaintiff's choice of forum should be accorded substantial weight is applicable. *Collins v. Straight, Inc.,* 748 F.2d 916, 921 (4th Cir.1984). As such, the court finds that the Plaintiff's choice of forum weighs in favor of keeping this action in this district.

*b. Residence of the parties*

Judge Keesler found that this factor slightly favors transfer; Plaintiff objects, arguing that because neither party is a resident of Michigan, this factor should have weighed against transfer or been neutral. Plaintiff is a resident of North Carolina. LGC is a corporation with its principal place of business in Seoul, Korea. LGCAI's principal place of business is in New Jersey. Judge Keesler found that because all LGC subsidiaries have outposts in the Eastern District of Michigan, and Defendants contend they are "at home" in Michigan, this factor weighs in favor of transfer.

For purposes of venue, "a corporate defendant resides in any judicial district in which it is subject to personal jurisdiction at the time the action commences." 28 U.S.C. § 1391(c). *See also* *VE Holding Corp. v. Johnson Gas Appliance Co.,* 917 F.2d 1574, 1584 (Fed.Cir.1990) (holding that the language of § 1391(c) applies to § 1400(b)); *Trintec Indus., Inc. v. Pedre Promotional Products, Inc.,* 395 F.3d 1275, 1280 (Fed.Cir.2005) ("Venue in a patent action against a corporate defendant exists wherever there is personal jurisdiction.").

Even assuming jurisdiction is proper over both Defendants in Michigan and that they are "residents" within the meaning of the applicable statutes, the disparity in the residencies between Plaintiff and Defendants would make this factor neutral. *See Simpson v. Snyder's of Hanover, Inc.,* No. 1:05–CV–354, 2006 WL 1642227, at *5 (W.D.N.C. June 12, 2006) (affirming magistrate judge's determination that the residence factor was neutral because one party was a resident of the forum and one party was a resident of the proposed venue); *Tracy v. Loram Maint. of Way, Inc.,* No. 5:10–CV–102–RLV, 2011 WL 2791257, at *6 (W.D.N.C. July 14, 2011) ("the Court finds that the residency of the parties is a neutral factor. Plaintiff resides in Catawba County, North Carolina, while Defendant's main place of business is in Minnesota. Regardless of the place of adjudication, one party will benefit to the other's detriment.").

The court finds it was error for the Magistrate Judge to find that residence of the parties favored transfer and finds this factor is, in fact, neutral.

*c. Access to evidence*

Judge Keesler found that this factor favors transfer; Plaintiff objects and argues that it should have been, at a minimum, neutral. "In patent infringement cases, the bulk of the relevant evidence usually comes from the accused infringer. Consequently, the place where the defendant's documents are kept weighs in favor of transfer to that location." *In re Genentech, Inc.,* 566 F.3d 1338, 1345 (Fed.Cir.2009) (citation omitted). Here, Plaintiffs allege that much of the proof in this case is in North Carolina, including "relevant documents, contracts, and e-mails." (Document No. 243, p. 5). Defendants allege that the bulk of the evidence is likely to come from LGC and its U.S. subsidiaries involved in the lithium battery business and located in Michigan. (Document No. 248, p. 2). Even accepting such argument as true for the patent infringement claims (despite the fact that neither Defendant is headquartered in Michigan), the same cannot be said for all of the

state law claims. As such, the court cannot find that the "bulk" of the evidence would be in Michigan, when the documents related to the conduct giving rise to Plaintiff's claims are likely at each party's headquarters—in Korea, New Jersey, and North Carolina. See *MGT Gaming, Inc. v. WMS Gaming, Inc.,* 978 F.Supp.2d 647, 669 (S.D.Miss.2013) ("Presumably, the bulk of the discovery material relating to a corporate party is located at the corporate headquarters.")(citing *In re Acer Am. Corp.,* 626 F.3d 1252, 1256 (Fed.Cir.2010)). The court finds that the magistrate judge erred in finding that this factor favored transfer and finds that given the nature of the claims and the relevant evidence, this factor is neutral.

*d. Availability of compulsory process for witnesses and the costs of transporting and obtaining those witnesses*

***10** Judge Keesler found that this factor favors transfer; Plaintiff objects. As the parties note, "[t]he convenience of witnesses, particularly nonparty witnesses important to the resolution of the case, is often cited as the most significant factor in ruling on a motion to transfer ... One strong argument against transfer is that the original forum will be the most convenient for the witnesses. And when transfer will better serve the convenience of the witnesses, the motion under Section 1404(a) is more likely to be granted." 15 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 3851 (4th ed.) (collecting cases).

Here, Plaintiff has identified two witnesses in North Carolina (Document No. 243, pp. 5–6); Defendants have not identified any witnesses. *See* Def. Reply (Document No. 248, p. 3) (stating that "LG Chem's potential witnesses are *likely* numerous ... and none of these potential witnesses are located in North Carolina. In part because of LGCAI's presence in Michigan, witness attendance of both Defendants is far easier in Michigan.") (emphasis added). Judge Keesler found that the facts on this factor are not as developed as he would have hoped, but that to the extent that non-party witnesses existed in this matter (i.e. customers or manufacturers of products that include the allegedly infringing separators), they were more likely to be made available in Michigan. (Document No. 262, p. 11–12). While the court understands the magistrate judge's logic, it simply cannot agree that this factor favors transfer where Defendant has not identified a single witness, let alone one in Michigan. *See* *Capital One Fin. Corp. v. Drive Fin. Servs., L.P.,* 434 F.Supp.2d 367, 375–76 (E.D.Va.2006) ("The party asserting witness inconvenience has the burden to proffer, by affidavit or otherwise, sufficient details respecting the witnesses and their potential testimony to enable the court to assess the materiality of evidence and the degree of inconvenience."); 15 Fed. Prac. & Proc. Juris. § 3851 ("The party seeking the transfer must identify, typically by affidavit, the key witnesses to be called, state their residence, and provide at least a general summary of what their testimony will cover."). The court therefore finds that Judge Keesler's decision on this factor was in error. The court will therefore construe this factor as neutral.

*e. Relative advantages and obstacles to a fair trial*

Judge Keesler found that this factor slighted favored transfer; Plaintiff objects. In explaining his determination on this factor, Judge Keesler again discussed availability of witnesses as a consideration. (Document No. 262, pp. 12–13). Plaintiff argues that Judge Keesler erroneously "double counted" the witness availability and that he should have considered the "home field advantage" or bias of a trial in Michigan, where Defendants allegedly have the support of large auto-makers. While this court finds no basis for disturbing Judge Keesler's on the issue of "double counting," and agrees with his determination that there is no basis for any clear advantages or obstacles to fair trial in either district, it does find that his reliance on the presence and availability of unidentified witnesses in Michigan was in error. As explained above, the court finds that as Defendants have not identified any witnesses in the state of Michigan, there is no basis for assuming that the presence of such witnesses will offer any advantages to a fair trial. Regarding Plaintiff's arguments as to Defendants' "home field" advantage in Michigan, the argument as to such advantages goes both ways. *See* *Rice v. Bellsouth Adver. & Pub. Corp.,* 240 F.Supp.2d 526, 530 (W.D.N.C.2002). The court therefore

finds that this factor is neutral.

*f. Practical issues affecting trial expediency and efficiency*

***11** Judge Keesler found that this factor slightly favored transfer; Plaintiff objects. Judge Keesler noted that no trial is ever easy, expeditious or inexpensive, and that all trials involve air travel and inconvenience. (Document No. 262, p. 13) (citing *Century Furniture, LLC v. C & C Imps., Inc.*, No. 1:07cv179, 2007 WL 2712955, at *5 (W.D.N.C. Sept.14, 2007)). He further stated that after balancing all evidence to date, this factor slightly favored transfer. The court finds that without more evidence to the contrary, this factor clearly does not favor transfer. In *Century,* wherein the plaintiff brought suit in the Asheville division of this district, the court noted that, "the practical problem is access to the situs of the litigation via air transportation, and the mountains of North Carolina simply are not *easily* accessible when engaged in transcontinental litigation." *Id.* Here, litigation in this district will occur in Charlotte, North Carolina, a city with an international airport that is easily accessible by all parties. Indeed, the court notes that three representatives from Defendants' office in Korea were present in Charlotte for the hour-long oral arguments on the objections at issue, and presumably reached the city via airplane. *See* Hearing Transcript (Document No. 274) at 14:24–15:8. Judge Keesler noted in his order that "travel from Korea or New Jersey to North Carolina or Michigan are roughly equivalent." (Document No. 262, p. 12). In light of the fact that motions to transfer are not to be granted merely to shift the inconvenience from one party to another, *Jim Crockett Promotions, Inc. v. Action Media Grp., Inc.*, 751 F.Supp. 93, 95 (W.D.N.C.1990), and that Judge Keesler appears to have based his determination solely on the inconvenience caused by air travel, the court finds that his determination that this factor weighed in favor of transfer was clearly erroneous. *See* *Rice v. Bellsouth Adver. & Pub. Corp.*, 240 F.Supp.2d 526, 530 (W.D.N.C.2002) ("In either forum, there will be practical problems such as travel and accommodations for the parties and their counsel. This factor is neutral."). The court therefore finds this factor to be neutral.

*g. Interest of resolving localized controversies at home and the appropriateness of having the trial of a diversity case in a forum that is at home with the state law that must govern the action*

Judge Keesler found this factor to be neutral; Plaintiff objects. On this factor, Judge Keesler found that, particularly with the aid of very able counsel, any district court would be able to apply the laws of North Carolina to the extent necessary, in addition to patent laws. He noted that this case involves claims of national, if not international patent violations. The court finds no error in this determination and overrules Plaintiff's objection that the focus should have been on the "strong interest in resolving issues locally."

**C. Conclusion**

***12** In light of the above analysis, the court finds that Judge Keesler clearly erred in weighing several *Crockett* factors, and that the balance of the factors favors maintaining this action in this district. Put another way, the court finds that transfer of this matter "would merely shift the inconvenience from the defendant to the plaintiff," *Jim Crockett Promotions, Inc. v. Action Media Grp., Inc.*, 751 F.Supp. 93, 95 (W.D.N.C.1990), which makes transfer inappropriate. Because the court finds that personal jurisdiction over both Defendants is appropriate in this district, *see* Section IV, and that the balance of factors does not favor transfer, the court will set aside those determinations of the magistrate judge discussed above, and deny Defendants' Alternative Motion to Transfer.

## III. DEFENDANTS' MOTION TO DISMISS COUNTS III–VI OF AMENDED COMPLAINT

The court now addresses Defendants' Motion to Dismiss Counts III, IV, V, and VI of Plaintiff's Amended Complaint. (Document No. 222). Defendants claim that Plaintiff has failed to properly plead facts sufficient to claim (1) unfair

and deceptive trade practices; (2) breach of contract; (3) breach of the duty of good faith and fair dealing; and (4) unjust enrichment, as required by Fed.R.Civ.P. 12(b)(6).

### A. Legal Standards

To survive a Rule 12(b)(6) motion to dismiss, a claimant must allege facts in his complaint that "raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do ..." *Id.* (second alteration in original; citation omitted). A claimant must plead sufficient facts to state a claim for relief that is "plausible on its face." *Id* . at 570.

As the Supreme Court elaborated in *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), "[a] claim has facial plausibility when the plaintiff pleads sufficient factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. This "plausibility standard" requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* Thus, a complaint falls short of the plausibility standard where a plaintiff pleads "facts that are 'merely consistent with' a defendant's liability...." *Id.* While the court accepts *plausible* factual allegations made in a claim as true and considers those facts in the light most favorable to plaintiff in ruling on a motion to dismiss, a court "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Eastern Shore Mkt.'s Inc. v. J.D. Assoc.'s, LLP,* 213 F.3d 175, 180 (4th Cir.2000).

### B. Discussion

#### *1. Unfair and Deceptive Trade Practices*

Defendants argue that Plaintiff has failed to plead a proper claim for unfair and deceptive trade practices under N.C. Gen.Stat. § 75–1.1 because the facts alleged do not amount to the aggravating circumstances required for such a claim. The elements of a claim for unfair and deceptive trade practices in violation of N.C. Gen.Stat. § 75–1.1 are: (1) an unfair or deceptive act or practice, or an unfair method of competition, (2) in or affecting commerce, (3) which proximately caused actual injury to the plaintiff or to his business. *Id.; Gray v. N. Carolina Ins. Underwriting Ass'n,* 352 N.C. 61, 529 S.E.2d 676, 681 (N.C.2000). Recovery under such a claim "is limited to those situations when a plaintiff can show that plaintiff detrimentally relied upon a statement or misrepresentation and he or she suffered actual injury as a proximate result of defendant's deceptive statement or misrepresentation." *McLamb v. T.P. Inc.,* 173 N.C.App. 586, 619 S.E.2d 577, 582–83 (N.C.App.2005) (internal quotation and citation omitted). A practice is unfair if it "is immoral, unethical, oppressive, unscrupulous, or substantially injurious to customers." *Deerborne Cottages, LLC v. First Bank,* No. 1:11CV178, 2012 WL 1835240, at *5 (W.D.N.C. Apr.9, 2012) *report and recommendation adopted,* No. 1:11CV178, 2012 WL 1836093 (W.D.N.C. May 21, 2012) (citation and internal quotation omitted). A practice is deceptive where it "has the tendency or capacity to deceive." *Id.* A claim for unfair and deceptive trade practices turns on the facts of each case and therefore involves a "highly fact-specific inquiry." *S. Atl.Ltd. P'ship of Tennessee, L.P. v. Riese,* 284 F.3d 518, 535 (4th Cir.2002).

***13** Here, Plaintiff alleges that LGC: (1) repeatedly promised Celgard that it would make Celgard its exclusive base film supplier for EVs, (2) in order to induce Celgard to increase its production capacity to meet LGC's requirements and provide it with favorable pricing, (3) while at the same time secretly making arrangements to replace Celgard. (Document No. 217 ¶¶ 68–69, 75, 77, 9092, 116.) The Amended Complaint further alleges that despite repeated promises to the contrary, LGC had no intention of entering into an LTA with Celgard, but strung Celgard along in order to ensure that LGC had sufficient supply of base film at discounted prices until LGC was ready to replace Celgard. *Id.* at ¶ 92. Then, LGC allegedly misrepresented to Celgard that the market price for comparable separator material had decreased by over 50% in an attempt to avoid its obligation in

the MOU to purchase the majority of separator material from Celgard. *Id.* at ¶¶ 9396, 116. The court finds that such allegations of misrepresentation and false promises fit squarely within the type of conduct that North Carolina courts have found to be in unfair and deceptive. *See, e.g. Deerborne Cottages,* 2012 WL 1835240, at *6. ("Put simply, Plaintiffs allege that Defendants ... made affirmative misrepresentations during Plaintiffs' dealings with The Bank of Asheville, and that Plaintiffs relied upon these misrepresentations in going forward with the project. As various courts have held, affirmative misrepresentations such as these can form the basis of an unfair trade practices claim in certain circumstances."). Although whether Plaintiff will prevail on its claim will ultimately depend on the specific facts in this case, the court finds that the allegations of deception and misrepresentation alleged in the Amended Complaint are sufficient to survive dismissal at this stage of the proceedings. The court will therefore deny Defendants' motion as to the unfair and deceptive trade practices claim.

***2. Breach of Contract***

Defendants argue that Plaintiff's breach of contract claim cannot succeed because Plaintiff has failed to show that the parties entered an enforceable contract. As Defendants correctly note, "[t]he elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." *Poor v. Hill,* 138 N.C.App. 19, 530 S.E.2d 838, 843 (N.C.App.2000). Defendants first argue that the MOU is not a contract because it explicitly states in the second paragraph, "LGC and CELGARD understand that this is a non-binding MOU." *See* MOU (Document No. 18–1 at 1). Here, Plaintiff claims that LGC breached the "Supplier Selection Agreement" contained in the MOU when it failed to purchase separator material primarily from Celgard during the Collaboration period. (Document No. 217, ¶ 127). The MOU states, "[b]oth parties agree that except as is explicitly set forth in this MOU, neither party shall be bound by any discussions or written proposals, letters, memos or charts used or exchanged unless and until a definitive and binding agreement is signed." (MOU at 1). Plaintiff argues that the non-binding language applies only to the parties' intent to enter into a long-term supply agreement, not to their interim obligations during the Collaboration Period. Specifically, Plaintiff notes that the MOU expressly provides that "[n]otwithstanding the foregoing":

> ***14** • "LGC will purchase separator primarily from CELGARD during the Collaboration Period....;"
>
> • "Initial products to be supplied by Celgard and purchased by LGC are Celgard® trilayer products manufactured to specifications mutually agreeable to both parties;" and
>
> • "LGC also agrees to give priority to qualifying CELGARD separator in any/all new cell applications for the EDV and ESS markets....".

(MOU at 1, ¶¶ 1–3 (emphasis added)). The court finds that Plaintiff has put forth sufficiently plausible allegations of the ambiguity of the document's intentions as to the supply of goods during the collaboration period to render dismissal at the 12(b)(6) stage inappropriate. *See Quorum Health Res., LLC v. Hugh Chatham Mem'l Hosp., Inc.,* 552 F.Supp.2d 527, 530 (M.D.N.C.2007) ("If the agreement is ambiguous ... interpretation of the contract is a matter for the jury. Ambiguity exists where the contract's language is reasonably susceptible to either of the interpretations asserted by the parties.") (internal citations and quotations omitted).

Defendants also argue that Plaintiff has failed to show the existence of a valid contract because the language of the MOU does not present definite and certain terms. *See Miller v. Rose,* 138 N.C.App. 582, 532 S.E.2d 228, 232 (N.C.App.2000) ("To be enforceable, the terms of a contract must be sufficiently definite and certain, and a contract that leaves material portions open for future agreement is nugatory and void for indefiniteness.") (internal citations and quotations omitted). The court finds that Defendants' arguments do not merit dismissal of this claim at this stage in the proceedings. While there are certainly questions as to the validity of the parties' agreement as a contract, the court finds that the language of the MOU states general terms for the parties' agreement, including the applicable time period, a quantity of separator material, price, and quality of goods for sale, that could be interpreted as a valid contract. *See* N.C. Gen.Stat. § 25–2204 (providing: "1) A contract for sale of

goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract ... [and] (3) Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy .").

The court will therefore deny Defendants' motion as to the breach of contract claim.

### *3. Breach of the Duty of Good Faith and Fair Dealing*

Defendants' sole challenge to Plaintiff's claim for breach of the covenant of good faith and fair dealing is premised on a finding that the MOU is not a valid and enforceable contract. Because the court will not dismiss Plaintiff's breach of contract claim at this time for the reasons explained above, it similarly declines to dismiss this claim. See *Recycling Equip., Inc. v. E Recycling Sys. ., LLC,* No. 5:14–CV–00056, 2014 WL 6977766, at *5 (W.D.N.C. Dec.9, 2014) ("The implied covenant of good faith and fair dealing is a part of every contract and is breached where one party to a contract does something that injures the right of the other to receive the benefits of the agreement....Where the claim for breach of good faith is part and parcel of a similar claim for breach of an express term of the contract claim, that claim will rise and fall with the other breach of contract claim.") (internal citations and quotations omitted).

### *4. Unjust Enrichment*

***15** Finally, Defendants argue that Plaintiff's alternative claim for unjust enrichment should be dismissed because the facts alleged are insufficient to state a plausible claim, the claim was not properly pleaded, and the claim is barred by the statute of limitations.

In order to establish a claim for unjust enrichment, a plaintiff must allege: (1) it conferred a measurable benefit on the other party; (2) that party consciously accepted the benefit, and (3) the benefit was not conferred officiously or gratuitously. *Booe v. Shadrick,* 322 N.C. 567, 369 S.E.2d 554, 556 (N.C.1988); *Primerica Life Ins. Co. v. James Massengill & Sons Const. Co.,* 211 N.C.App. 252, 712 S.E.2d 670, 677 (N.C.App.2011). Both parties acknowledge that under North Carolina law, "a claim for unjust enrichment may not be brought in the face of an express contractual relationship between the parties." *Madison River Mgmt. Co. v. Bus. Mgmt. Software Corp.,* 351 F.Supp.2d 436, 446 (M.D.N.C.2005) (citing *Se. Shelter Corp. v. BTU, Inc.,* 154 N.C.App. 321, 572 S.E.2d 200, 206 (N.C.App.2002)). However, in the absence of an express contractual agreement, "A claim of unjust enrichment is an alternative to a claim based on breach of contract ..." *Volumetrics Med. Imaging, Inc. v. ATL Ultrasound, Inc.,* 243 F.Supp.2d 386, 411 (M.D.N.C.2003).

The court fist addresses the wording of Plaintiff's alternative pleading. Defendants argue that Plaintiff's alternative claim for unjust enrichment was pleaded improperly because it incorporated all previous allegations in the Amended Complaint by reference. *See* (Document No. 217, ¶ 137); *Howard v. Carroll Companies, Inc.,* No. 1:12CV146, 2013 WL 3791619, at *12 (M.D.N.C. July 19, 2013) (dismissing claim for unjust enrichment where Plaintiff's claim did "not indicate that this claim was made in the alternative" and incorporated by reference all preceeding allegations, including those alleging the existence of the two contracts); *Deltacom, Inc. v. Budget Telecom, Inc.,* No. 5:10–cv–38, 2011 WL 2036676, at *5–6 (E.D.N.C. May 22, 2011) (declining to construe an unjust enrichment claim as an alterative claim when the complaint alleged the existence of a contractual relationship, defendant admitted to contractual relationship, plaintiff expressly incorporated by reference allegations of a contractual relationship in unjust enrichment claim, and failed to make the claim in the alternative). Here, the court finds no basis to dismiss the claim, phrased as "In the Alternative, Unjust Enrichment Against LG Chem," on the basis of Plaintiff's incorporation by reference of previous allegations because the claim was clearly made in the alternative. *See* (Document No. 217 at ¶¶ 137–38). Where, as here, Defendants deny the existence of a valid contract and Plaintiff has clearly stated that it makes its claim in the alternative to the contract claims, the court will allow the claim to proceed at this stage.

Defendant also argues that the facts Plaintiff

alleges simply show that it voluntarily took steps to improve production capabilities in the hopes of gaining additional LGC business. The court disagrees with such a characterization of the facts alleged. Here, Plaintiff has alleged that it increased its production capabilities and provided LGC with discounted pricing for base film based on promises by LGC that if Plaintiff did so, Plaintiff would become LGC's long-term, exclusive supplier of separator material for the EV industry. (Document No. 217 at ¶¶ 68, 69, 140). Plaintiff states, quite plausibly, that these benefits were not conferred gratuitously, but instead in direct response to, and in reliance on, LGC's promises. The court therefore finds no reason to dismiss Plaintiff's claim based on Defendants' argument that Plaintiff's actions were gratuitous.

***16** The court has also carefully considered the statute of limitations issue raised by Defendants. A claim for unjust enrichment is subject to a three year statute of limitations period that runs from the date the claim accrues. *Mountain Land Properties, Inc. v. Lovell,* No. 2:12–CV–84–MR–DLH, 2014 WL 4542413, at *13 (W.D.N.C. Sept.11, 2014) (citing *Stratton v. Royal Bank of Canada,* 211 N.C.App. 78, 712 S.E.2d 221, 229 (N.C.App.2011); *Housecalls Home Health Care, Inc. v. State, Dept. of Health & Human Servs.,* 200 N.C.App. 66, 682 S.E.2d 741, 744 (N.C.App.2009); *Miller v. Randolph,* 124 N.C.App. 779, 478 S.E.2d 668, 670 (N.C.App.1996)). Generally, a cause of action "accrues when the wrong is complete and, thus, a plaintiff is entitled to assert the claim in court." *Id.* Here, the Amended Complaint alleges that LGC strung Plaintiff along for years, but that the wrong to Plaintiff was not complete until June 20, 2013, when LGC refused to enter into the LTA and instead switched suppliers. (Document No. 217 at ¶¶ 100–01). The court there finds that Plaintiff's claim for unjust enrichment is not barred by the statute of limitations.

### C. Conclusion

The court finds that Plaintiff has stated plausible claims for relief based on factual allegations sufficient "to raise a right to relief above the speculative level," *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). It will therefore deny Defendants' 12(b)(6) motion.

## IV. DEFENDANTS' MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

Finally, the court considers Defendants' Motion to Dismiss Plaintiff's Amended Complaint for Lack of Personal Jurisdiction pursuant to Rule 12(b)(2). (Document No. 226). Defendants argue that they are not subject to personal jurisdiction in the Western District of North Carolina under any legal theory and that they lack the requisite minimum contacts with this state to make an assertion of jurisdiction over them reasonable or fair. Plaintiff claims that both Defendants are subject to personal jurisdiction here under various theories. Specifically, Plaintiff contends that LGC is subject to specific jurisdiction through its prior business dealings here and that its placement of allegedly infringing products into the stream of commerce also satisfies personal jurisdiction. Plaintiff also argues that LGC is subject to general jurisdiction or, alternatively, nationwide jurisdiction. Plaintiff claims that LGCAI is subject to jurisdiction under the theories of general jurisdiction and its use of the stream of commerce.

### A. Standard of Review

The plaintiff bears the burden of establishing personal jurisdiction over the defendant by a preponderance of the evidence. *IMO Indus., Inc. v. SEIM S.R.L.,* No. 305–CV–420–MU, 2007 WL 1651838, at *1 (W.D.N.C. June 4, 2007). When evaluating a motion to dismiss pursuant to Federal Rule 12(b)(2), if no evidentiary hearing is held and the court determines the question of personal jurisdictional based on affidavits and other written materials, the plaintiff need only establish a prima facie case of personal jurisdiction. *Electronics For Imaging, Inc. v. Coyle,* 340 F.3d 1344, 1349 (Fed.Cir.2003). *See also IMO Indus.,* 2007 WL 1651838, at *1. Here, while jurisdictional discovery has been permitted, no formal evidentiary hearing has been conducted to resolve disputed issues of jurisdictional fact. As such, Plaintiff must only make a prima facie case that the

court has personal jurisdiction over Defendants, which "is established if the plaintiff presents sufficient evidence to defeat a motion for directed verdict." *ATI Indus. Automation, Inc. v. Applied Robotics, Inc.,* No. 1:09CV471, 2013 WL 1149174, at *2 (M.D.N.C. Mar.19, 2013) (quoting 2 James W. Moore, Moore's Federal Practice § 12.31[5] )). In determining whether Plaintiff has made the requisite showing upon a motion to dismiss, a district court must accept the uncontroverted allegations in the plaintiff's complaint as true and resolve any factual conflicts in the affidavits in the plaintiff's favor. *Electronics For Imaging,* 340 F.3d at 1349.

**B. Legal Standards**

***17** Federal Circuit case law applies in determining whether this court has personal jurisdiction over an out-of-state accused infringer. *Beverly Hills Fan Co. v. Royal Sovereign Corp.,* 21 F.3d 1558, 1564–65 (Fed.Cir.1994).[3] Federal courts apply the relevant state statute when determining personal jurisdiction over a defendant, even when the cause of action is purely federal. *Id.* at 1569. Because North Carolina's long-arm statute is co-extensive with federal due process requirements, the jurisdictional inquiry here collapses into a single determination of whether this court's exercise of jurisdiction over Defendants comports with due process. *Dillon v. Numismatic Funding Corp.,* 291 N.C. 674, 676, 231 S.E.2d 629 (1977). "The constitutional touchstone for determining whether an exercise of personal jurisdiction comports with due process 'remains whether the defendant purposefully established minimum contacts in the forum State.' " *Nuance Commc'ns, Inc. v. Abbyy Software House,* 626 F.3d 1222, 1230–31 (Fed.Cir.2010) (quoting *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474, 105 S.Ct. 2174, 85 L.Ed.2d 528, (1985)).

To be consistent with the limitations of due process, a defendant must have "minimum contacts" with the forum state "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Minimum contacts may be established by showing "general" or "specific" jurisdiction. *Helicopteros Nacionales de Columbia, S.A. v. Hall,* 466 U.S. 408, 414, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984).

***1. General Jurisdiction***

A court may exercise general jurisdiction over a non-resident defendant if the defendant has contacts with the state that are so "continuous and systematic" as to render himself "essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown,* ––– U.S. ––––, ––––, 131 S.Ct. 2846, 2851, 180 L.Ed.2d 796 (2011). When a defendant maintains such systematic and continuous contacts with the forum state, even when the cause of action has no relation to those contacts, assertion of general jurisdiction is proper. *Grober v. Mako Products, Inc.,* 686 F.3d 1335, 1346 (Fed.Cir.2012) (citing *LSI Indus. Inc. v. Hubbell Lighting, Inc.,* 232 F.3d 1369, 1375 (Fed.Cir.2000); *Helicopteros,* 466 U.S. at 414–16)). Plaintiffs bear a "higher burden" when establishing general jurisdiction than they do when establishing specific jurisdiction. *Avocent Huntsville Corp. v. Aten Int'l Co., Ltd.,* 552 F.3d 1324, 1330 (Fed.Cir.2008). "Sporadic and insubstantial contacts with the forum state ... are not sufficient to establish general jurisdiction." *Campbell Pet Co. v. Miale,* 542 F.3d 879, 884 (Fed.Cir.2008). Further, "continuous activity of some sorts within a state is not enough ... the continuous corporate operations within a state must be so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities." International Shoe, 326 U.S. at 318. A court must look at the facts of each case to determine whether a defendant's activities within a state are "continuous and systematic." LSI Indus. *Inc. v. Hubbell Lighting, Inc.,* 232 F.3d 1369, 1375 (Fed.Cir.2000).

***2. Specific Jurisdiction***

***18** A court has specific jurisdiction over a defendant in a cause of action that arises out of the

defendant's activities in the forum state, and "can exist even if the defendant's contacts are not continuous and systematic." *Grober v. Mako Products, Inc.,* 686 F.3d 1335, 1346 (Fed.Cir.2012) (citation omitted). When exercising specific jurisdiction, a court must have jurisdiction over each party as to each claim alleged. *Pan–Am. Products & Holdings, LLC v. R.T.G. Furniture Corp.,* 825 F.Supp.2d 664, 678 (M.D.N.C.2011) (citations omitted).

In analyzing specific jurisdiction over a defendant, the Federal Circuit considers whether: "(1) the defendant purposefully directed its activities at residents of the forum state, (2) the claim arises out of or relates to the defendant's activities with the forum state, and (3) assertion of personal jurisdiction is reasonable and fair." *Grober,* 686 F.3d at 1346 (citing *Elecs. For Imaging, Inc. v. Coyle,* 340 F.3d 1344, 1349 (Fed.Cir.2003)). Plaintiff has the burden of making a prima facie showing of specific jurisdiction by satisfying the first two elements; the burden then shifts to defendant to show that such assertion of personal jurisdiction is not reasonable and fair. *Id.*

### *3. Stream of Commerce*

Where a defendant's contacts with the forum state are indirect and only the result of an intermediary distributorship arrangement, the Federal Circuit has explained that a "stream of commerce" theory is to be applied in lieu of the typical concepts of specific and general jurisdiction. *Viam Corp. v. Iowa Exp.-Imp. Trading Co.* ., 84 F.3d 424, 427 (Fed.Cir.1996); *see also* *Beverly Hills Fan Co. v. Royal Sovereign Corp.,* 21 F.3d 1558, 1566 (Fed.Cir.1994). The law governing this theory has been concisely summarized by the Federal Circuit:

> In *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 298 (1980), the Supreme Court stated that a defendant could purposefully avail itself of a forum by "deliver[ing] its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum [s]tate." In *Asahi Metal Industry Co. v. Superior Court of California,* 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987), a plurality of four justices concluded that something more was required—"*an action of the defendant purposefully directed toward the forum state* ." *Id.* at 112 (emphasis in original). The cited examples of purposeful direction included "marketing through a distributor ... in the forum [s]tate" and "providing regular advice to customers." *Id.* Four other justices considered the showing of additional conduct unnecessary. *Id.* at 117.

*Nuance Commc'ns, Inc. v. Abbyy Software House,* 626 F.3d 1222, 1233 (Fed.Cir.2010). Like the Supreme Court, the Federal Circuit has not yet decided whether "something more than the mere act of placing a product in the stream of commerce with the expectation that it would be purchased in the forum state" is required to establish jurisdiction. *Id.* at 1234 (citing *Beverly Hills Fan,* 21 F.3d at 1566). *See also* *Avocent Huntsville Corp. v. Aten Int'l Co.,* 552 F.3d 1324, 1332 (Fed.Cir.2008) ("We have also applied the stream of commerce theory, although we have not resolved the split in authority reflected in the competing plurality opinions in *Asahi* ); *AFTG–TG, LLC v. Nuvoton Tech. Corp.,* 689 F.3d 1358, 1365 (Fed.Cir.2012). However, under either version of the stream of commerce theory, where an alien Defendant: 1) places the accused product into the stream of commerce, 2) knows or should know the likely destination of the product, and 3) its conduct and connections with the forum state are such that it may reasonably foresee being haled into court within that forum, exercise of jurisdiction under the stream of commerce theory is appropriate. *Beverly Hills Fan,* 21 F.3d at 1566. Thus, if the manufacturer purposefully ships the accused products into the forum state through an established distribution channel, with the expectation that those products will be sold in the forum, such action is sufficient to give rise to a proper assertion of jurisdiction. *Nuance Commc'ns,* 626 F.3d at 1233–34.

### *4. Nationwide Jurisdiction*

***19** If neither specific nor general jurisdiction applies, a court may exercise nationwide jurisdiction under Fed.R.Civ.P. 4(k)(2). *See id.*

(providing that "For a claim that arises under federal law, serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if: (A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction"). Nationwide jurisdiction is appropriate where "the defendant contends that he cannot be sued in the forum state and refuses to identify any other where suit is possible." *Touchcom, Inc. v. Bereskin & Parr,* 574 F.3d 1403, 1415 (Fed.Cir.2009).

***5. Reasonability of Jurisdiction***

Even where a defendant's contacts with the forum state are sufficient to satisfy personal jurisdiction, a defendant can still defeat jurisdiction "by marshaling a compelling case against jurisdiction on the grounds that its exercise would be unreasonable, [and] contrary to concepts of fair play and substantial justice." *Viam Corp.,* 84 F.3d at 429. This "unreasonableness" test weighs the burden the litigation places on the defendant against the plaintiff's interest in a convenient forum and the forum's interest in resolving the controversy. *Id.; see also Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 477, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). It is a difficult test for a defendant to pass: "these cases are limited to the rare situation in which the plaintiff's interest and the state's interest in adjudicating the dispute in the forum are so attenuated that they are clearly outweighed by the burden of subjecting the defendant to litigation within the forum." *Beverly Hills Fan,* 21 F.3d at 1568. The inquiry under this test includes a balancing of (1) the burden on the defendant; (2) the interests of the forum state; (3) the plaintiff's interest in obtaining relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the interest of the states in furthering their social policies. *Viam Corp. v. Iowa Exp.-Imp. Trading Co.,* 84 F.3d 424, 429 (Fed.Cir.1996) (citing *World Wide Volkswagen Corp. v.* Woodson, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)).

***6. Supplemental Jurisdiction***

28 U.S.C. § 1367(a)) provides that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." Such claims must arise out of "a common nucleus of operative fact." *United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *accord Silent Drive, Inc. v. Strong Indus., Inc.,* 326 F.3d 1194, 1206 (Fed.Cir.2003).

**C. Personal Jurisdiction over LGC**

***1. State Law Claims (Counts III–VI)***

i. *Specific Jurisdiction*

As noted above, assertion of specific jurisdiction is proper when the plaintiff's cause of action arises from a defendant's contacts with the forum state. The court finds that assertion of specific jurisdiction is appropriate for all of Plaintiff's claims arising under state law—unfair and deceptive trade practices, breach of contract, breach of the implied covenant of good faith and fair dealing, and alternatively, unjust enrichment—because LGC's contacts with North Carolina throughout the course of its business relationship with Plaintiff gave rise to those claims.

***20** The court first finds that LGC purposefully directed its activities at the forum state. Here, LGC conducted business with Plaintiff, a North Carolina resident, for seven years. In that time, LGC purchased $95 million worth of separator material made in, and shipped from, North Carolina. (Document Nos. 56 ¶ 23; 242–15). The parties entered into a written MOU and extensively negotiated a written LTA for LGC's EV programs. (Document No. 18 ¶ 7, 13). Accepting Plaintiff's allegations as true, Plaintiff spent over $300,000,000 to expand its manufacturing capacity in order to meet LGC's long-term supply requirements based on LGC's representations that it would make Plaintiff its exclusive supplier of

separator material for EV batteries if Plaintiff increased production capacity. *Id.* ¶¶ 8–10, 20. Additionally, Plaintiff states that until the expanded capacity became operational, it stopped taking orders from certain CE customers to redirect resources to meet LGC's volume requirements. *Id.* ¶ 18; (Document No. 172 ¶¶ 8, 11).

Throughout the course of these business dealings, LG Chem representatives extensively communicated by e-mail with Plaintiff. *See e.g.,* Documents No. 242–1–12. *See also* *Electronics For Imaging, Inc. v. Coyle,* 340 F.3d 1344, 1351 (Fed.Cir.2003) (discussing Defendant's contacts with Plaintiff in the forum state by phone and noting "[Defendant's] communications are significant in the personal jurisdiction calculus even though [Defendant] was not physically present in [forum state] when he made these communications."). More significantly, LGC representatives had numerous in-person meetings in North Carolina, occurring "on about at least a quarterly basis." (Document Nos. 37 ¶ 4; 17 ¶ 11; 32 ¶ 9; 52 ¶ 8). Plaintiff has provided the following evidence that high-level LGC executives and other employees traveled to North Carolina for numerous meetings to inspect Celgard's facilities, negotiate agreements, and discuss Celgard's intellectual property rights:

- LGC officers and engineers visited and inspected Celgard facilities in Charlotte and Concord, North Carolina to certify that they met LGC specifications. (Document Nos. 18 ¶ 17; 242–18).

- In October and November 2010, LGC executives traveled to Charlotte to meet with Celgard. (Documents No. 242–7; 242–8).

- In July 2011, LGC personnel attended Celgard's Grand Opening event for the Concord, North Carolina facility. (Document No. 242–11).

- In September 2011, LGC personnel traveled to North Carolina to tour the Concord and Charlotte facilities and to discuss the expansion plan. (Documents No. 242–9; 242–10).

- In November 2012, an LGC executive traveled to Charlotte to discuss LGC's business forecast for 2013, Celgard's pricing proposals, and collaborating to develop new separator products. (Document Nos. 242–6; 56 ¶ 22).

- In February 2013, an LGC executive met in Charlotte to negotiate various options for parties' ongoing relationship, including an LTA. (Document Nos. 242–4; 242–2).

***21** • In August 2013, representatives from LGC met with Celgard in Charlotte for a top management meeting. (Document Nos. 242–1; 242–39; 242–12; 242–29). Among other things, the parties discussed the LTA. (Document No. 242–33).

- In October 2013, LGC executive traveled to Charlotte to discuss the LTA and LGC's "use of Celgard's ceramic coating patents in LGC's current and future CE and EV batteries." (Document Nos. 242–35; 242–36; 242–20; 242–21).

- On December 9, 2013, LGC met with Celgard in North Carolina to discuss pricing and supply. (Document Nos. 37 ¶ 4; 52 ¶ 13).

The court finds that LGC's contacts with the forum state that occurred because of the parties' established commercial relationship were purposefully directed at North Carolina. *See* *Electronics For Imaging, Inc. v. Coyle,* 340 F.3d 1344, 1351 (Fed.Cir.2003) (finding purposeful availment where, *inter alia,* defendant repeatedly called plaintiff in forum state and sent representatives to form state for purpose of demonstrating patented technology); *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 479, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (finding purposeful contacts even despite lack of physical ties to forum state where party "reached out" to negotiate with resident of forum state for long-term franchise agreement).

Second, the court finds that Plaintiff's state law claims arise out of LGC's contacts directed at the forum state. Plaintiff's deceptive trade practices claim is grounded in LGC's alleged misconduct regarding a product made in North Carolina, including alleged misrepresentations during meetings in North Carolina and significant capital expenses incurred in North Carolina in reliance on such alleged misrepresentations. (Document No. 217, ¶¶ 116–119). Similarly, Celgard's breach of contract, breach of implied covenant of good faith

and fair dealing, and unjust enrichment claims are based on the MOU, which governed the North Carolina manufacture and supply of separator material. *Id.* ¶¶ 120–136.

Third, the court has considered whether asserting personal jurisdiction over LGC is reasonable and fair. Here, the court has considered (1) the burden on the defendant, (2) the interests of the forum state, (3) the plaintiff's interest in obtaining relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental substantive social policies, *Electronics For Imaging, Inc. v. Coyle,* 340 F.3d 1344, 1352 (Fed.Cir.2003), and finds that LGC is unable to demonstrate that it would be unreasonable for this court to exercise jurisdiction over it.

First, litigating in North Carolina will not unreasonably inconvenience LGC. Although LGC is based in South Korea, "progress in communications and transportation has made the defense of a lawsuit in foreign tribunal less burdensome." *Synthes (U.S.A.) v. G.M. Dos Reis Jr. Ind. Com. De Equip. Medico,* 563 F.3d 1285, 1299 (Fed.Cir.2009). Indeed, LGC employees traveled to North Carolina numerous times between 2008 and 2013. Additionally, LGC is apparently willing to litigate this dispute in the Eastern District of Michigan, which is not substantially closer to Korea than North Carolina, which indicates that LGC is prepared to accept the burden of travel. (Document No. 231). Second, North Carolina has an interest in adjudicating claims arising out of North Carolina law and relating to wrongs against a North Carolina citizen, as well as claims relating to infringement of a citizen's patent. *See Beverly Hills Fan,* 21 F.3d at 1568 ("Virginia has an interest in discouraging injuries that occur within the state ....that interest extends to design patent infringement actions such as the one here.") (internal citation omitted). Third, Plaintiff has a significant interest in maintaining this action in North Carolina, as much of its evidence and witnesses knowledgeable about the patented invention are located here. As to the fourth and fifth factors, the court does not find that Defendant has offered any compelling reason why the interstate judicial system's interest in obtaining efficient resolution of controversies or the states' interest in furthering substantive social policies necessitates a finding that exercising jurisdiction over LGC is unreasonable or unfair. Accordingly, the court concludes that this case is not one of the "rare situation[s] in which the plaintiff's interest and the state's interest in adjudicating the dispute in the forum are so attenuated that they are clearly outweighed by the burden of subjecting the defendant to litigation within the forum." *Id.* In light of the above analysis, the court finds that specific jurisdiction over LGC is appropriate for each of Plaintiff's state law claims.

### *2. Patent Claims (Counts I And II)*

i. *Supplemental Jurisdiction*

***22** The court next considers whether it is appropriate to exercise supplemental jurisdiction over Plaintiff's patent infringement claims given its finding that it has specific jurisdiction over Plaintiff's state law claims. Plaintiff argues that a common nucleus of operative facts exists here because the facts giving rise to its state law claims are substantially the same as those giving rise to its patent infringement claims. Specifically, Plaintiff contends that Celgard and LGC's seven-year relationship and LGC's decision to terminate the relationship with Celgard and source base film from an alternative source, while continuing to use or cause others to use Celgard's patented technology without permission, form a common nucleus of operative fact. Defendants argue that the facts related to the patent claims (the distribution, importation, and/or sale of the allegedly infringing product) are distinct from the facts related to the state law claims (LGC's activities in North Carolina related to its alleged obligations under the MOU), and that they are not sufficiently common to render supplemental jurisdiction appropriate. LGC points out that Plaintiff's state law claims concern the now-severed business relationship that centered on sale and purchase of Plaintiff's *uncoated polymeric base film,* whereas its patent infringement claims concern LGC's manufacture of *ceramic coated separator product.* LGC thus argues that the facts giving rise to the alleged injuries are wholly distinct and that supplemental jurisdiction is inappropriate.[4]

As LGC correctly notes, the base film made by Plaintiff, itself, is not the accused infringing

product. However, as explained by one of LGC's own employees, base film is a component of the allegedly infringing ceramic-coated separators. Jina Lee, Manager in a Cell Procurement Team at LGC, stated in her affidavit that a separator is a component of a lithium-ion battery that is placed between the anode and the cathode to prevent electrical shorting (i.e.fire). *See* (Document No. 52, ¶ 4, Declaration of Jina Lee "Lee Decl ."). Additionally, Ms. Lee explained:

> There are two types of separators: "wet-type" and "dry-type". *A separator consists of a "base film" and a coating on top of the base film.* "Dry-type" separators are more susceptible to heat than "wet-type." The base film by itself (i.e., without coating)—especially the base film for "dry-type" separators-cannot be used as a separator and cannot even be considered a finished component for use in a battery because of heat safety issues. LGC does not manufacture uncoated base films for "dry-type" separators. Instead, *LGC purchases base films and then performs additional manufacturing, using its own coating technology, in order to arrive at the final, finished separator ... Celgard provided to LGC uncoated base films for "dry-type" separators.*

Document No. 52, ¶ 5 (emphasis added). Accordingly, while the two products are distinct, they are very closely related. Indeed, by Defendants' own description, base film is an essential component of a separator.

***23** LGC also argues that the facts relevant to the state law claims are "[LGC's] termination of Celgard as a supplier of uncoated base film for lithium-ion batteries" and the facts related to the patent claims are "[LGC's] manufacture, distribution, importation, and sale of lithium-ion batteries with SRS-coated separators." (Document No. 275–1, p. 2). While the court agrees, it also believes that LGC's termination of Celgard as a supplier of uncoated base film is factually intertwined with, if not the exact cause of, LGC's manufacture, distribution, importation, and sale of lithium-ion batteries with SRS-coated separators. As noted above, the '586 patent claims ceramic-coated separators and batteries or systems including such separators. (Document Nos. 17 ¶ 8; 16, p. 4). Here, Plaintiff initially provided base film to LGC for use in manufacturing lithium-ion batteries for CE devices. (Document Nos. 18 ¶ 4–5; 217 ¶ 67). In 2008, Plaintiff and LGC began discussions regarding Plaintiff becoming LGC's exclusive supplier of base film for lithium-ion batteries used in EVs. (Document No. 18 ¶ 6; 217 ¶ 68). Pursuant to LGC specifications, Plaintiff designed separator material to which LGC could apply a ceramic coating. (Document Nos. 17 ¶¶ 13, 15; 80 ¶ 3; 19). Plaintiff states that once ceramic coated, this separator embodied the '586 patent, but that because LGC's use of the patent was authorized by Plaintiff at that time, the separator did not constitute infringement. *See* 35 U.S.C. § 271 (infringement requires use "without authority"); Pl. Resp. Def. Mot. Dismiss (Document No. 241, p. 2). Upon the beginnings of the breakdown of the LTA negotiations, Plaintiff discussed its patented technology with LGC, informing LGC that if it was going to cease purchasing its base film, it needed a license to ceramic-coat any non-Celgard separator. *See* (Document Nos. 242–34; 24218; 242–19; 242–21; 242–32; 242–38). The parties also discussed these patent issues during at least one of LGC's visits to Plaintiff in North Carolina. (Document No. 242–30). Plaintiff claims that infringement is occurring because LGC is purchasing base film from third parties and applying a ceramic coating layer to such base film in order to create coated battery separators, which fall within the scope of the patent. (Document No. 217, ¶ 51). The infringement that Plaintiff claims thus arises from LGC's choice to stop using Plaintiff's base film in its separators and to source it from a third party without a license. (Document No. 17, ¶¶ 49–52; 278, p. 4).

In light of the fact that Plaintiff's claims of patent infringement arise from LGC's choice to stop using Celgard base film in its separators, which is very

closely related to, if not essentially the same as, the conduct that gave rise to Plaintiff's state law claims, the court finds that a common nucleus of operative facts exists to warrant the exercise of supplemental jurisdiction. In sum, Plaintiff provided base film to Defendants for use in their separators. When the business relationship went sour, LGC sourced base film from a third party. Plaintiff alleges that the use of this third-party base film, in combination with LGC's application of ceramic coating, constitutes a battery separator that infringes upon the '586 patent. The nature of the parties' business dealings and LGC's decision to stop purchasing base film from Plaintiff after their significant history form a "common nucleus" that renders the patent claims part of the same "case or controversy" as the state law claims.

ii. *Other Jurisdictional Theories*

***24** The court has also considered whether it may exercise personal jurisdiction over LGC on independent grounds under the stream of commerce theory, particularly in light of the extensive briefing on the question and this court's recent decision in *Celgard, LLC v. SK Innovation, Co., Ltd.,* 3:13cv254–MOC–DSC, 2014 WL 5430993 (W.D.N.C. Aug.29, 2014), which found no personal jurisdiction over a foreign defendant under the stream of commerce theory. The question for the court is whether LGC has purposefully shipped its allegedly infringing products through an established distribution channel with the expectation that those products would be sold in the forum. *Nuance Commc'ns, Inc. v. Abbyy Software House,* 626 F.3d 1222, 1234 (Fed.Cir.2010); *Beverly Hills Fan Co. v. Royal Sovereign Corp.,* 21 F.3d 1558, 1566 (Fed.Cir.1994).

Here, Plaintiff has offered the following evidence in support of its argument that LGC meets this requirement:

- LGC supplies batteries containing separators for EVs sold at North Carolina dealerships, including the Cadillac ELR, Hyundai Sonata Hybrid, Kia Optima Hybrid, and Chevrolet Volt (for which LG Chem is the exclusive supplier). (Document Nos. 17 ¶¶ 16–17; 37 ¶ 5; 242–25; 242–26; 56 ¶¶ 14–18; 56–5; 80 ¶ 12; 80–2).

- Between 2011 and 2013, over 1,000 new Chevrolet Volts—each with an LGC battery—were registered in North Carolina; as were over 500 new Kia Optima Hybrids. (Document Nos. 57–4–57–6).

- In 2013, LGC supplied lithium-ion batteries for almost 26% of all plug-in EVs sold in the U.S., 56% of which contained ceramic-coated separators. (Document No. 17 ¶¶ 18–19, 23).

- LGC also sells batteries with separators for use in popular CE devices manufactured by Apple, Hewlett Packard, Nokia, Dell, and LG Electronics, among others. (Document Nos. 17–5, p. 3; 17–10, p. 5; 136, p. 6). These CE devices are widely sold and distributed in North Carolina, including by retailers like Best Buy, Target, and Walmart.[5] (Document Nos. 56 ¶ 25; 136, p. 6).

- LGCAI markets and distributes LGC's products in the U.S. (Document No. 33 ¶ 2).

The court also notes that in defending its motion to stay the preliminary injunction against it in this case, LGC went to great lengths to describe the expanse of its participation in the U.S. economic markets:

> Defendants sell in the order of $ 0.76 million every day attributable to the accused batteries sold or imported into the United States.... Worldwide, that number jumps to $6 million in daily sales. Defendants have yearly revenue of $278 million attributable to the accused batteries sold or imported into the United States (and $2.4 billion worldwide).... Beyond that, Defendants do business ***every day*** with companies at the center of the U.S. economy.

(Document No. 136, p. 4) (emphasis in original).

Defendants further described the alleged consequences of such injunction and its use of nationwide distribution channels to distribute infringing goods:

> ***25** In light of the broad scope of the Order, Defendants will be barred from making sales in the United States to downstream customers in consumer electronics (*e.g.,* Apple, Hewlett–Packard, and Dell) and the automotive industry (*e.g.,* General Motors and Ford Motor Company), and the impact of the Order will clearly be detrimental to these customers. Taken to its logical conclusion, not only will the Order take Defendants' batteries "off the shelves" but it also strips Best Buy and Wal–Mart (with respect to consumer electronics products) and car dealerships and distributors of their ability to provide products containing these batteries to consumers. Ultimately, the effect of this Order to a John Doe member of the public is not that he may have to buy a higher priced good, but that there will be no goods for him to buy.

*Id.* at 6 (footnote omitted).

The court has very carefully considered the evidence put forth by Plaintiff and agrees that LGC has knowingly and intentionally used nationwide distribution channels for its products, with the expectation that its products will be sold throughout the country, including in the state of North Carolina. However, the court finds that Plaintiff has not made the requisite showing that LGC ever placed *the allegedly infringing product* into the stream of commerce or that such product was offered for sale here. *See Nuance Commc'ns,* 626 F.3d at 1234; *Beverly Hills Fan,* 21 F.3d at 1566 (both requiring that for exercise of jurisdiction under the stream of commerce theory to be proper, Defendants must have placed the "accused product" in the stream of commerce). *See also Celgard, LLC v. SK Innovation Co.,* No. 3:13–CV–00254–MOC, 2014 WL 5430993, at *4 (W.D.N.C. Aug.29, 2014) (finding that stream of commerce theory did not succeed where "plaintiff has provided this court with no indication that [defendant] has ever made a sale or even an offer of sale in North Carolina and none of SKI's products have been found in this forum."). Plaintiff's patent infringement claims are premised upon LGC using non-Celgard base film in its separators. Plaintiff admits that when LGC used Celgard base film in its separators, the manufacture of such separators did not constitute infringement because LGC's use of the patent was authorized by Plaintiff at that time. Pl. Resp. Def. Mot. Dismiss (Document No. 241, p. 2). It is difficult for this court to find that the allegedly infringing product has been placed in the stream of commerce when Plaintiff has failed to submit any evidence that LGC has placed a separator *with non-Celgard base film* in the stream of commerce, let alone shown that one was offered for sale in this state. As Defendants note,

> By Celgard's own timeline, it takes four to six months to incorporate a base film into an LGC lithium-ion battery. (Paulus Decl. ¶ 8, Dkt. 80.) Celgard also maintains that LGC "consumed or otherwise used" Celgard base film at least until January 2014. *(Id.* at ¶ 7.) Celgard, however, does not estimate how long it takes for an LGC lithium-ion battery to be incorporated into an EV or CE downstream product, nor does Celgard estimate how long it takes before an assembled EV will ship out to a dealer in North Carolina or a CE downstream product will reach big box stores, like Wal–Mart or Best Buy.

***26** (Def. Reply, Document No. 247, n. 3). Plaintiff has simply offered no evidence that an LGC product with an allegedly infringing separator has been found in this forum. The court will not assume that the LGC separators found in this state within the EV and CE devices sold here are those accused of infringement, particularly when Plaintiff admits that until fairly recently, LGC separators shipped from South Korea to the U.S. were not infringing. Plaintiff's evidence that LGC sells products with separators in this state, alone, is not sufficient to support a finding of jurisdiction under a stream of commerce theory.

Because the court has found that LGC is subject to jurisdiction here through supplemental jurisdiction, it will not address Plaintiff's alternative argument that LGC is subject to nationwide jurisdiction under Rule 4(k)(2). Similarly, because the court believes that the exercise of jurisdiction over LGC under the theory of supplemental jurisdiction is appropriate, it will not undergo further analysis of whether LGC's contacts with North Carolina are so systematic and continuous as to render it subject to general personal jurisdiction here.

**D. Personal Jurisdiction over LGCAI**

The court next considers whether Plaintiff has established a prima facie case of personal jurisdiction over LGCAI. As noted above, LGCAI, a wholly-owned subsidiary of LGC, is a Delaware company headquartered in Englewood Cliffs, New Jersey. *See* Declaration of Juan (S.H.) Oh ("Juan Decl."), (Document No. 33), ¶ 2; Def. Mem. Mot. Dismiss (Document No. 227), p. 4). LGCAI is responsible for marketing LGC petrochemicals, information and electronic materials, and batteries to customers in the United States. (Juan Decl, ¶ 2). LGCAI also acts as a product distributor for LGC's customers in the U.S. and is responsible for sales and program management to U.S. customers, but has no direct involvement with the manufacture of LGC products and does not share any officers with LGC. *Id.*

Relevant to LGCAI's contacts with the state of North Carolina, LGCAI has no offices, employees, telephone listing, post office box, mailing address, bank account, or advertising in North Carolina. *Id.* at ¶ 3. LGCAI does not own or rent any real property in North Carolina. *Id.* However, LGCAI is registered with the Secretary of State of North Carolina to do business here and has a registered agent for service of process here. *Id.* In the past, LGCAI stored inventory in one of its customer's consignment warehouses here, though it has not stored any inventory there since 2013. *Id.* LGCAI also paid taxes to the state of North Carolina in 2012 related to storing such inventory. (Document No. 217 at ¶ 43; Def.'s Mem. Sup. Mot. Dismiss (Document No. 227, p. 16)). Additionally, between 2009 and 2013, LGCAI had seven customers in North Carolina (unrelated to the products accused of infringement). (Juan Decl. at ¶ 4). LGCAI sold over $14 million worth of products to these customers during that time, which Defendant states accounted for, on average, approximately 0.9% of LGCAI's total revenues in the United States during that period. *Id.* at ¶ 4. LGCAI admits that it "conducts business from time to time in North Carolina for the purpose of selling products for its petrochemical and toner businesses." *Id.*

***27** Plaintiff argues that LGCAI is subject to general jurisdiction because even though LGCAI is a non-resident and its contacts are unrelated to Plaintiff's causes of action for patent infringement, its contacts with North Carolina are "continuous and systematic." As noted above, sporadic, insubstantial contacts with the forum state are insufficient to establish general jurisdiction. While there is no precise test for determining general jurisdiction, *LSI Indus.Inc. v. Hubbell Lighting, Inc.*, 232 F.3d 1369, 1375 (Fed.Cir.2000), courts have generally focused on two areas of inquiry. *Ashbury Int'l Grp., Inc. v. Cadex Defence, Inc.*, No. 3:11CV00079, 2012 WL 4325183, at *4 (W.D.Va. Sept.20, 2012). First, they look for physical presence in the forum state, such as corporate facilities, bank accounts, agents, registration, or incorporation. *Id.* (citing *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952)). Second, "courts have also considered whether the defendant has actively solicited business in the forum state and the extent to which the defendant has participated in the state's economic markets....In other words, courts have examined the "economic reality" of the defendant's activities in the forum state." *Id.* (internal citation omitted). *See also Trierweiler v. Croxton & Trench Holding Corp.*, 90 F.3d 1523, 1533 (10th Cir.1996) (noting that courts consider "(1) whether the corporation solicits business in the state through a local office or agents; (2) whether the corporation sends agents into the state on a

regular basis to solicit business; (3) the extent to which the corporation holds itself out as doing business in the forum state through advertisements, listings or bank accounts; and (4) the volume of business conducted in the state by the corporation.") (cited with approval as a non-exhaustive set of appropriate factors in *Delta Sys., Inc. v. Indak Mfg. Corp.,* 4 F. App'x 857 (Fed.Cir.2001) (unpublished)).

Here, LGCAI has physical presence in the state of North Carolina in the form of being registered to do business here, having a registered process agent here, using property in this state for storage, and paying state taxes at least once. Additionally, LGCAI has participated in the economic markets of this state through its sales to North Carolina customers. As noted above, Plaintiffs have submitted evidence that LGCAI sold over $14 million worth of products to seven customers in the state between 2009 and 2013. (Juan Decl., ¶ 4; Lee Decl. (Document No. 242), ¶ 47–53). These sales accounted for, on average, approximately 0.9% of LGCAI's total revenues in the United States during that time (0.9 % in 2010, 1% in 2011%, 1% in 2012, and 0.8% in 2013). *Id.* Though the parties dispute the significance of these sales and revenue percentages, the court notes that "just as it would be inappropriate to permit an exercise of personal jurisdiction solely on the presence of sales into the forum ... it would likewise be inappropriate to entirely disregard a defendant's sales into the forum simply because they only generated a small percentage of the defendant's total revenue." *ATI Indus. Automation, Inc. v. Applied Robotics, Inc.,* No. 1:09CV471, 2013 WL 1149174, at *4 (M.D.N.C. Mar.19, 2013) (internal citation and quotation omitted). Here, though LGCAI earned only a small percentage of its revenue from customers in North Carolina, the dollar figure is by no means insignificant. Additionally, LGCAI earned revenue from such sales for each of the four years before the complaint was filed in this action. The court therefore finds such sales an appropriate factor for consideration. *See id.* at *5 (finding that defendant's sales to North Carolina were appropriate for consideration where they constituted 1.2% of annual sales, and distinguishing *Campbell Pet Co. v. Miale,* 542 F.3d 879, 884 (Fed.Cir.2008), wherein Federal Circuit affirmed district court's finding of no general jurisdiction over defendants who made only 12 sales to Washington residents in eight years, for a total of less than $14,000 in gross revenue (approximately 2% of total sales), and in four of those years made no sales in Washington at all).

***28** While this case presents a close call, the court finds that the evidence of LGCAI's physical presence in North Carolina, as well as its participation in the state's economic markets through its sales to companies here, is sufficient to support a prima facie case of general jurisdiction. *See LSI Indus.Inc. v. Hubbell Lighting, Inc. .,* 232 F.3d 1369, 1375 (Fed.Cir.2000) (finding that non-resident defendant had continuous and systematic contacts with forum state partially based on millions of dollars of sales in the state, despite lack of sale of the allegedly infringing product in forum state); *Ashbury Int'l Grp., Inc. v. Cadex Defence, Inc.,* No. 3:11CV00079, 2012 U.S. Dist. LEXIS 134878, at *6, 2012 WL 4325183 (W.D.Va. Sept. 20, 2012) (finding sales of millions of dollars of products to repeat customers sufficient for general jurisdiction, even absent traditional factors indicating physical presence in forum state).

The court also finds that the exercise of general jurisdiction over LGCAI at this point is reasonable and that LGCAI has failed to meet its burden of showing otherwise. First, litigating in North Carolina will not unreasonably inconvenience LGCAI. LGCAI has its principal place of business in New Jersey and its marketing and sales office for the accused lithium-ion batteries is in California. As noted above, "progress in communications and transportation has made the defense of a lawsuit in foreign tribunal less burdensome." *Synthes (U.S.A.) v. G.M Dos Reis Jr. Ind. Com. De Equip. Medico,* 563 F.3d 1285, 1299 (Fed.Cir.2009). The court, having already found that LGC, a company headquartered in Korea, will not be unreasonably inconvenienced by litigating here, declines to find that a company headquartered in this country would be so inconvenienced. Additionally, LGCAI is apparently willing to litigate this dispute in the Eastern District of Michigan, which is not substantially closer to California or New Jersey than North Carolina, which indicates that LGCAI is prepared to accept the burden of travel. The court finds that the same analysis applies to LGCAI as to LGC for the remaining four factors for consideration. As noted above, North Carolina has an interest in adjudicating claims relating to infringement of a citizen's patent. Plaintiff has a

significant interest in maintaining this action in North Carolina, as much of its evidence and witnesses knowledgeable about the patented invention are located here. Defendant has not offered any compelling reason why the interstate judicial system's interest in obtaining efficient resolution of controversies or the states' interest in furthering substantive social policies necessitates a finding that exercising jurisdiction over LGCAI is unreasonable or unfair. As with LGC, the court finds that LGCAI has not met its burden of showing that being subject to personal jurisdiction here would be unreasonable. In light of the above analysis, the court finds that the exercise of general jurisdiction over LGCAI is appropriate for Plaintiff's patent law claims.

***29** Plaintiff also argues that LGCAI is subject to personal jurisdiction under the stream of commerce theory because it participates in the same distribution chain for LGC's batteries as LGC. The court finds such argument futile in light of the above finding that Plaintiff has failed to show LGC is subject to jurisdiction under such theory, let alone offered any argument as to how any action of LGC can be imputed to LGCAI.

## V. CONCLUSION

For the reasons stated herein, the court finds that this maintenance of this action is appropriate in this district at this time.

## ORDER

**IT IS, THEREFORE, ORDERED** that:

1) Defendants' "Objections to Magistrate Judge's Order Granting Defendants' Alternative Motion to Transfer Venue" (Document No. 266) are **SUSTAINED in part and OVERRULED in part,** as described herein;

2) The Order of the Magistrate Judge transferring venue (Document No. 262) is **REVERSED** and Defendants' Alternative Motion to Transfer Venue to the Eastern District of Michigan (Document No. 230) is **DENIED;**

3) Defendants' Motion to Dismiss Counts III–VI of Plaintiff's First Amended Complaint for Failure to State a Claim (Document No. 222) is **DENIED;** and

4) Defendants' Motion to Dismiss Plaintiff's First Amended Complaint for Lack of Personal Jurisdiction (Document No. 226) is **DENIED.**

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 2412467

## Footnotes

1 The MOU refers to LGC's purchase of "separators" from Celgard, but affidavits filed by both parties makes clear that the "separators" referred to in the MOU are equivalent to "base film," as the term is used in this Order. *See generally* Pulwer Decl.; Declaration of Jina Lee (Document No. 52).

2 More specifically, LG Chem states that it is subject to specific jurisdiction in the Eastern District of Michigan because it sells the accused lithium-ion batteries to electric vehicle manufacturers residing in the district, including General Motors, Ford Motor Company, and Chrysler. (Def. Mem. Sup. Mot. Transfer (Document No. 231, p. 5); ("Declaration of Jun Hong Min ..." ("Min Decl.") ¶ 3, Dkt. 73.) Additionally, all three of LG Chem's U.S. subsidiaries, including LGCAI, have outposts and/or offices in Michigan. (Min Decl. ¶ 2, Dkt. 73).

3 The court has considered whether the law of the Federal Circuit applies to both the state law claims and the claims for patent infringement in this case and notes that both parties have argued their positions on personal jurisdiction solely under the law of the Federal Circuit. *See* Def. Mem. Mot. Dismiss (Doc. No. 227, p. 5, n. 24); Pl. Mem. Opp. (Document No. 241, p. 14–15). The court finds that application of Federal Circuit law is appropriate here as to all of Plaintiff's claims. In *3D Systems, Inc. v. Aarotech Lab ., Inc.,* 160 F.3d 1373, 1377–78, 48 USPQ2d 1773, 1776 (Fed.Cir.1998), the Federal Circuit held that the law of

that circuit, as opposed to the regional circuit, applied in determining that the district court had personal jurisdiction over an out-of-state corporation defending claims for patent infringement and state law claims of trade libel and unfair competition where the exercise of supplemental jurisdiction was proper. *See* *id.* at 1377–78 ("Because of supplemental jurisdiction under 28 U.S.C. § 1367 ... the propriety of jurisdiction in light of federal due process for both the state law claims and the federal patent law claims is to be analyzed using Federal Circuit law."). The Federal Circuit found that because the patentee's trade libel and unfair competition claims went "hand-in-hand with its patent infringement claims," and because the claims arose out of the same facts, application of Federal Circuit law was appropriate in resolving the personal jurisdiction issue, even though state law claims were involved. *Id.* at 1377.

4 The court has also carefully considered Plaintiff's statements at the hearing in response to questioning by the court as to why its patent law and state law claims are related. *See* Hearing Transcript (Document No. 274) at 25:1026:25; 13:1–25. To the extent Defendants construe Plaintiff's statements as allegations of theft of intellectual property in their supplemental brief (# 275–1), the court is not persuaded that Plaintiff was attempting to assert a new claim against Defendants at the hearing. *See id.* at 26:23–5 ("They completely said, Sorry, you know, Go pound sand. We're going to go run off with your technology and work with someone else."); *id.* at 13:19–23 ("[LG Chem] went and learned about our technology and then they went and took it to someone else and are now infringing our patents with technology that we provided to them and that we taught them."). The court finds that Plaintiff's arguments about the relationship between its patent claims and state law claims at the hearing are consistent with the allegations and arguments it made in its Amended Complaint (Document No. 217) and its Response in Opposition to Defendants' Motion to Dismiss (Document No. 241).

5 Simple internet searches indicate that in the Charlotte, North Carolina area alone, Best Buy has at least nine retail stores, *see* http:// www.bestbuy.c om/site/olspage.jsp?id+cat12092 & type+page & _ requestid +100835, Wal–Mart has at least nine retail stores, *see* http:// www.walmart .com/store/finder?location+charlotte, north carolina & distance+10, and Target has four retail stores, *see* http://www . target.com/store-locator/search-results?address= charlotte'+ north+carolina & fromPage=findStore. Apple has two retail stores in Charlotte and five retail stores in the state of North Carolina, *see* https://www.apple.com/retail/storelist/.

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

goods will be in any way impacted as it appears that plaintiff is able to provide the products necessary for production.

***

Having carefully considered all four factors, the court finds that the entry of a preliminary injunction is necessary to protect plaintiff from ongoing and irreparable harm during the pendency of this action. Such harm to plaintiff significantly outweighs any harm that defendants may incur as a result of the entry of the injunction. Finally, the Federal Rules of Civil Procedure state that "[n]o ... preliminary injunction shall issue except upon the giving of security by the applicant, in such sum the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." Fed.R.Civ.P. 65(c). The amount of bond is within the discretion of the Court. Maryland Dept. of Human Resources v. U.S. Dept. of Agriculture, 976 F.2d 1462, 1483 (4th Cir.1992). The Court here finds that a bond of $1,000.000.00, is sufficient to cover defendant's costs or damages should it later be determined that defendant was wrongfully enjoined.

**ORDER**

**IT IS THEREFORE ORDERED** that plaintiff's Motion for Preliminary Injunction is hereby **GRANTED**, and defendants are preliminarily enjoined from (1) making, using, selling, or offering for sale in the United States, (2) importing into the United States, and (3) activity inducing others in the United States to make, use, sell, or offer for sale in the United States or to import into the United States the following: any battery, separator, or system that uses or constitutes (i) LG Chem's SRS technology, (ii) an infringing ceramic-coated separator, or (iii) any rechargeable lithium-ion battery, cell, pack, module, or other device, vehicle, or product that includes an infringing ceramic-coated separator. Plaintiff shall secure a bond in the face amount

of $1,000,000.00. Upon motion filed by any party, the court will review the impact of such preliminary injunction after a period of 60 days if requested to do so.

**IT IS FURTHER ORDERED** that defendants' Motion to Dismiss for Lack of Personal Jurisdiction (#30) and Motion to Transfer Venue (#71) are REFERRED to the Magistrate Judge for consideration after jurisdictional discovery, and plaintiff's Motion for Jurisdictional Discovery (#58) is ALLOWED and jurisdictional discovered is opened for a period of 60 days, which shall also be directed by the magistrate judge.

Signed: July 17, 2014

Max O. Cogburn Jr.
United States District Judge

# EXHIBIT 4

Advertise Here

—Advertisement—




# City announces new scooter and bike share permits: Spin and Wheels are out, Bird is in

Posted on May 13, 2022 by Tom Fucoloro




It's difficult to draw too many conclusions from this chart due to the pandemic (and smoke), but more devices and warmer weather generally resulted in more trips, as expected. From SDOT's scooter share pilot program report (PDF).

Spin and Wheels have not received permits to operate in Seattle under the city's 2022–2023 permit, SDOT announced. But for the first time, scooter company Bird will operate here.

LINK scooters have retained their permit, as have Lime's scooters and bikes. The most recent entrant into Seattle, Veo, has also retained its permit for its bikeish-scooters.

SDOT says it selected the permits based on each company's "commitment to safety, community engagement, and continual improvement." From the SDOT Blog:

> *All three of the selected companies submitted robust proposals detailing their commitment to safety, community engagement, and continual improvement, as well as considering the needs of other people traveling on streets, sidewalks, bike paths, and trails.*
>
> *The selection was difficult, and we are grateful for Wheels and Spin, two current scooter companies that will not continue operating in Seattle, for the transportation service they provided between 2020–2022.*

*We are issuing three permits at this time. We may issue an additional permit to another company in the future if we see a good opportunity to benefit the public.*

People took more than 1.4 million trips on shared scooters and bikes between October 2020 and September 2021, a figure that is likely to increase as more destinations fully reopen and the number of events grows. The top trip destinations were crowded areas like downtown or busy business districts, SDOT noted in their pilot permit summary. The average scooter trip was 15 minutes, traveled 1.4 miles and cost $6.63.




Map of scooter trip destinations, from the scooter share pilot program report (PDF).

A portion of the fees collected from scooter and bike services help fund an adaptive cycling program the city hosts in partnership with Outdoors For All in Magnuson Park, providing people a chance to ride accessible cycles designed to work for people with many different disabilities.

Spin and Wheels will have "a few weeks to wind down their operations," SDOT wrote. It will likewise take Bird a few weeks to get up and running.

This entry was posted in news and tagged bike share, outdoors for all, scooter share, sdot. Bookmark the permalink.

## 5 Responses to *City announces new scooter and bike share permits: Spin and Wheels are out, Bird is in*

**Greg** *says:*
May 14, 2022 at 7:33 am

"The average scooter trip was 15 minutes, traveled 1.4 miles and cost $6.63." This is a little surprising, isn't it? You can walk 1.4 miles in 20-25 minutes for free. And $6.63 is far more than bus fare, which is another alternative. With the new higher pricing, it's not clear how competitive this is, is it?

Scooters and shared bikes looked more attractive to use when they were cheaper because they were subsidized by cheap VC cash, but I'm not sure about their prospects at the prices the businesses will have to charge to make a profit. We'll see, I guess.

Reply

**Cole Gleason** *says:*
May 14, 2022 at 3:42 pm

I'l use them if I'm running late for something and walking would be a bit too slow. It's too pricy to replace transit for me, but between that and rideshare I'll take the scooter/e-bike.

Reply

**RossB** *says:*
May 15, 2022 at 10:18 am

Yeah, the prices seem outrageously expensive. Is there a discount for lots of trips? If so, I can't find it. If you take a dozen trips a month, you are spending quite a bit of money. Even weekly trips seem expensive.

In contrast, consider some similar size cities for bike share (not scooters). Portland: $8.25 a month ($100 a year), for an unlimited number of trips. Boston, $120 a year. Vancouver, $130 a year. All of these are run by the city (or some public agency). They all look a lot better, in terms of bike availability, from what I can tell. (I'm pretty sure Boston has a great system, not sure about Portland and Vancouver.)

We really took the wrong approach here. We abandoned public bike share, figuring the private market would give us cheap prices and quality service. It has provided neither.

We need to change our approach, and do what other cities have done: consider bike share an important part of public transportation. They complement other forms of public transit (buses and trains) that thankfully are publicly owned. The bike share system should be run by a public agency (or non-profit, like in Minneapolis) along with a relatively small amount of public subsidy (along with private sponsorship, like Nike in Portland). We should have a lot more docks in most of the city, with dockless only in the low density outskirts.

Reply

---

**Ballard Biker** *says:*

May 15, 2022 at 10:17 pm

Wheels were motorcycles disguised as scooters and their typical rider behaved like your typical car driver. They will not be missed. I'm shocked SDOT set some standards when it comes to motorized vehicles on non-motorized infrastructure.

Reply

---

**eddiew** *says:*

May 17, 2022 at 12:58 pm

The most serious issues are safety and clutter. There have been many injuries. Dock-less devises are often parked without discipline and block sidewalks, curb ramps, and bus stops. They interfere with passage by pedestrians, seniors, handicapped, and bus riders. The net seems negative.

Reply

---

# EXHIBIT 5

Bird Cities Blog

Shop Category Subscribe Ride Now

Go back

Impact • 5/13/22

# Bird Selected to Launch Safe, Accessible Scooters in Seattle



Related Posts

Canada Joins Bird Bike Expansion With Calgary, Windsor, Edmonton Launches
June 8, 2022

Bird is coming to the Emerald City.

Seattle this week announced that Bird has been selected as one of three operators to serve the city's 750,000 residents.

In a blog post announcing the decision, the Seattle DOT noted that "Bird operates in over 400 cities and has a demonstrated commitment to safety and sustainability. They will bring their newest Bird Three scooters to Seattle, which offer a safer ride and longer battery life than their earlier models."

The permit will allow Bird to deploy up to 2,000 scooters throughout Seattle in an effort to help reduce dependence on personal cars and provide greater access to safe, sustainable micromobility.

## A Commitment to Safety, Accessibility and Proper Parking

Bird is committed to being both a trusted city transportation partner and a contributing member of the Seattle community.

Our Bird Three scooters come equipped with design features and technology that include the industry's longest and most stable footboard, Autonomous Emergency Braking, Beginner Mode for new riders as well as custom designed tubeless tires that absorb significantly more vibrations than semi-solid tires with shocks.

We also unveiled our revolutionary Bird Visual Parking System (VPS) this week, powered by Google's ARCore Geospatial API, to help provide cities like Seattle with the most precise and scalable parking technology available.




In addition to our technology, Bird has made it a priority to connect and partner with local organizations such as Defy Ventures and Transportation Choices Coalition, and has partnered with the Arbor Day Foundation on a tree-planting initiative in Seattle. We're also proud to offer our exclusive On-Demand Accessible Mobility program in Seattle in partnership with Scootaround to help ensure everyone has the opportunity to benefit from micro-electric transportation.

## Learn More

New to Bird in Seattle? We've got you covered. Our team has put together a series of helpful guides to get you started riding safely and in compliance with the rules.

- Click here for our 2022 How to Bird riding guide
- Click here for our 2022 How to Park guide

You can also learn more about Bird's advanced technology and upcoming launches by subscribing to the Bird Cities Blog.



**Rider**

How to Bird
Map
Safety
Sustainability

**Vehicles**

Bird Bikeshare
Bird Three
Bird Two
Bird One

**Partner**

Cities
Investor
Fleet Manager
Platform

**Company**

About
Blog
Careers
Contact us
Press
Shop

**Blog**

Canada Joins Bird Bike Expansion With Calgary, Windsor, Edmonton Launches
6.8.22

Bird Bike's New OTA Alarm System Upgrade Is Here
6.3.22

Rental Agreement Terms of Service Privacy Policy Do Not Sell My Personal Information (California)

Copyright © 2022 Bird Rides, Inc

English

# EXHIBIT 6

## Northern Europe

Copenhagen
Helsinki
Odense
Stockholm

## UK&I

London
Manchester
Milton Keynes

## Southern Europe

Cadiz
Catania
Lisbon
Madrid
Milan
Naples
Palermo
Rimini
Rome
Seville
Turin
Verona

## US North

Baltimore
Bloomington
Cincinnati
Cleveland
Columbus
Detroit
Evansville
Grand Rapids
Hampton, VA
Indianapolis
Lansing
New York
Norfolk, VA
Omaha
Richmond, VA
Roanoke, VA
Rochester
St. Louis
Washington DC

## US South

Atlanta
Austin
Bartlesville
Boulder
Charleston
Charlotte
Colorado Springs
Corpus Christi
Denver
Edinburg
Little Rock
Louisville
Lubbock
Nashville
Oklahoma City
Orlando
Raleigh/Durham
Statesboro
Tampa
Tulsa

## US West

Boise
Los Angeles
Oakland
Ogden
Portland
Provo
Sacramento
Salt Lake City
San Diego
San Francisco
San Jose
Santa Barbara
Seattle
Spokane




## Download the App

Download on the App Store
GET IT ON Google Play

# EXHIBIT 7

TO MI OR NOT TO MI

# Rebranded Chinese scooters are taking over San Francisco

April 19, 2018

By **Mike Murphy** & **Alison Griswold**




BIRD

A flock of Bird scooters.

If you've been in downtown San Francisco, Los Angeles, or Washington DC recently, you've probably noticed an influx of scooters—electrified versions of the longtime children's toy —on street corners and sidewalks.

Startups including Bird, founded by former Lyft-then-Uber executive Travis VanderZanden, LimeBike, and Spin, have been dumping internet-connected scooters on city streets over the last year, ostensibly in an effort to fill the gaps in municipal transit.

These startups market their fleets as a cheap and easy way to get around cities plagued by congestion and poor public transit. They've been richly funded by venture capitalists, raising a collective $255 million. VanderZanden has implied electric scooters are part of "the biggest revolution in transportation since the dawn of the Jet Age."

Quartz took a closer look at the technology littered across city sidewalks: a scooter, retailing for $500, made by Chinese electronics company Xiaomi.

Xiaomi is perhaps best-known in the West for producing low-cost smartphones and wearables, but the company actually produces a litany of gadgets under its Mi brand, from cameras and TVs, to computers, appliances, headphones, and even sofas.

A Bird scooter recently inspected by Quartz in San Francisco bore a product sticker on the base that read, "Mi Electric Scooter." The sticker listed the scooter's maximum speed at 15.5 miles per hour, and maximum load at 220 pounds. The product was made in Changzhou, China, by Xiaomi's subsidiary Ninebot, which also owns Segway. Bird states on its online safety page that scooter speeds are "throttled to 15 mile per hour" [sic] and says in its rental agreement that riders must not exceed a maximum weight of 200 pounds. The average weight of a US man is about 196 lbs.






QUARTZ/MATT QUINN

The product sticker on the undercarriage of a Bird scooter shows it to be the Xiaomi Mi scooter.

In China, the Mi scooter sells for 1,999 yuan (roughly $320), but in the US, on sites like Amazon, it can cost about $500. It weighs just shy of 27 lbs and can connect wirelessly over Bluetooth to other apps. The scooter has a maximum travel range of about 18 miles “under specific conditions,” which include mild weather conditions, a load of about 165 lbs, and a “flat road without strong winds,” according to a product description on Amazon. (San Francisco, of course, is not exactly known for its flat roads.)




SPIN, BIRD

Spin and Bird’s scooters are almost identical.

Bird refused to confirm that it’s using the Mi scooter, even when Quartz said that it had photos of the scooters showing their model. Spin appears to use the same scooters as Bird, and a spokesperson for Spin confirmed to Quartz that it’s working with Xiaomi to produce and customize its scooter

fleet. They added that the devices have been certified by UL, a US testing company that sets safety standards for many consumer products. Bird declined to comment on what safety tests its scooters had been through. Assuming the models are the same, though, should mean that both Spin and Bird scooters won't repeat the fate that befell the short-lived hoverboard fad.

The self-balancing boards exploded in popularity in 2015, and then just started exploding. To meet the skyrocketing demand, manufacturers seemed to cut corners, shipping models around the world that caught fire and exploded while people were riding or charging the devices. In many cases, shoddy batteries were to blame, leading Amazon to pull many models from its sites, and the US Consumer Product Safety Commission to request that UL come up with a test for ensuring hoverboard batteries were safe to sell to consumers. By the time the first UL-certified boards hit the market, the fad was dead.






LIMEBIKE

LimeBike's proprietary scooter design.

LimeBike told Quartz that its scooters are a proprietary "Lime-S" design, built by a third party overseas. Although it didn't confirm who that was, it appears the company is using a modified version of a design produced by a range of manufacturers—you can find the design on Amazon under the names Haitral, Logisys, Swagtron, and Partu, to name a few—and retail between about $200 to $400. It's unclear what sorts of tests these batteries have been through, and LimeBike couldn't confirm whether its scooters' batteries were UL certified. It has deployed over 35,000 bikes and scooters across the US since last June.

On the surface, there isn't much wildly different between these scooter startups. They all have scooters that can travel at roughly the same speeds, that are connected to apps and can unlock with some combination of Bluetooth, cellular data, and GPS. LimeBike told Quartz that it's building software that can detect if its scooters fall over (so if users are carelessly tossing them on street corners instead of neatly propping them up somewhere, or if they're being stolen, Lime will know), while Bird and Spin claim to have the operational savvy required to run an on-demand transit

network. But really, there isn't much that makes one of these companies more special than another, at least not yet. Just as Uber and Lyft notoriously have the same drivers, it's perhaps not surprising that the next wave of mobility startups are using pretty much the same technologies.

Bird has raised $118 million to date from investors including New York-based Tusk Ventures. That gives the company plenty of money to spend on Xiaomi scooters, which it's presumably purchasing for less than the $500 sticker price. On Chinese e-commerce site Alibaba, for example, a minimum of 100 Mi scooters can be purchased for $250 to $299 apiece. At the midpoint of that price range, Bird could buy a fleet of 500 scooters for $137,500, or 0.1% of its total funding. Bird declined to disclose how many scooters it has deployed. (Spin said it has "hundreds" of scooters, and they're mainly concentrated in the SoMa neighborhood of San Francisco.)

On the other hand, at Bird's current rates of $1 per ride plus 15 cents per minute, it would take a long time to recoup the cost of a single scooter. In Bird's hometown of Santa Monica, for instance, a 2016 study of local transit found that 53% of trips were less than 3 miles and 18% were less than 1 mile. At 15 mph, a Bird scooter could make a three-mile trip in about 12 minutes, which means the entire trip would cost $2.80. If Bird were purchasing scooters in bulk at $275 apiece, it would take about 100 of those trips to offset the initial purchase price. Bird said the majority of its rides were less than 2 miles long.

*Additional reporting by Matt Quinn.*

QZ **Quartz Daily Brief**

# EXHIBIT 8

Due to COVID-19, the ongoing health and containment emergency measures may cause service delays at logistic couriers and Xiaomi authorized service centers until further notice. Thank you for your understanding and support. ×



# Launching of Repair Programme for M365 Mi Electric Scooter with the Hook Made of Aluminium Alloy

Learn more at https://www.mi.com/us/support/scooter-safety-notice



reddot award 2017
best of the best

The minimal yet modern design of Mi Electric Scooter has been awarded the prestigious Red Dot "Best of the Best" Award, as well as the iF Design Award 2017. Mi Electric Scooter has a forward-thinking design that inspires and moves, just as it moves you ahead.

18.6 miles — Long-range battery | 3 s — Innovative folding design | 5 x — Walking speed [1] | Double — Safety braking system



## Works as simple as it looks

Every aspect of Mi Electric Scooter is crafted with simplicity in mind. The scooter frame, components and accessories use the same geometric design language that puts usability and the user at the front. A single button kicks the scooter to life and the red design accents add modernity. Mi Electric Scooter is made to look right, and feel right.

**Minimally designed**
Uniform geometric design elements

**Made for comfort**
Curved pedal board

**Folds up**
Simple folding levers

## Folds in 3 easy steps

Flip, fold, clip.

Simply flip down the folding lever to fold, and the scooter bell catches onto a latch on the rear wheel. The result is a compact and secure folding design that's perfect for stowing Mi Electric Scooter away at home, in the office, or in the trunk of a car.



## Aerospace-grade aluminum frame

Weighs just 26.9 lbs

The sturdy frame is made of aerospace-grade aluminum, which has a low density and high structural strength. It also has excellent thermal conductivity and corrosion resistance for added durability. At just 26.9 lbs, Mi Electric Scooter is a great portable size and weight for carry-ons and for maneuvering stairs and pavements.



**Anti-slip handle**
Provides a great grip and control over the scooter, even for longer rides.

**Controlled acceleration**
Give the accelerator a gentle downward push and adjust the amount of pressure until you reach a comfortable speed.



**Battery life at a glance**
4 LED notification lights on the dashboard indicate remaining battery life.

**Power button controls** [2]
Single press to switch on. Long press to shut down. When Mi Electric Scooter is on, a short single press will switch headlights on/off. Double press to switch between normal and power saving modes.



Front and rear double braking system

Ultra-bright headlights

Headlights are essential for night riding.

Red taillights for braking

Front and rear double braking system

Features a disc braking and eABS regenerative anti-lock braking system for an efficient, responsive braking distance of just 13.1 ft. [3]



## Shock-absorbing tires for a smoother ride

The large 8.5-inch front and rear tires have great shock absorption and anti-slip treads. Coupled with a 250W brushless DC motor for stable power output, Mi Electric Scooter is set to deliver a smoother riding experience.





## 18.6 miles long-range battery [4] with smart power management

Several 18650 high-capacity lithium batteries deliver up to 18.6 miles of travel on a single charge. Smart battery management via the app displays the health of the battery pack and notifies you immediately if there are issues.

Short circuit protection | Overcurrent protection | Double protection from overcharging | Double protection from overdischarging | Temperature Resistance | Undervoltage auto-sleep protection

## Recovers and regenerates energy

In order to extend battery life, Mi Electric Scooter converts and stores kinetic energy during acceleration into electrical power. It is also fitted with regenerative braking for additional power. This enhances the emergency braking experience and improves battery life at the same time.



## Ride statistics on the app





# EXHIBIT 9

# PROTERRA SELECTED IN ELECTRIC BUS CONTRACT BY VIRGINIA DEPARTMENT OF GENERAL SERVICES

June 28, 2019

*Transit agencies, universities and institutions can now purchase Proterra Catalyst® buses and charging stations directly from the Virginia state contract*

**Burlingame, Calif. – June 28, 2019 –** Today Proterra, a leading innovator in heavy-duty electric transportation, announced that it has been selected by the Virginia Department of General Services as a vendor to supply zero-emission battery-electric buses and charging stations for its Statewide Contract. In 2018, transit buses in the state of Virginia provided more than 74.5 million trips to riders throughout the Commonwealth.

Proterra, along with other manufacturers, underwent a testing and review process by the state of Virginia and was chosen among a pool of providers to help streamline local transit agencies' access to the vendor and vehicle that best meet their specific transit system needs. As a result, transit agencies, universities and institutions can now purchase Proterra® battery-electric buses and charging systems through the state's pre-established contract. Transit agencies in other states can also leverage the Virginia state contract to simplify the process of purchasing electric buses.

Proterra battery-electric buses bring both economic and environmental benefits to transit agencies and the communities they serve. Each time a Proterra electric bus replaces a diesel bus, around 230,000 pounds of greenhouse gas emissions are avoided per year. Further, battery-electric bus technology continues to advance, with the Proterra Catalyst vehicle now capable of delivering nearly twice the horsepower and five times the efficiency of a standard diesel engine. Proterra electric buses feature industry-leading bus design, including a lightweight

composite body, energy dense battery systems, highly efficient electric drivetrain technology, and a connected vehicle intelligence system. The Proterra Catalyst® electric vehicle platform can be customized to meet the demands of a wide range of transit routes to bring clean, quiet transportation to Virginians.

Additionally, Proterra now offers Proterra Energy™ fleet solutions, which helps customers transition to an all-electric fleet by offering a full suite of products and services that enable turn-key delivery of a complete energy ecosystem. Proterra can design, build, deploy and maintain electric buses, batteries, chargers and charging infrastructure for customers to enable a streamlined transition to an electric fleet with a single point of contact. Through the Virginia Statewide Contract, transit agencies can also utilize Proterra's battery-leasing program, which reduces the upfront cost of electric buses to be competitively priced against diesel. With this battery leasing program, Proterra will guarantee the performance of the batteries through the life of the bus, decreasing operator risk.

"Thanks to efforts from the state of Virginia, we can be on a quicker path to reduce our dependence on fossil fuels, remove harmful pollution from our air, and leverage more energy efficient technology to power our transportation systems." said Proterra CEO Ryan Popple. "Proterra has helped more than 90 North American transit agencies, airports and universities transition to zero-emission electric buses, and we look forward to helping more transit agencies in Virginia transition to electric vehicle technology."

###

**About Proterra:**

Proterra is a leader in the design and manufacture of zero-emission, heavy-duty electric vehicles, enabling bus fleet operators to significantly reduce operating costs while delivering clean, quiet transportation to local communities across North America. The company's configurable Catalyst platform is designed to serve the daily mileage needs of a wide range of transit routes on a single charge. With industry-leading durability and energy efficiency based on rigorous U.S. independent testing, Proterra products are proudly designed, engineered and manufactured in America, with offices in Silicon Valley, South Carolina, and Los

Angeles. For more information, visit: http://www.proterra.com and follow us on Twitter @Proterra_Inc.

**Media Contact**:
pr@proterra.com

Contact Careers

PROTERRA TRANSIT

The Proterra ZX5 Electric Transit Bus

Safety

Range

Fuel Economy

Financing Bus Fleets

Training & Maintenance

**APPLICATIONS**

Public Transit

Commercial Transit

Schools

Airports

Universities

Last-Mile Delivery

Construction

Industrial Equipment

© 2022 Proterra. All Rights Reserved.

Quality | Privacy Policy | DBE Program | Sitemap | Site By Razorfrog

# EXHIBIT 10

# Seattle Area Transit Agency Chooses Proterra for EV Transit Program

August 21, 2014

*Seattle's King County Metro signs contract to purchase two EV buses with option to buy 200 more over next five years*

**GREENVILLE, S.C.**, August 21, 2014 – Proterra Inc, the leading provider of electric vehicle transit technology, recently announced the sale of two 40-foot (12 meter) battery-electric transit vehicles and a fast charge system to King County Metro in Seattle, Wash. Following a one-year trial period, the agency has the pre-arranged option to purchase up to 200 more buses and additional fast charge systems, depending on the outcome of the demonstration.

Proterra was selected through a competitive process for the program, which included bids from other transit vehicle manufacturers.

A pioneer in clean technology for transit, King County Metro's fleet currently incorporates electric trolley and diesel-hybrid vehicles. The ability to test and deploy more EV buses like Proterra's may allow the agency to meet its goal of moving toward an all-electric and hybrid-electric fleet.

"Driven by strong economic and environmental benefits, the public transportation market is adopting EV technology and proving-out the business case," said Ryan Popple, CEO of Proterra. "King County Metro is one of the largest and most technologically-advanced transit agencies in the United States, and we are thrilled that they have chosen Proterra for this exciting program. In addition to having a positive impact on the Seattle area, King County Metro's willingness to adopt EV buses as a means to reduce emissions and fuel costs will help other agencies understand and perfect the deployment of EV transit vehicles."

Funding for the 40-foot zero-emission electric buses and fast charge system, which are scheduled to be delivered in the first half of 2015, will be provided by FTA TIGGER funding and matching funds from King County.

With this purchase, the Seattle area is the latest in a group of metropolitan areas, including Stockton and Pomona, Calif.; San Antonio, Texas; Worcester, Mass.; Tallahassee, Fla.; Seneca, S.C.; Nashville, Tenn.; Reno, Nev.; and Louisville, Ky., to purchase and deploy Proterra EV transit technology. Proterra EV buses have logged nearly 500,000 road miles, powered 100 percent by clean local electricity.

Proterra is proud to offer a state-of-the-art transit vehicle technology to help create the urban environment of the 21st century – cleaner, quieter, lower-cost and more enjoyable for families and businesses in these great cities.

About King County Metro

King County Metro Transit is popular locally and admired nationwide for its innovative transit services, pioneering green practices and visionary approach to meeting the transportation needs of the county's growing population.

In a service area of more than 2,000 square miles and 2 million residents, Metro operates 214 bus, trolley and dial-a-ride-transit routes that serve destinations across the county. Every bus is equipped with a bicycle rack and a wheelchair lift or ramp.

For more information, please visit http://metro.kingcounty.gov.

About Proterra

Proterra is a leader in the design and manufacture of clean technology and clean energy, providing zero- emission vehicles that enable bus fleet operators to significantly reduce operating cost while delivering clean, quiet power to the community. Proterra buses' fast-charge enabled infinite range makes them well-suited to transit routes. With unmatched durability and energy efficiency based on rigorous U.S. certification testing, the Proterra product is proudly designed, engineered and manufactured in America, based in Greenville, S.C. For more information about Proterra, please visit www.proterra.com.

ed

hnology

es

y

nfrastructure

ed

ctrification

Bus Fleets

Maintenance

y

nagement

Charging Infrastructure

ification Planning

nsit

Mining

cking

rial Handling

rtation

ns

PROTERRA

© 2022 Proterra. All Rights Reserved.

Quality | Privacy Policy | DBE Program | Sitemap | Site By Razorfrog

# EXHIBIT 11

Kitsap Transit
Connecting Communities

**PRESS RELEASE**

# Kitsap Transit wins $3.9 million federal grant for five electric buses

**May 29, 2020**
Media Contact:
Sanjay Bhatt, 360-824-4926, sanjayb@kitsaptransit.com

BREMERTON, Wash. – Kitsap Transit has won a competitive grant of $3.92 million from the Federal Transit Administration (FTA) to replace five conventional diesel buses with battery-electric buses and charging infrastructure, accelerating the greening of the agency's fleet.

The grant from the FTA's Low- or No-Emission Vehicle Program will bring the total number of battery-electric buses in Kitsap Transit's fleet to seven and was supported jointly by U.S. Rep. Derek Kilmer, Sen. Patty Murray and Sen. Maria Cantwell.

"This is great news and supports our efforts to be a cleaner, more efficient transit system," said John Clauson, Executive Director at Kitsap Transit. "We are grateful for the strong support for our grant application from Congressman Kilmer and Senators Murray and Cantwell, who also are championing federal relief for local and state governments battered by the impact of the COVID-19 pandemic."

"Our region is continuing to lead the way in reducing carbon emissions and growing green jobs," said U.S. Rep. Derek Kilmer. "Federal investments to make these buses - and our public transportation system in general - more green, more clean, and more affordable is great news for our region, our planet, and our economy. I'll keep at it."

In 2017 Kitsap Transit committed nearly $1 million of local funding to procure its first battery-electric bus from Proterra. Later that year the FTA awarded Kitsap Transit $1 million for a battery-electric bus; Kitsap Transit purchased one from Gillig that is scheduled to be delivered this November. The same grant also paid for critical power upgrades and installation of a charger in February this year at Kitsap Transit's North Base in Poulsbo.

Kitsap Transit's Charleston base requires upgrades to electrical service and distribution systems to support the expansion of its battery-electric bus fleet there. Earlier this year, Kitsap Transit received about $1 million from the Washington State Department of Transportation's Green Transportation Grant Program to accomplish that. The power upgrades will enable Kitsap Transit to convert up to 44 of its 74 buses from diesel to electric in the future.

The grant announced today will cover 80 percent of the $4.9 million cost of replacing five conventional diesel buses with battery-electric buses at Charleston base by 2022. Kitsap Transit, which is providing a local match of $980,000, plans on placing an order for the electric buses by the end of this year.

The Charleston base was selected from Kitsap Transit's three bus bases for the five new battery-electric buses because it is located just outside of downtown Bremerton and serves the largest ridership and population center. The Charleston base is certified to the global standard ISO 14001 for environmental management systems.

In addition to electric buses, Kitsap Transit runs the first hybrid-electric ferry to operate on the Puget Sound and has converted the majority of its *ACCESS* diesel buses to propane, which burns cleaner and is significantly less expensive than diesel. Since 2013, Kitsap Transit has decreased its carbon-dioxide footprint by more than 375 metric tons, equivalent to taking 82 cars off the road per year.

**About Kitsap Transit**
Kitsap Transit has been operating friendly, convenient public transit since 1983. The transit agency for Kitsap County carried more than 3.8 million riders in 2018 across a multi-modal system of routed buses, passenger ferries, paratransit shuttles, vanpools, and worker/driver buses for the Puget Sound Naval Shipyard.

**Hablar español?**
Por favor llame al 1-800-501-7433 durante las horas normales de oficina. El personal de servicios al cliente se conectará con un intérprete para ayudarle a responder sus preguntas.

**Nagsasalita ka ba ng Tagalog?**
Paki-tawagan ang numero 1-800-501-7433 normal na oras ng trabaho. Customer Service kawani ay kumonekta sa isang taga interpretor upang tulungan sagutin ang iyong katanungan.

###

# EXHIBIT 12

PierceTransit

Menu




# SUSTAINABILITY AT PIERCE TRANSIT

Sustainable transit reduces a community's environmental footprint from transportation and enhances its quality of life by making travel more enjoyable, affordable and timely. At Pierce Transit sustainability is a core value, addressed in terms of both the services we provide and how we operate.

Pierce Transit plays a key role in reducing the number of single-occupant vehicles on the road and the pollution they generate. In 2019, our customers skipped 9.3 million car trips, taking Pierce Transit buses, paratransit rides or Vanpools instead. Pierce Transit's commitment to sustainability is reflected throughout the conception, planning, design, construction and operation of our system. We believe sustainability practices must make good business, public, and environmental sense by balancing the community's economic, social and environmental needs.

## THE APTA SUSTAINABILITY PLEDGE

Pierce Transit has pledged to adopt sustainable business practices and strategies. We track, measure and report progress. We administer these practices on an ongoing basis to continually improve them over time. As a signatory to the American Public Transportation Association (APTA) Sustainability Commitment, Pierce Transit actively supports and responsibly serves our community.

**Executive Order No. 1**
Read an overview of actions we take agency wide to reduce, reuse and recycle.
DOWNLOAD HERE

**APTA Pledge**
Download to view Pierce Transit's commitment to sustainability.
DOWNLOAD HERE




Microsoft Power BI

## DEDICATED GREEN TEAM




Pierce Transit's Green Team comprises representatives from a variety of departments including Data Analytics, Marketing, Communications, Maintenance, Safety & Training, Community Development, ADA Eligibility and Planning. The goal of the Green Team is to establish sustainability outcomes for the agency and develop best practices, benchmarks and data collection protocol to measure outcome attainment.

### THE GREEN TEAM WORKS TO:

### DATA COLLECTION PROTOCOL INCLUDES:

- Improve public awareness of our agency's sustainability efforts
- Emphasize modernization
- Increase community partnerships
- Expand our community experience
- Identify potential areas of improvement
- Develop matrices to measure data
- Increase employee awareness of PT sustainability practices, as well as awareness in community
- Quantify results to demonstrate success, areas needing further development

---

We believe that making sustainable strides benefits all by expanding regional connections, helping improve local air quality and enhancing our brand.

## OUR FLEET

The majority of Pierce Transit's buses run on Compressed Natural Gas (CNG) which offers lower emissions than diesel or standard fuel. Pierce Transit now has nine battery electric buses in its fleet: three Proterra and six GILLIG. **These zero-emission buses offer a smooth, quiet ride and save on fuel costs and tailpipe emissions.**






## IDLING REDUCTION

In 2018, Pierce Transit approved a vehicle idling policy intended to protect the health of our employees, passengers, and communities; conserve fuel, reduce pollution and harmful effects to the environment; prevent premature engine wear, and minimize operating costs. This policy applies to every Pierce Transit-owned vehicle. Here's a summary of what it covers:

1. Pierce Transit vehicles will not be parked with the engine operating for more than five minutes unless it is essential for the performance of work.
2. This limit applies to all Pierce Transit vehicles, unless the vehicle is idling under specific circumstances to be clarified by supervisors (including outdoor temperature extremes).
3. In cases where the operator must leave the vehicle and interior and/or clearance lights must remain ON, certain rules apply.
    - offsets some of its own carbon footprint; and
    - saves around 1,000 metric tons of greenhouse gas on an annual basis.

## SOURCING OUR FUEL

Pierce Transit currently purchases its compressed natural gas (CNG) through a distributor, United Energy Trading, on the open market. As the market fluctuates, so does the price of gas per therm (a unit of heat equivalent). By purchasing several years' worth of gas at a time, Pierce Transit was able to lock in a reduced rate at a third of what the market averages right now. As good stewards of public funds, Pierce Transit seeks such opportunities to reduce costs.

Currently, market price of gas is 90 cents per therm, and Pierce Transit pays 30 cents per therm, significantly saving the agency money and allowing it to reinvest a portion of those savings to **The Francis Beidler Forest Project** (a forest management concern) to reduce overall carbon footprint.

## WHAT IS PIERCE TRANSIT'S CARBON FOOTPRINT?

There are different methods used to calculate the carbon footprint of a transit agency. Carbon footprint is the total amount of greenhouse gases (including carbon dioxide and methane) that are generated by an entity's actions. Some agencies use the number of vehicles in their fleet, how much fuel is used for those vehicles, and the cost of utilities that support the vehicle operation.

Pierce Transit has chosen to take a more comprehensive approach that includes not only fleet vehicles but commute trips taken by employees in personal vehicles and in vanpools and carpools. Considering not only the operations of the agency but the associated travel made by its employees gives a more holistic picture of resource use. Calculating the agency's true carbon footprint, and planning ways to reduce that footprint, captures all aspects of service.

### PIERCE TRANSIT'S CARBON FOOTPRINT EVALUATION




To that end, Pierce Transit is working with an industry expert to examine data we currently collect on resource use and process that to establish the carbon footprint baseline. Having a clear understanding of the starting point then empowers the agency to make smart decisions on what bus specifications, bus types, and other resources to procure. That is where reinvesting a portion of fuel savings comes into play.

## RESPONSIBLY SOURCED NATURAL GAS

In late 2021, Pierce Transit began transitioning its vehicles that operate on Compressed Natural Gas (CNG) to Responsibly Sourced Gas, or RSG. This gas is mined, and during the mining process, there are greenhouse gas emissions (GHG) emitted. These emissions impact the air we breathe and therefore have a carbon footprint associated with them. Responsibly sourced natural gas comes from mines that offset GHG created during the mining process with other sustainable practices.

In purchasing responsibly-sourced gas, Pierce Transit:

While some would argue that using RSG is not a perfect process, it is far cleaner than running buses on diesel. In addition, each bus – regardless of its fuel source – takes potentially dozens of single occupancy vehicles off the road, which further reduces carbon output.

Pierce Transit is also investigating using renewable natural gas (RNG). This gas comes from dairy farms or landfills that produce methane. This gas costs more, but the advantage is that it offsets exhaust emissions. By using this fuel, Pierce Transit would effectively operate with a neutral carbon footprint. Effective January 1, 2023, the State of Washington will give companies carbon credits for using renewable natural gas.

Moving to responsibly-sourced and eventually renewable natural gas represents another step taken toward making Pierce Transit services sustainable.

## ELECTRIC



Pierce Transit has installed LED lighting at Tacoma Dome Station parking garages, transit centers, and at headquarters on our bus lot. This new lighting provides brighter illumination, movement- and daylight-sensitive fixtures to reduce time lit, and lower utility bills.

With efficiency and sustainability in mind, Pierce Transit provides Toyota Prius and Ford Fusion Energi plug-in hybrid electric vehicles (EVs) to employees for use when travelling to meetings or running agency errands. There are charging stations set aside for these cars at our headquarters. We also recently installed electric vehicle charging stations for employees to charge their personal vehicles; these are very popular and encourage employees to go electric.

Hybrid electric vanpool vehicles are now part of our fleet, available for community use. Tacoma Public Utilities partnered with Pierce Transit to become the first recipient of 8 plug-in Vanpool vans for their employees.

## RECYCLING

Large mixed recycling bins are provided around our headquarters, in high-use areas, and each employee is offered a small desk-side bin for daily collection. Employees are reminded of which items to recycle and which to throw away.

In order to encourage recycling efforts in our Maintenance department, bins are placed throughout the shop, near the offices and break room.

Fluids used in the operation of our buses and fleet vehicles, along with materials used for parts and repairs, are recycled. Cardboard boxes and packaging materials from our parts warehouse are, too.

Water used in our bus wash is also recycled. The water is collected and processed through a filtration system. The only water wasted is that remaining on the coaches when they leave the bus wash.

Pierce Transit Commitment to Recycling

## WATER

Our agency avoids purchasing water or other beverages in single-use plastic bottles whenever possible.

Those teams that work out in the community during summer months are provided with insulated cooler jugs they can refill with water throughout the day.

Maintenance staff have large coolers of water and Gatorade available at several stations in their shops. Bus operators are provided with reusable bottles and cups and the Employee Wellness Committee awards insulated water bottles and other containers to employees who participate in wellness challenges.

Filtered water bottle filling stations are available throughout our headquarters and, as of year-end 2021, have saved using 54,309 plastic bottles.

© 2022 Pierce Transit, All Rights Reserved.

## REPORT ISSUE WITH THIS PLANNED TRIP

From

Email Address

Comments

Close

# EXHIBIT 13

# Proterra Selected in Electric Bus Contract by Washington State Department of Enterprise Services

April 13, 2021

*Transit agencies, universities, and commercial customers can now purchase Proterra battery-electric buses directly from the Washington State Cooperative Purchasing Contract*

**Burlingame, Calif.** — Proterra Inc ("Proterra"), a leading innovator in heavy-duty electric transportation, today announced that it has been selected by the Washington State Department of Enterprise Services as a vendor to supply zero-emission battery-electric transit buses and charging infrastructure under the state's regional Cooperative Purchasing Contract.

Proterra was chosen to help streamline local transit agencies' access to vehicles that best meet their specific transit system needs. Transit agencies, universities, and other commercial operators can now purchase Proterra battery-electric buses as well as Proterra charging infrastructure through the Washington State Cooperating Purchasing program's pre-established contract.

> *"Proterra is proud to support more than 130 customers across North America including transit agencies, airports, universities, and commercial operators that are delivering an essential service to riders. We look forward to helping even more customers throughout the country accelerate the switch to 100% clean transportation for all," said John Walsh, Proterra Senior Vice President.*

Proterra battery-electric buses feature zero tailpipe emissions, saving approximately 230,000 pounds of greenhouse gases annually when replacing

diesel buses. The purpose-built electric buses further offer a quieter ride for reduced noise pollution, greater efficiency, and lower operating costs than combustion engine vehicles.

In 2020, Proterra introduced its fifth-generation battery-electric transit vehicle, the Proterra ZX5. The ZX5 electric transit bus features a new streamlined vehicle design and maximizes the amount of energy that can be stored on board the vehicle to increase power and range. The 40-foot Proterra ZX5 can be equipped with 675 kWh of energy storage to deliver up to 329 miles of drive range, which represents the most energy storage and longest drive range of any 40-foot electric bus available in the market today. The ZX5 is available to customers today as a 35-foot and 40-foot bus and in models featuring 450 kWh and 225 kWh of energy storage capacity.

In addition to its transit products, Proterra Energy fleet solutions offers a turn-key approach to delivering the complete energy ecosystem for heavy-duty electric fleets, including charging infrastructure design, build, financing, operations, maintenance and energy optimization.

**Stay Up to Speed**

Join 12,000+ subscribers receiving our Company Newsletter emails with the best Proterra news. (1-2x/mo.)

Email *

Statement of terms:

**By submitting, I consent to receive email from Proterra as stated by these terms.**

Submit

## About Proterra

Proterra is a leader in the design and manufacture of zero-emission electric transit vehicles and EV technology solutions for commercial applications. With industry-leading durability and energy efficiency based on rigorous U.S. independent testing, Proterra products are proudly designed, engineered, and manufactured in America, with offices in Silicon Valley, South Carolina, and Los Angeles.

## Proterra Media Contact

Shane Levy
Corporate Communications
pr@proterra.com

## Business Combination

On January 11, 2021, Proterra entered into a merger agreement with ArcLight Clean Transition Corp. (Nasdaq: ACTCU, ACTC and ACTW), a special purpose acquisition company. ArcLight has filed with the SEC a Registration Statement on Form S-4 (as amended, the "Registration Statement"), which includes a preliminary proxy statement/prospectus of ArcLight, in connection with the proposed merger transaction (the "Business Combination") involving ArcLight and Proterra. After the Registration Statement is declared effective, ArcLight will mail a definitive proxy statement/prospectus and other relevant documents to stockholders of ArcLight as of a record date to be established for voting on the Business Combination. ArcLight's stockholders and other interested persons are advised to read, the preliminary proxy statement/prospectus, and amendments thereto, and, when available, the definitive proxy statement/prospectus in connection with ArcLight's solicitation of proxies for its stockholders' meeting to be held to approve the Business Combination because the proxy statement/prospectus will contain important information about ArcLight, Proterra and the Business Combination. Stockholders will also be able to obtain copies of the Registration Statement, without charge, once available, at the SEC's website at www.sec.gov. In addition, the documents filed by ArcLight may be obtained free of charge from ArcLight at https://www.arclightclean.com or by directing a request to: ArcLight Clean Transition Corp., 200 Clarendon Street, 55th Floor, Boston, MA 02116.

## Participants in the Solicitation

**ArcLight, Proterra and their respective directors, executive officers, other members of management and employees, under SEC rules, may be deemed to be participants in the solicitation of proxies of ArcLight's shareholders in connection with the Business Combination.** Investors and security holders may obtain more detailed information regarding the names and interests in the Business Combination of ArcLight's directors and officers, and Proterra's directors and executive officers, in ArcLight's filings with the SEC, including the Registration Statement.

## Disclaimer

This communication is for informational purposes only and is neither an offer to purchase, nor a solicitation of an offer to sell, subscribe for or buy, any securities or the solicitation of any vote in any jurisdiction pursuant to the Business Combination or otherwise, nor shall there be any sale, issuance or transfer or securities in any jurisdiction in contravention of applicable law. No offer of securities shall be made except by means of a prospectus meeting the requirements of Section 10 of the Securities Act.

Maintenance

y

nagement

Charging Infrastructure

ification Planning

nsit

Mining

cking

rial Handling

rtation

ons

PROTERRA

© 2022 Proterra. All Rights Reserved.

Quality | Privacy Policy | DBE Program | Sitemap | Site By Razorfrog

# EXHIBIT 14

CHEVROLET Vehicles ▼ Shopping ▼ Offers ▼

Find A Dealer My Chevrolet Rewards Español Support

My Account

# LOCATE A DEALER

Search by

(•) City/State ( ) ZIP Code ( ) Dealer Name

Spokane, WA, USA

SELECT FILTERS

EV Sales & Service ✕

## CAMP CHEVROLET

A

1.6 Mi



# EXHIBIT 15

# 2022 CHEVROLET BOLT EV 1LT

1LT 2LT









## CHOOSE YOUR COLOR



## STARTING MSRP FROM $31,500

Choose color SUMMIT WHITE

VIEW INVENTORY

## TRIMS



### 1LT

STARTING AT: **$31,500**

- Wheels, 17" (43.2 cm) Silver painted aluminum
- Seats, front bucket
- Chevrolet Infotainment 3 Plus system 10.2" diagonal HD color touchscreen, AM/FM stereo, Bluetooth audio streaming for 2 active devices, Apple CarPlay and Android Auto capable, enhanced voice recognition, in-vehicle apps, cloud connected personalization for select infotainment and vehicle settings. Subscription required for enhanced and connected services after trial period.
- Engine, none
- StabiliTrak, stability control system with Traction Control
- <<< Preliminary 2022 Warranty >>>
- 131 (MPGe) City / 109 (MPGe) Highway

VIEW INVENTORY



### 2LT

STARTING AT: **$34,700**

- Wheels, 17" (43.2 cm) machined-face aluminum with carbon flash painted pockets
- Seats, front bucket
- Chevrolet Infotainment 3 Plus system 10.2" diagonal HD color touchscreen, AM/FM stereo, Bluetooth audio streaming for 2 active devices, Apple CarPlay and Android Auto capable, enhanced voice recognition, in-vehicle apps, cloud connected personalization for select infotainment and vehicle settings. Subscription required for enhanced and connected services after trial period.
- Engine, none
- StabiliTrak, stability control system with Traction Control
- <<< Preliminary 2022 Warranty >>>
- 131 (MPGe) City / 109 (MPGe) Highway

VIEW INVENTORY



### NEW 2022 CHEVROLET BOLT EV
5dr Wgn 1LT

**AutoNation Price** $28,035

| | |
|---|---|
| EXTERIOR | SUMMIT WHITE |
| MILEAGE | N/A |
| ENGINE | ELECTRIC DRIVE UNIT |

VIEW DETAILS

## SCHEDULE YOUR TEST DRIVE

* = required

Choose A Vehicle

Make * Any Make
Model *
Trim
Exterior Color
Interior Color
Additional Options

Request An Appointment To See This Vehicle

Day
Time

Contact Information

Send Form To * AutoNation Chevrolet Spo
First Name *
Last Name *
Email * user@mydomain.com

SUBMIT

# EXHIBIT 16

# 2022 CHEVROLET BOLT EV

1LT 2LT









## CHOOSE YOUR COLOR



### STARTING MSRP FROM $31,500

Choose color SUMMIT WHITE

VIEW INVENTORY

## TRIMS



1LT

STARTING AT: **$31,500**

- Wheels, 17" (43.2 cm) Silver painted aluminum
- Seats, front bucket
- Chevrolet Infotainment 3 Plus system 10.2" diagonal HD color touchscreen, AM/FM stereo, Bluetooth audio streaming for 2 active devices, Apple CarPlay and Android Auto capable, enhanced voice recognition, in-vehicle apps, cloud connected personalization for select infotainment and vehicle settings. Subscription required for enhanced and connected services after trial period.
- Engine, none
- StabiliTrak, stability control system with Traction Control
- <<< Preliminary 2022 Warranty >>>
- 131 (MPGe) City / 109 (MPGe) Highway

VIEW INVENTORY



2LT

STARTING AT: **$34,700**

- Wheels, 17" (43.2 cm) machined-face aluminum with carbon flash painted pockets
- Seats, front bucket
- Chevrolet Infotainment 3 Plus system 10.2" diagonal HD color touchscreen, AM/FM stereo, Bluetooth audio streaming for 2 active devices, Apple CarPlay and Android Auto capable, enhanced voice recognition, in-vehicle apps, cloud connected personalization for select infotainment and vehicle settings. Subscription required for enhanced and connected services after trial period.
- Engine, none
- StabiliTrak, stability control system with Traction Control
- <<< Preliminary 2022 Warranty >>>
- 131 (MPGe) City / 109 (MPGe) Highway

VIEW INVENTORY

No photo available

### NEW 2022 CHEVROLET BOLT EV

5dr Wgn 1LT

**Today's Price $30,030**

| | |
|---|---|
| EXTERIOR | CHERRY RED TINTCOAT |
| ENGINE | ELECTRIC DRIVE UNIT |

VIEW DETAILS

## SCHEDULE YOUR TEST DRIVE

* = required

Choose A Vehicle

Make * Any Make

Model *

Trim

Exterior Color

Interior Color

Additional Options

Request An Appointment To See This Vehicle

Day

Time

Contact Information

First Name *

Last Name *

Email * user@mydomain.com

SUBMIT

BACK TO TOP

# EXHIBIT 17

Sales 206-876-7093 Service 206-243-5800 Parts 206-243-5800 SERVICE MAP CONTACT

CHEVROLET BURIEN Cars Electric Incoming Vehicles! Used Cars Shop Click Drive Research Specials Service & Parts Finance Contact About Blog Google Reviews

Order Your New Chevrolet Tap or Click to start now

Ready to Trade In or Sell Your Car?
Get a Kelley Blue Book® Instant Cash Offer in minutes.
GET MY OFFER

Refine Search

Search Inventory

Price Range
- $25,001 - $30,000 (1)
- $35,001 - $40,000 (1)

Trim
- LT (3)
- Premier (2)

Ext. Color
- Black (1)
- Gray (1)
- Red (1)
- Silver (2)

Features

Packages

Search

# Chevrolet Bolt EV for Sale near Seattle, WA

Interested in buying an electric vehicle in the Seattle, WA area? Burien Chevrolet has dozens of Chevrolet Bolt EV models available today! Whether you live in Burien, Seattle, Renton, Auburn or beyond, Burien Chevrolet is ready to help you get behind the wheel of a brand-new Chevrolet Bolt EV today!

CHAT

Check out our inventory online and sort by color, trim, price and more. Ready to see how it handles on the road? Schedule a test drive today! We look forward to seeing you at our Chevrolet Dealership, feel free to contact us with any questions.

(1 - 5 of 5 Vehicles)

Sort by: Price: Low to High Show: 10



Sneak Peek
Send to Mobile
Window Sticker

## New 2022 Chevrolet Bolt EUV LT
View Vehicle Details

**Condition:** New
**Body Style:** SUV
**Model Code:** 1FF48
**Engine:** Electric drive unit
**Drive Type:** FWD
**Transmission:** Automatic
**Ext. Color:** Silver Flare Metallic
**Int. Color:** Jet Black, Cloth seat trim
**MPG:** 115 City / 115 Hwy
**VIN #:** 1G1FY6S09N4118396
**Stock #:** C9784

MSRP: ~~$35,885~~
Dealer Price: $35,885
Customer Cash -$6,300
**FINAL PRICE: $29,585**

For Well-Qualified Buyers When Financed w/ GM Financial 2.49% for 60 mo.

VIEW & BUY
Confirm Availability
Explore Financing Capital One

Get a Kelley Blue Book Instant Cash Offer for your car now

Compare Vehicle



Sneak Peek
Send to Mobile
Window Sticker

## New 2022 Chevrolet Bolt EUV Premier
View Vehicle Details

**Condition:** New
**Body Style:** SUV
**Model Code:** 1FG48
**Engine:** Electric drive unit
**Drive Type:** FWD
**Transmission:** Automatic
**Ext. Color:** Mosaic Black Metallic
**Int. Color:** Dark Ash Gray/Sky Cool Gray, Perforated leather-appointed seat trim
**MPG:** 115 City / 115 Hwy
**VIN #:** 1G1FZ6S03N4122151
**Stock #:** C9797

MSRP: ~~$41,490~~
Dealer Price: $41,490
Customer Cash -$6,300
**FINAL PRICE: $35,190**

For Well-Qualified Buyers When Financed w/ GM Financial 2.49% for 60 mo.

VIEW & BUY
Confirm Availability
Explore Financing Capital One

Get a Kelley Blue Book Instant Cash Offer for your car now

Compare Vehicle



Sneak Peek
Send to Mobile
Window Sticker

## New 2022 Chevrolet Bolt EUV LT
View Vehicle Details

**Condition:** New
**Body Style:** SUV
**Model Code:** 1FF48
**Engine:** Electric drive unit
**Drive Type:** FWD
**Transmission:** Automatic
**Ext. Color:** Gray Ghost Metallic
**Int. Color:** Jet Black, Cloth seat trim
**MPG:** 115 City / 115 Hwy
**VIN #:** 1G1FY6S07N4107266
**Stock #:** C9598

This vehicle is temporarily unavailable. Please call dealer for details.

Get a Kelley Blue Book Instant Cash Offer for your car now

Compare Vehicle



Sneak Peek
Send to Mobile
Window Sticker

## New 2022 Chevrolet Bolt EUV LT
View Vehicle Details

**Condition:** New
**Body Style:** SUV
**Model Code:** 1FF48
**Engine:** Electric drive unit
**Drive Type:** FWD
**Transmission:** Automatic
**Ext. Color:** Cherry Red Tintcoat
**Int. Color:** Jet Black/Nightshift Blue, Perforated leather-appointed seat trim
**MPG:** 115 City / 115 Hwy
**VIN #:** 1G1FY6S03N4108785
**Stock #:** C9538

This vehicle is temporarily unavailable. Please call dealer for details.

Get a Kelley Blue Book Instant Cash Offer for your car now

Compare Vehicle



Sneak Peek
Send to Mobile
Window Sticker

## New 2022 Chevrolet Bolt EUV Premier
View Vehicle Details

**Condition:** New
**Body Style:** SUV
**Model Code:** 1FG48
**Engine:** Electric drive unit
**Drive Type:** FWD
**Transmission:** Automatic
**Ext. Color:** Silver Flare Metallic
**Int. Color:** Jet Black/Nightshift Blue, Perforated leather-appointed seat trim
**MPG:** 115 City / 115 Hwy
**VIN #:** 1G1FZ6S04N4112079
**Stock #:** C9562

This vehicle is temporarily unavailable. Please call dealer for details.

Get a Kelley Blue Book Instant Cash Offer for your car now

Compare Vehicle

### Disclaimer

Prices for vehicles as equipped do not include charges such as: License, Title, Registration Fees, State or Local Taxes, Finance Charges, Credit Investigation, Optional Credit Insurance, Physical Damage or Liability Insurance, Delivery Fees, or a negotiable $200 Documentary Services Fee. All photos and graphics for illustration purposes only. Where actual vehicle photos are not available, stock image representations may be displayed. Prototype features or options may be displayed. Dealership makes no representations, expressed or implied, to any actual or prospective purchaser or owner of vehicles as to the existence, ownership, accuracy, description or condition of vehicles' listed equipment, accessories, price or any warranties. Prices may include dealer installed options. Any and all differences must be addressed prior to the sales transaction. The Employee Discount for Everyone is not compatible with Lease offers. See Burien Chevrolet for details.

FIND NEW ROADS™

Copyright © 2022 by DealerOn | Sitemap | Privacy | Burien Chevrolet | 14400 1st Ave S, Burien, WA 98168 | Sales: 206-876-7093

# EXHIBIT 18

AUTOS

# GM to begin fixing Chevy Bolt EVs, recalled due to fire risk, as soon as next month

PUBLISHED MON, SEP 20 2021•2:30 PM EDT UPDATED MON, SEP 20 2021•3:23 PM EDT

Michael Wayland
@MIKEWAYLAND

SHARE

## KEY POINTS

- General Motors said Monday it expects to begin replacing battery modules in Chevrolet Bolt EVs, which were recalled due to fire risk, as soon as next month.
- The timing follows the automaker's battery supplier LG Chem restarting production of battery cells with updated manufacturing processes at plants in Michigan, GM said.
- GM has confirmed 13 battery fires globally.

In this article

MARKETS CNBC TV WATCHLIST MENU



**A 2019 Chevrolet Bolt EV caught fire at a home in Cherokee County, Georgia on Sept. 13, 2021, according to the local fire department.**
*Cherokee County Fire Department*

DETROIT — General Motors announced Monday that it expects to begin replacing battery modules in Chevrolet Bolt EVs, which were recalled due to fire risk, as soon as next month.

The timing comes after the automaker's battery supplier LG Chem restarted production of battery cells with updated manufacturing processes at plants in Michigan, GM said. Cell production went down last month following two rare manufacturing issues forcing GM to recall more than 140,000 EVs due to risk of the batteries spontaneously catching fire.

GM has confirmed 13 battery fires globally. The automaker has identified the problems as a torn anode and a folded separator, both of which need to be present in the same battery cell for a fire to occur. EV battery packs are made up of modules that hold the cells.

VIDEO 15:18

GM's big bet on electric vehicles

The recall is expected to cost the automaker $1.8 billion, some of which it is negotiating to recoup from LG Chem, according to GM. Depending on the vehicle, GM may have to replace some, if not all, of the modules.

In addition to shipping new battery modules to dealers beginning mid-October, GM also plans to roll out a software diagnostic update for battery monitoring in the next 60 days.

GM said the diagnostic software will be designed to detect specific abnormalities that might indicate a damaged battery in Bolt EVs by monitoring the battery performance, alerting customers of any anomalies and prioritizing damaged battery modules for replacement.

Customers will have to take their Bolt EVs into a dealership for the battery module replacements as well as the software update. Owners will be able to start to schedule software installation in about 60 days, while GM has established a notification process that will inform affected customers when their replacement modules will be available.

# EXHIBIT 19

# PRODUCT OVERVIEW

Like 173K

## Lights




Gelish offers a wide range of professional, high performance gel curing LED lamps.



### Gelish® 18G^Plus LED Light with Safelight™ Technology

The Gelish LED 18G Plus Gel Light is a scientifically engineered, precisely calibrated authentic LED light of exceptional quality. It is specially designed for rapid, efficient gel curing, particularly for the high-performance Gelish Soak-Off Gel Polishes. Additional features include: curing all five fingers, patented eyeShield™ with SafeLight™ Technology, patented magnetic removable tray, acetone resistant, ergonomic design, one year warranty (valid when registered upon purchase), high intensity diamond reflectors and pedicure friendly.
Item #1100148 (110V US)
Item #1100150 (230V UK)
Item #1100149 (220V EU)
Item #1100151 (240V AU)



### Gelish® 18G Unplugged LED Light

GET UNPLUGGED. Whether moving from nail table to pedicure station or taking your skills on the road, you're ready to roam with the innovative Gelish® 18G UNPLUGGED™ Professional Mobile LED Light! Designed to outperform the rest, 18G UNPLUGGED™ is the first LG \ lithium battery powered LED light engineered using Gelish's® exclusive Intelligent Power Assist - advanced circuitry that eliminates inconsistent power levels when used in battery mode. The light features also include: curing all five fingers and toes, 36 Watts of Power, one year warranty (valid when registered upon purchase), built-in handle, no slip pedicure friendly button, Comfort Cure™, SafeLight™ Technology, scratch and acetone resistant, high intensity diamond reflectors, and a countdown feature.
Item #1168012 (US)
Item #1168013 (EU)
Item #1168014 (UK)
Item #1168015 (AU)



### Gelish® PRO LED Light

The 30 Watt, Gelish® Pro LED Light effectively and efficiently cures Gelish® Soak-Off Gel Polish. Gelish® Pro Light's bulbs will not ever need bulb replacements with up to 50,000 hours of performance guaranteed, and consistent power output that does not degrade over time. The Pro LED Light has a sleek compact design with a cure you can trust. The pedicure friendly light features a removable tray, two pre-programmed auto timers and cures all five fingers.
Item #1168087 (110V US)
Item #1168088 (230V UK)
Item #1168089 (220V EU)
Item #1168090 (240V AU)



### Gelish® Touch MINI LED Light

Portable focused beam LED light. The Gelish Touch MINI LED takes LED application to another level. Integrate fast, even curing into your application. The Gelish® Touch MINI LED Light is designed for use with LED formulated gels and has specialized preprogrammed 30 cure times to ensure accurate total cure of LED gels. The LED light features 3 watts of Power, touch activated, portable, and acetone resistance.
Item #1168202



### Gelish® Unplugged LED Replacement Battery

Whether moving from nail table to pedicure station or taking your skills on the road, you're ready to roam with the innovative Gelish® 18G UNPLUGGED™ Professional Mobile LED Light! Paired with the first LG lithium replacement battery, the 18G UNPLUGGED™ LED Light is designed to outperform the rest.
Item #1168017



### 18G Replacement Tray

Fits the Gelish LED 18G and 18G Plus LED Lights to allow interchangeability to sanitize between clients. The acetone resistant, stainless steel tray reflects light from bulbs for efficient, maximum exposure while the magnetic ability allows for quick and easy replacement.
Item #01373

*As Nail Artists ourselves, we understand that nothing is more important than the tools of our craft and nothing is more challenging than product inconsistencies. It has been and always will be that quality is our #1 priority. We are proud to identify as a PETA certified cruelty-free brand.*

**Nail Alliance - North America, Inc. PETA Certification.*

CONTACT US

**Email:** information@nailharmony.com
**Tel:** 714. 773. 9758
**Fax:** 714.773. 9767

Nail Alliance - North America, Inc.
1545 Moonstone
Brea, CA 92821
United States of America

Copyright © 2022 Nail Alliance - North America, Inc. All Rights Reserved. • Terms and Conditions • Privacy Policy



GM will prioritize Chevy Bolt customers whose batteries were manufactured during specific time frames when GM said battery defects appear to be clustered.

"Resuming battery module production is a first step and we'll continue to work aggressively with LG to obtain additional battery supply. In addition, we're optimistic a new advanced diagnostic software will provide more convenience for our customers," Doug Parks, GM executive vice president of product development, purchasing and supply chain, said in a release.

The recalled vehicles include all Chevy Bolt EVs, including a recently released larger version of the car known as the Bolt EUV.

Due to the battery problem, production of the Bolt EV and Bolt EUV has been down since Aug. 23 at a Michigan plant. GM last week confirmed manufacturing of those vehicles is not expected to resume until at least Oct. 15.

*GM says owners with questions should visit www.chevy.com/boltevrecall, contact its Chevrolet EV help line at 1-833-EVCHEVY or contact their preferred Chevrolet EV dealer.*

# EXHIBIT 20

# Salon Locator

Like 173K

## Find Gelish® Near You!

City, address or zip code: Seattle, WA 100mi Search




### IN YOUR AREA

- (0.0 miles)
- Aluxe Beauty (0.2 miles)
- Erika Kennedy (0.3 miles)
- Julep Nail Parlor (0.3 miles)
- (0.5 miles)
- Rock Paper Scissors (2.0 miles)
- Rock Paper Scissors (2.0 miles)
- Khanh (4.2 miles)
- Spa Scotta (4.3 miles)
- Spa Envy (4.4 miles)
- Designs by Jama (5.1 miles)
- pronails &skin care (6.1 miles)
- Latsamy Nail/Spa (6.2 miles)
- Huong (6.2 miles)
- Pretty Nails (6.7 miles)

Salon Services Gelish Salon Services PolyGel Brand



Copyright © 2022 Nail Alliance - North America, Inc. All Rights Reserved. • Terms and Conditions • Privacy Policy

# EXHIBIT 21

**Pulse** by Maeil Business Newspaper

print

# LG Elec releases new lineup of cordless vacuum cleaners

2017.06.13 14:34:11 | 2017.06.13 14:34:36




LG Electronics' H&A division president Song Dae-hyun (center) and domestic sales division president Choi Sang-gyu (right) introduce the company's new lineup of cordless vacuum cleaners CordZero ART at LG Twin Tower in Yeouido, Seoul, on Monday. [photo by Lee Seung-hwan]

South Korea's LG Electronics Inc. unveiled its new cordless vacuum cleaner lineup called CordZero ART on Monday at LG Twin Tower in Yeouido, Seoul, throwing down the gauntlet to the global top wireless handy vacuum cleaner maker Dyson

based in the U.K.

“We will focus more on the development of cordless vacuums to meet growing demand for the wireless vacuum cleaners across the world,” said Song Dae-hyun, president of LG Electronics’ Home Appliance & Air Solution (H&A) division. He also declared that the company aims to snatch the crown from current No. 1 Dyson in the global cordless vacuum market.

Cordless vacuum cleaners currently account for 30 percent in the global vacuum cleaner market worth $14 billion, and the demand for cordless ones is growing rapidly. An official from LG Electronics said its cordless vacuum cleaner sales has grown at a 20 percent rate annually, and the new CordZero ART products are expected to help the growth of its wireless vacuum cleaner sales accelerate at a pace of more than 30 percent a year.

Weak suction power and short battery lifetime has been pointed out as disadvantages of battery-powered vacuum cleaners, but LG Electronics’ latest lineup addressed the issues, the company said. “Equipped with a smart inverter motor with a rotation speed of 115,000 per minute and LG Chem’s lithium-ion battery, the CordZero ART series deliver similar power and performance with corded cleaners,” said an official from the company.

The company claimed that the CordZero A9 boasts of the world’s strongest suction power of 140 watts for hand-stick models, and is capable of cleaning not only big objects but also fine dust with an additional motor installed at the head of the cleaner.

The CordZero T9, a bagged cordless model, has the same suction power with corded cleaners of 250 watts, also the world’s best for cordless models, according to the

company. It can run for at most 40 minutes at normal mode and 30 minutes at power mode.

By Kim Dong-eun

[ⓒ Pulse by Maeil Business Newspaper & mk.co.kr, All rights reserved]

# EXHIBIT 22

Independence Day Savings SEE OFFERS

LG Life's Good | Shop | Product Support | Business | Search LG

HOME / Other Appliances / Vacuum Cleaners / Stick Vacuums / A913BM

A913BM

# LG CordZero™ A9 Cordless Stick Vacuum - Black



$399.00 $50.99 OFF WAS ~~$449.99~~ | 4 interest-free payments of $99.75 with Klarna.

✓ In Stock

KEY FEATURES

- Quick Release Battery and Portable Charging Stand
- One-Touch Control

Enter ZIP for Estimated Delivery

ZIP Code | Submit

Add to Wishlist | Add to Compare | Find a Retailer | ADD TO CART

4.2 (62) | Write a review

OVERVIEW | SPECS | REVIEWS | RELATED PRODUCTS | SUPPORT | WHERE TO BUY

## BUY DIRECTLY FROM LG



A913BM

SALE : $399.00 ~~$449.99~~ Save $50.99

ADD TO CART

Sold and Fulfilled by LG

| Best Buy | The Home Depot | Abt |
|---|---|---|
| Out of Stock | ✓ In Stock | Backorder |
| View | Buy Now | View |




PriceSpider

Portions Copyright © 2005-2022. Use of this information implies agreement to PriceSpider.com Terms of Service

[1]Free shipping not available for parts and accessories. Free shipping to qualifying US destinations in the contiguous United States; not available for P.O. Boxes, addresses outside the contiguous 48 states, international addresses, Army Post Office (APO), Diplomatic Post Office (DPO) and Fleet Post Office (FPO).

Prices, promotions and availability may vary by model, store, and online. Prices subject to change without notice. Quantities are limited. Check with your local retailers for their final price and availability.

Take charge of your cleaning with the LG CordZero™ A9 Cordless Stick Vacuum (A913BM). Designed for the ultimate in portability, our cordless vacuum cleaner makes quick work of dust and dirt, pet hair, crumbs and more. Take a look at just a few of the ways our cordless stick vacuum does it.

• Long-Lasting Battery for More Cleaning Power. Unlike other cordless vacuums, our comes with two battery packs, so you can run your vacuum cleaner for up to 50 minutes[1].

• Powerful Suction: With the LG Smart Inverter Motor™, the A913BM vacuum cleaner creates powerful 160W suction—and it's backed by a 10-year limited warranty for even greater peace of mind.

• Universal Power Nozzle: Now, you can clean hardwood and carpeted floors with just one attachment. Our cordless vacuum cleaner's Universal Power Nozzle makes it easy to tackle everything from fine dust on wood or tile flooring to pet hair trapped in carpets, and even clean your upholstered furniture, all with the same vacuum head.

• Telescoping Handle: The LG CordZero™ A9 Cordless Stick Vacuum not only allows you to adjust the length of the wand for convenient use and save storage space, but you can even convert our vacuum carpet cleaner into a handheld vacuum for greater control when cleaning furniture, mattresses and crevices.

• Powerful Filtration & Easy Maintenance: The LG CordZero cordless vacuum cleaner filters 99.99%[2] of dust and dirt. And with the LG CordZero's washable cyclone and filters, it's easy to clean away dirt and keep your vacuum running at its best.

With a long-lasting battery, powerful suction and accessories for all of your home's surfaces, plus its sleek, clean lines, our CordZero A9 vacuum carpet cleaner delivers form and function as never before. For more options, check out all of our vacuum cleaners, as well as our newest air care solutions – and keep your home clean, fresh and healthy from top to bottom.

[1]In normal mode without Power Nozzles using one battery.

[2] Based on testing performed by SLG Prüf- und Zertifizierungs GmbH on April 24, 2018.

*Prices, promotions, and availability may vary by model, store, and online. Prices are subject to change without notice. Quantities are limited.

*Additional 5% or 10% back will be in the form of a Visa prepaid card issued by The Bancorp Bank®, N.A., Member FDIC. Terms and expiration apply-see rebate form at www.LG-Promos.com/ABS622. for details. Subject to availability. 5% will apply to the total invoice price of 2 eligible LG Kitchen plus select Floor Care and Air Care products before taxes (excludes Countertop Microwave Ovens and the Trim Kit, Laundry, LG Styler,® and Top Freezer, Bottom Freezer and Single Door Refrigerators). 10% will apply to the total invoice price of 3 or more eligible LG Kitchen and Laundry products plus select Floor Care, Air Care, LG Styler®, Countertop Microwave Ovens, Trim Kit (sold separately), Wall Oven and Cooktop products before taxes. Qualifying categories include: Refrigerator, Range, Wall Oven, Over-the-Range, Microwave Oven (OTR), Countertop Microwave Oven, Cooktop, Hood Vent, Dishwasher, Washer, Dryer, LG SideKick,™ Floor Care, Air Care and LG Styler.® WashTower™ products (Washer + Dryer) will count as two (2) qualifying units towards a bundle. Select Countertop Microwave Ovens purchased together with a Trim Kit (sold separately) will count as one (1) qualifying unit towards a bundle.Product must be purchased in a single transaction between June 22, 2022 and July 13, 2022. Online submissions made at www.LG-Promos.com/ABS622 must be received by 11:59 PM Pacific Time on October 13, 2022.Maximum number of products of the same category allowed to qualify for rebate is one (1).

*Purchase a bundle of four (4) select LG Kitchen Appliance products including eligible LG Refrigerator, Range, Over-the-Range Microwave Oven and Dishwasher models and receive instant additional savings of 10% applied to the pre-tax purchase price of the eligible products plus up to an additional $982 savings. Products must be purchased in the same online order June 22 - July 13, 2022 on LG.com to receive the instant additional savings. Maximum number of products of the same category allowed to qualify for the package discount is one (1). Savings will be reflected in the cart when all offer requirements are met. If any of the qualifying items are removed from the cart or part of the order is cancelled or returned, the promotional savings will be void. Prices and offers are non-redeemable for cash, non-transferable, and may not be combined with other offers/discounts. Not stackable with other LG rebates via online submission at www.LG-Promos.com/ABS622.. Availability, prices and terms of offer are subject to change without notice.

Extra $387 savings eligible models: LRFWS2906S, LRFWS2906D, LDFN4542S, LDFN4542D, LMV1831ST, LMV1831BD, LREL6323S, LRGL5823S, LREL6323D, LRGL5823D
Extra $432 savings eligible models:LFXS28968S, LFXS28968D, LREL6325F, LRGL5825F, LREL6325D, LRGL5825D, LMV2031ST LMV2031BD, LDTS5552S, LDTS5552D
Extra $452 savings eligible models:LFXS26973S, LFXS26973D, LRE

USA, English

Appliances: Washers, Refrigerators, Dishwashers, Cooking Appliances, Built-in Kitchen Appliances, LG Studio Appliances, Washers & Dryers, Styler Steam Closet, Vacuums, Air Conditioners, Window Air Conditioners, Portable Air Conditioners, Wall Air Conditioners, Air Purifiers, Dehumidifiers, Other Appliance Accessories, Kitchen, Laundry, Other

TV & Home Theater: TVs, Projectors, Sound Bars, Blu-ray & DVD Players, TV Audio Video Accessories

Audio: Sound Bars, Headphones, Earbuds, Neckbands, Speakers, Portable Speakers, Party Speakers, Gaming Speakers

Support: Parts & Accessories, Register a Product, Order Status, Software & Drivers, Manuals & Documents, Help Library, Video Tutorials, Contact Us, Easy Bluetooth Connect Guide, Request a Repair, LG Premium Care, Custom Installation, Online Chat, Twitter Support, How to become an LG Servicer, Facebook Support, Business Support, Compliance Information

My Account: My LG, My Orders, Track My Order

About LG: Press Release, Media Contacts, Career Opportunities, Newsletter Sign Up

LG Signature: Brand Story

LG ThinQ

Promotions

Online Chat

Email Support

Social Support: /LGUSSupport, @lgussupport

Computing: Laptops, Monitors, Burners & Drives, Computer Accessories

Home Upgrades: Ductless Air Conditioning, Built-in Kitchen Appliances

Small Business: Signage TVs, Commercial TVs, Hospitality TVs, Laptops, Monitors, Projectors

Mobile: Cell Phones, Mobile Accessories

Business | Privacy | Privacy Portal - Do Not Sell My Personal Information

Terms of Use | Terms of Purchase | Patent | Accessibility Help

Site Map

LG Jeong-Do Management Ethics Hotline

LG Life's Good

Copyright © 2009-2022 LG Electronics. All Rights Reserved

# EXHIBIT 23

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JUAN MANUEL FLORES | ' | |
| | ' | |
| VS. | ' | C.A. No.: 1:16-cv-297 |
| | ' | |
| LG CHEM, LTD. AND LG CHEM AMERICA, INC. | ' | JURY DEMANDED |

ORAL AND VIDEOTAPED DEPOSITION OF JOON YOUNG SHIN
NOVEMBER 29, 2017

ORAL AND VIDEOTAPED DEPOSITION OF JOON YOUNG SHIN, produced as a witness at the instance of the Plaintiff and duly sworn, was taken in the above styled and numbered cause on Wednesday, November 29, 2017, from 3:29 p.m. to 7:38 p.m., before LOREN GONZALES, CSR in and for the State of Texas, reported by computerized stenotype machine, at the offices of Lewis, Brisbois, Bisgaard & Smith, Welayan Tower, Suite 1400, 24 Greenway Plaza, Houston, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record herein.

A P P E A R A N C E S

FOR THE PLAINTIFF:
Mr. Michael Cowen
COWEN | MASK | BLANCHARD
6243 IH-10 West
Suite 801
San Antonio, Texas 78201
(210) 941-1301
Michael@cmbtrial.com

FOR THE DEFENDANTS:
Mr. Sean Higgins
LEWIS, BRISBOIS, BISGAARD & SMITH
Welayan Tower, Suite 1400
24 East Greenway Plaza
Houston, Texas 77046
(713) 659-6767
Sean.higgins@lewisbrisbois.com

THE VIDEOGRAPHER:
Mr. John Castro

THE INTERPRETER:
Mr. Teak-Sung Song

THE CHECK INTERPRETER:
Mr. Kyoo (John) Y. Song PhD.

THE VIDEOGRAPHER: Today's date is November 29th, 2017 and the time is, approximately, 3:29 p.m. We are on the record.

JOON YOUNG SHIN,

having been duly sworn, through interpreter, testified as follows:

EXAMINATION

BY MR. COWEN:

Q. Good morning.
A. Good morning.
Q. What is your name?
A. My name is Shin, Joon Young. Mr. Shin, last Shin, S-H-I-N. First name Joon, J-O-O-N-Y-O-U-N-G.
Q. And, Mr. Shin, are you here to testify as the representative of LQ Chem Limited?
A. Yes, I am.
Q. Have you testified on behalf of LG Chem Limited before?
A. No, I have not.
Q. Have you given a deposition before?
A. No.
Q. Who is your employer?
A. LG Chemicals.

THE INTERPRETER: Sorry, LG Chem. Correction by the interpreter, LG Chem.

Q. (BY MR. COWEN) And what is your job title?
A. On the Customer Service Team, Team Leader.
Q. What are your job duties as the Customer Service Team, Team Leader?
A. Responding to customers on quality issues outside the company.
Q. How many people work in the Customer Service Team?
A. About 15 in Korea, 15.
Q. Is there anyone in the United States who works with the Customer Service Team?
A. No, there is not.
Q. What is your -- no -- let me ask a different question. To whom do you report?
A. Mr. Yoon. Last name "Yoon." First name "Suk Won."
Q. And what is Mr. Yoon's position?
A. We call him "person in charge."
Q. In charge of what?
A. In charge of internal -- company internal, company external issues regarding small cells.
Q. What is your educational background?
A. I have a bachelors degree.
Q. In what topic?
A. ISE.

Q. And what is ISE?
A. Industry Systems Engineering.
Q. And where did you get your bachelors degree?
A. I graduated from Ohio State University.
Q. So even though you have a degree from Ohio State University, we are still using an interpreter for your deposition; is that correct?
MR. HIGGINS: Objection. Form.
A. Yes, that is.
Q. (BY MR. COWEN) Were you able to take classes at Ohio State University without an interpreter?
A. Yes. That's what I did.
Q. So why do you need an interpreter today?
MR. HIGGINS: Objection. Form.
A. My mother tongue is Korean, and I believe in this right to use the mother tongue in important matters.
Q. (BY MR. COWEN) Do you have any other college degree besides the one you have from Ohio State University?
A. No.
Q. Did you have any involvement in the design of the LG HG2 battery?
A. I was not involved in designing the HG2 battery.
Q. Have you been involved in the design of any battery?

Q. Tell me about the E-cigarette issues that you received.

MR. HIGGINS: Objection. Form.

A. Is there anything in particular you would like to know?

Q. (BY MR. COWEN) Everything you remember. You said that there was some E-cigarette issues that you received that caused LG to change the design of the aluminum tab. What were those issues that were received?

A. At the time any E-cigarette user had a lithium-ion cell, HG2 cell, in a bag and together with the cell had keys, key chains, and whatnot in the bag as well and together with other conductive materials and that caused the fire. Such issue happened.

Q. Where did that happen, the E-cig user that had a fire?

A. In the U.S. Happened in the U.S.

Q. Do you know what year that happened?

A. I believe it was towards the end of 2015 or early 2016.

Q. Was there a lawsuit against LG involving that incident?

A. My recollection is that there was not.

Q. Are there any documents within LG Chem that

Q. And what was the change in the thickness of the tab? I see it was a .15 and it became a .1. .15 what? And .1 what?

A. It was changed from .15 millimeters to .1 millimeter.

Q. Are you familiar with the warnings or instructions that accompanied HG2 batteries?

A. I am aware.

Q. How did LG package the HG2 batteries?

A. When we send them out, a hundred single cells go loaded onto a small box and two small boxes are packaged into one big box and sent out. For your information, about 10,000 or more cells go out on a single palette.

Q. And what kinds of customers buy these boxes of batteries?

MR. HIGGINS: Objection. Form.

A. Companies that make power tools and packers that make battery packs to be used on power tools and also small agents.

Q. (BY MR. COWEN) What do you mean by "small agents"?

A. Companies that sell to small packers and small power tool companies and not big packers or big -- not big sized packers or big size power tool companies. We call those companies that sell to the small packers and

small power tool companies agents.
Q. Did LG intend for the HG2 battery to be used in E-cigarettes?
A. No. We had no idea.
Q. Why did LG not want the HG2 batteries being used in E-cigarettes?
MR. HIGGINS: Objection. Form.
A. I don't think not wanting is the proper expression here. We never fathomed that it would be used in an E-cigarette.
Q. (BY MR. COWEN) Why would you not want it used in an E-cigarette?
MR. HIGGINS: Objection. Form.
A. It's not about wanting or not. We just never knew that they were being used in E-cigarettes.
Q. (BY MR. COWEN) I'd like to look at Exhibit 8. Does Exhibit 8 show the instructions and cautions that accompanied the batteries as of September of 2016?
A. That is correct.
Q. Prior to September 2016, were there any kind of instructions or cautions on the battery or on the packaging?
A. No, there weren't.
Q. So it was just -- what was written on the outside of the battery prior to September of 2016?

A. The production numbers -- production -- production data, about that.
Q. And starting on September 2016, the word "caution" was added to the battery. Correct?
A. Yes.
Q. Who made the decision to add the word "caution" to the battery in September of 2016?
A. I think I could say us and the legal team made the decision.
Q. What are the names of the people that made the decision?
A. There's actually quite a number of people that knew about the application of the warning language. There's quite a number of them and the president of the company knows as well.
Q. But who's idea was it to add the caution language?
A. It was the ideas of us and the legal team.
Q. What do you mean by -- what do you mean by "us"?
A. The CS Team.
Q. And who on the CS Team was involved in the decision to add a caution label to the HG2 battery back in September of 2016?
A. From the CS Team, myself, and the senior manager named Ji-Hyun Lee. Last name Lee, L-E-E. First name

changes made to the labeling, specifically, because of what happened with Juan Manuel Flores?

MR. HIGGINS: And I am going to caution the witness not to disclose any communications that he may have had with counsel.

A. In the early parts of 2016 these E-cigarette issues kept on occurring and prior to that, we were not aware of our batteries or even just 18650 batteries being used for different purposes and we had been doing business for ten years or so and we had no such issues and our customers were aware of this and then come early 2016, these issues started to occur and that's when we started to take action and make a decision to apply this language, warning language, for protection of customers with -- with the -- considering the possibilities of these incidences happening.

Q. (BY MR. COWEN) When did LG Chem make the decision to add the caution label to the HG2 battery, the label that was added in September '16, when was that decision made to add it?

A. My understanding is that the decision was made in August and we turned around and started applying them immediately afterwards from September 1st.

Q. When did LG Chem first become aware of the incident in which Juan Manuel Flores was burned?

Q. (BY MR. COWEN) When did LG first become aware that there was a possibility of a lithium-ion battery catching fire if someone was carrying the battery in their pocket?

MR. HIGGINS: Objection. Form.

A. We first became aware in early 2016.

Q. (BY MR. COWEN) And you first became aware when you got a claim letter?

A. That's correct.

Q. When was LG Chem first sued over an allegation that a lithium-ion battery caught fire and burned somebody?

MR. HIGGINS: Objection. Form.

A. I do not recollect the exact date, but I think it will be early 2016.

Q. (BY MR. COWEN) Has LG Chem ever had any customer complaints other than lawsuits or claim letters regarding an allegation that a lithium-ion battery caught fire?

A. Yes.

Q. When did LG Chem receive the first such complaint?

A. Early 2016.

Q. How many complaints has LG Chem received outside the legal process from customers complaining that -- let

me rephrase that -- how many complaints has LG Chem received, other than lawsuits or demand letters from lawyers, claiming that LG batteries caught fire?
A. Most cases -- most cases come through the legal team and I do not believe there were any cases where I was directly -- I received such directly from the general consumer.
Q. Is there any kind of address or telephone number in the United States that consumers would direct complaints to if they thought an LG battery caught fire?
A. Yes. It's on the website.
Q. Does LG Chem keep records of any kind of customer complaints?
A. Customer complaint records, you say?
Q. Does LG Chem either keep a data base, a written record, an electronic record, something documenting when customers complain about batteries?
A. We write it down, yes.
Q. What is -- go ahead.
A. And we do have records of sending it over to the -- to our insurance company with the advice of the legal team.
Q. But outside of the legal team, does LG Chem keep records of any kind of customer complaints?
A. Yes. My team, myself, and the person that works

with me create a spreadsheet for that.
Q. And where is that spreadsheet maintained?
A. In the PC.
Q. In your computer at work?
A. Mostly in the PC in the computer of the person in charge and I open it up.
Q. Does that spreadsheet contain -- let me rephrase. Does that spreadsheet contain any claims that lithium-ion batteries caught fire?
A. When E-cigarette cases are received, we relay that to the legal team and what we -- and what is conveyed to us is summarized and put on that spreadsheet and, with that, can we take a quick break, please.
Q. Yes.
THE VIDEOGRAPHER: Off the record at 6:53 p.m.
(Break taken from 6:53 p.m. to 7:05 p.m.)
THE VIDEOGRAPHER: We are now back on the record. The time now is 7:05 p.m.
Q. (BY MR. COWEN) Could you get Exhibit 9.
A. Yes.
Q. Exhibit 9 is four pages. Could you identify what those pages are?
A. These are affidavits that we send to the agents that deal with us.

Q. When were these documents created?
A. I remember it to be around June 2016.
Q. And were they created on a computer?
A. Well, yeah, the legal team created this so I guess.
Q. Do you know if the original digital file still exists?
A. I can ask the legal team.
Q. You don't know?
A. Correct. I was knowledgeable with this -- this work.
Q. What was the reason that these documents were sent out?
A. The idea was that that might possibly be a possibility of our agents that deal with small packers and selling our products for E-cigarette purposes. So we thought it would be a good idea to raise -- re-raise this warning.
Q. Does LB Chem maintain a list of the persons or companies to which it sent the documents that are in Exhibit 9?
A. I'll have to check.
Q. I want you to go to the third page of the exhibit. The one Bates Nod. 60.
A. Yes.

Q. And it's -- looks like a letter with a subject line of "Notice on Prohibition of Unauthorized Sales of Battery Cells."
A. Yes.
Q. To whom was that letter sent?
A. The agents and companies that we supply our cells to.
Q. How many agents and companies in the United States does LG provide its cells to?
A. I, personally, don't know the details of what businesses in the U.S. the -- what agents might have.
Q. What was the reason for sending this letter to the people buying these batteries from LG?
THE INTERPRETER: Counsel, it didn't come across. Could you repeat that, please?
MR. COWEN: Sure.
Q. (BY MR. COWEN) What was the reason for sending out the letter that's Page 3 of Exhibit 9?
A. This was to emphasize that just in case our customers that purchase our cells might consider businesses other than intended usage in businesses other than intended with our sales, don't do it. It's to emphasize that.
Q. And I'd like to turn to the second paragraph of that letter.

A. Yes.
Q. The first sentence is that "LGC has learned that consumers are able to and have been purchasing LGC's products directly from E-commerce websites and retail stores often for use in personal E-cigarette devices." Did I read that correctly?
A. Yes.
Q. And does LGC stand for LG Chem Limited?
A. Yes, that's the abbreviation.
Q. And how did LGC learn that consumers were purchasing their batteries for use in personal E-cigarette devices?
THE INTERPRETER: Counsel, could you repeat that question again, please.
MR. COWEN: Sure.
THE INTERPRETER: It just didn't come across.
Q. (BY MR. COWEN) How did LG Chem learn that consumers were purchasing its batteries from retail stores to use in personal E-cigarette devices?
THE INTERPRETER: Thank you.
A. In the -- if you have a look at the claim letters that were sent to us, the company, by general consumers, they state that the purchase was made over the internet or at vape shops. That's how we got to know. In other

words, LG Chem's customers are packers and agents and we were curious as to how individual and general consumers got their hands on and purchased the cells and in the letters that -- in those letters -- what those letters contained that piece of information.

Q. (BY MR. COWEN) Did LG Chem ever find out how the batteries ended up in retail stores being sold to people for E-cigarette use?

A. Initially, when we found out -- when we became aware of the E-cigarette issues and after becoming aware, a member of my team was sent to the U.S. to investigate and that person visited vapor shops to conduct use and find out how they purchased our products and through what route the products ended up there but nobody would tell us.

Q. Who was that person on your team that came to the U.S. to do the investigation?

A. Ms. Lee, Senior Manager. Last name Lee, L-E-E. When Ms. Lee visited the vapor shops and tried to determine how the batteries were being purchased, it was reported that when the batteries were being purchased, there was some cases -- well, they were in white paper boxes that sometimes had warning labels and sometimes did not have warning labels on the paper cases and when cells were being sold to the general consumers, in some

cases they were being sold together with plastic cases and sometimes not with the plastic cases.

Q. Were any documents created regarding Ms. Lee's investigation?

A. Just two things to what I've just said about that. There was a letter, if one would recall that, that was created.

Q. And does will LG Chem still have those documents?

A. I'll have to look.

Q. Going back to the third page of Exhibit 9. The last sentence of the second paragraph reads, "LGC strictly prohibits the sale of individual cells without protection circuits as such unprotected cells may create a fire hazard leading to serious bodily injury when mishandled."

Did I read that correctly?

A. Yes, that's correct.

Q. So the reason that LG Chem does not want these batteries sold for use in E-cigarettes is because they may create a fire hazard leading to serious bodily injury?

MR. HIGGINS: Objection. Form.

A. We're not just talking about E-cigarettes here. That's not the only thing that is the issue. Any and every application of lithium-ion cells, it must have a

protective circuit. I don't think that it's only the -- it is exclusively the people that use E-cigarettes that can carry around cells in their pockets and that they are the only people that could do it. For all the other applications that use cells and that in which the cells can be put in and out and taken out of the device that such a usage and such cells and such applications and there is a risk of danger because our products are only to be used together with a protective circuit as an embedded type.

Q. (BY MR. COWEN) Are HG2 batteries manufactured by LG Chem?

A. Yes. My company uses HG2 batteries.

Q. And are they manufactured in Korea?

A. Yes, they are manufactured in Korea.

Q. What is LG Chem's position as to whether the vape store that sold the battery to Mr. Flores was negligent for selling him an HG2 battery for use in an E-cigarette?

MR. HIGGINS: Objection. Form.

A. I have no knowledge on how the vape shop had sold it to the person that received the damage and I did not receive any explanation on what was explained and what was not but my thought is, on the E-cigarette issue, is that what's wrong is that the lithium-ion batteries are